IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY 96

05 APR 11 PM 3: 4

ROBERT R. DI TROLIO
CLERK, U.S. DIST. CT.
W.D. OF TN, MEMPHIS

|  |  |  |
|---|---|---|
| In re ACCREDO HEALTH, INC.<br>SECURITIES LITIGATION | )<br>)<br>)<br>)<br>)<br>) | Case No.:03-2216 - BBD<br>**CLASS ACTION** |

---

## ORDER DENYING THE MOTION OF DEFENDANTS TO DISMISS THE CONSOLIDATED COMPLAINT (DKT. # 105)

---

Before the Court is the motion of Accredo Health, Inc. ("Accredo"), David D. Stevens, and Joel R. Kimbrough (hereinafter collectively "Defendants") to dismiss the consolidated complaint of Plaintiffs[1] for violation of the Federal Securities Laws. Defendants assert that the consolidated complaint 1) fails to plead fraud with particularity, 2) fails to allege a strong inference of scienter, and 3) fails to state a claim against the individual Defendants for control person liability. The Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the following reasons, the Court denies Defendants' motion to dismiss.

## I.    PROCEDURAL AND FACTUAL BACKGROUND[2]

Defendants in the instant action are Accredo, a publicly traded company; David D. Stevens, Accredo's Chief Executive Officer ("CEO") and Chairman of the Board; and Joel R. Kimbrough, Accredo's Chief Financial Officer ("CFO") and Senior Vice President. Cons. Compl. ¶ 1. Plaintiffs

---

[1]Plaintiffs include Joan Ferrari, James Miles, David Stein, Vincent R. Angichiodo, Raphael Mbouwe, John Andrew Hokenson, Stanley Sved, Ken Altschuld, and Debra Swiman, individually and on behalf of all others similarly situated.

[2]The factual background is taken from the consolidated complaint and is deemed true for purposes of the instant order.

assert claims against Defendants for violations of § 10(b) of the Securities and Exchange Act of 1934

("Securities Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5,

on behalf of all purchasers of Accredo securities from June 16, 2002 through April 7, 2003 (the

"Class Period"). Plaintiffs also assert a claim against Defendants Stevens and Kimbrough, as control

persons, for violation of § 20(a) of the Securities Act, 15 U.S.C. § 78t(a). Id. ¶¶ 1, 12, 104, 110.

Accredo provides specialty retail pharmacy services. Id. ¶ 2. In November 2001, Defendants

Stevens and Kimbrough began the process of acquiring the Specialty Pharmacy Services division

("SPS") of Gentiva Health Services, Inc. ("Gentiva"). Id. ¶ 30. SPS distributed drugs and

administered antibiotics, chemotherapy treatments, nutrients and other medications to patients

suffering from acute or chronic diseases. Id. ¶ 3.

Accredo and Gentiva conducted due diligence of SPS beginning December 3, 2001, and

continuing until at least January 2, 2002. Id. ¶¶ 5(d), 31. At the due diligence meetings, the SPS

assets that Accredo sought to acquire were discussed among the parties. Id. ¶ 31. Defendant

Kimbrough, a Certified Public Accountant, was actively involved in the due diligence of SPS. Id.

¶ 5(d).

SPS's assets consisted primarily of $316 million in accounts receivable. Id. ¶ 31. SPS's

acute therapy division had nearly $60 million in uncollectible accounts receivable on its books as

of January 2, 2002. Id. Nonetheless, Defendants executed an acquisition agreement with Gentiva,

and on June 12, 2002, Accredo shareholders voted to authorize the purchase of SPS. Id. ¶¶ 4, 31.

Before the acquisition of SPS, Accredo reserved 10% of its gross patient receivables as an

allowance for doubtful accounts. Id. ¶ 32. During the due diligence of SPS, Defendants learned that

SPS's reserves for doubtful accounts were inadequate given the high days sales outstanding

2

("DSO")[3] of SPS's patient accounts receivable. Id. ¶¶ 5(a), 32. From July 2002 through April 2003,
Stevens and Kimbrough received monthly Aged Trial Balance ("ATB") reports that contained the
identification and age of each SPS account receivable, the days past due, and the percentage
likelihood that each would be collected. Id. ¶¶ 5(b), 28(a), 77-78, 84. The ATB reports showed that
SPS's accounts receivable, with a gross book value of $316 million, was impaired by almost $60
million. Id.

Defendants did not disclose the impairments of SPS's accounts receivable on Accredo's
2002 fourth quarter financial report. Id. ¶ 6. Defendants announced record financial results in the
2002 fourth quarter, 2003 first quarter, and 2003 second quarter. Id. ¶ 7. After announcing the 2002
fourth quarter "record" results, on August 26, 2002, Defendants Stevens and Kimbrough sold
123,750 shares of their Accredo stock for approximately $4.1 million. Id. ¶ 8. On January 8, 2003,
Defendants filed a shelf registration with the SEC to begin the sale of $500 million in Accredo
securities. Id. Defendants subsequently sold the SPS acute business that had value, but were unable
to sell the part of the business that included the uncollectible accounts receivable. Id. ¶ 7.

On April 8, 2003, Defendants announced that Accredo had not adequately reserved for the
accounts receivable associated with the SPS acquisition and that it would have to take a charge
against fiscal year 2003 earnings. Id. ¶ 9. Defendants took a $58.5 million charge to earnings,
resulting in a net loss of $17.8 million in the 2003 third quarter. Id., Ex. A. After this
announcement, Accredo's stock dropped over eleven dollars in one day, closing at $14.29, a drop
of approximately 63% from the Class Period high three months earlier. Id. ¶ 9. On May, 5, 2003,

---

[3]DSO is a financial metric that represents the average number of days it takes to collect
receivables.

Accredo sued its auditing firm, Ernst and Young, LLP. Accredo, however, did not prosecute the case. Id. ¶ 10.

On April 8, 2003, Joan Ferrari, individually and on behalf of all others similarly situated, filed the first complaint against Defendants related to the underlying occurrences alleged in the instant action. Thereafter, eight additional cases related to the same occurrence were initiated. On June 20, 2003, the Court consolidated these actions. On June 30, 2004, the Court appointed lead counsel. On September 15, 2004, Plaintiffs filed a consolidated complaint. Defendants move the Court to dismiss the complaint.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) enables a defendant to file a motion to dismiss for a plaintiff's failure to state a claim upon which relief can be granted. Motions to dismiss under Fed. R. Civ. P. 12(b)(6) are designed to test "whether a cognizable claim has been pleaded in the complaint." Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988). Dismissal under Fed. R. Civ. P. 12(b)(6) is appropriate when no set of facts exists which would entitle the plaintiff to recover. Hammond v. Baldwin, 866 F.2d 172, 175 (6th Cir. 1989). Essentially, it allows the court to dismiss meritless cases which would otherwise waste judicial resources and result in unnecessary discovery. See, e.g., Nietzke v. Williams, 490 U.S. 319, 326-27 (1989).

In reviewing a defendant's Rule 12(b)(6) motion to dismiss, a district court should construe the complaint in the light most favorable to the plaintiff and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. Meador v. Cabinet for Human Res., 902 F.2d 474, 475 (6th Cir. 1990), cert. denied, 498 U.S. 867

4

(1990). If an allegation is capable of more than one inference, it must be construed in the plaintiff's favor. Sinay v. Lamson & Sessions Co., 948 F.2d 1037, 1039-40 (6th Cir. 1991).

A district court may not grant a defendant's Fed. R. Civ. P. 12(b)(6) motion to dismiss based on its disbelief of the plaintiff's factual allegations. In Re Sofamor Danek Group, Inc., 123 F.3d 394 (6th Cir. 1997), cert. denied, Murphy v. Sofamor Danek Group, Inc., 523 U.S. 1106 (1998). It is not the court's function to weigh evidence or evaluate the credibility of witnesses. Miller v. Currie, 50 F.3d 373, 377 (6th Cir. 1995). A court will not consider any disputed questions of fact at this stage. Barnes v. Winchell, 105 F.3d 1111, 1114 (6th Cir. 1997). Rather, the court should accept all well-pleaded facts as true and not consider matters outside the pleadings. Hammond, 866 F.2d at 175. "In securities fraud cases, however, courts may consider the full text of SEC filings, prospectuses, and analysts' reports not attached to a plaintiff's complaint if they are integral to statements within the complaint." In re Firstenergy Corp. Sec. Litig., 316 F. Supp.2d 581, 591 (N.D. Ohio 2004) (citation omitted). Courts may also take judicial notice of public records and documents. Id. (citations omitted). The United States Supreme Court has held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Nietzke, 490 U.S. at 326-27; Lewis, 135 F.3d at 405 (6th Cir. 1997). Thus, the standard to be applied when evaluating a motion to dismiss for failure to state a claim is very liberal in favor of the party opposing the motion. Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976). Even if the plaintiff's chances of success are remote or unlikely, a motion to dismiss should be denied. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

## III.    ANALYSIS

### A.    Section 10(b) and Rule 10b-5 Claims

#### 1.    Pleading of Actionable Misstatements and Omissions of Material Fact

Defendants first assert that the complaint does not sufficiently allege claims for violation of

§ 10(b) of the Securities Act and Rule 10-b5, as required by 15 U.S.C. § 78u-4(b)(1) and Fed. R. Civ.

P. 9. More specifically, Defendants argue that the consolidated complaint fails to adequately specify

each statement alleged to have been misleading and the reasons why each statement was misleading.

As discussed *infra*, the Court finds that Plaintiffs sufficiently plead that Defendants made

misstatements.

The complaint asserts that during the Class Period, Defendants engaged in a scheme and

course of business whereby Defendants made false statements or failed to disclose adverse facts in

order to defraud or deceive purchasers of Accredo stock. Cons. Compl. ¶ 33. Plaintiffs maintain

that Defendants' scheme consisted of knowingly or recklessly manipulating Accredo's publicly-filed

financial statements and other statements by failing to appropriately report patient receivables and

allowances for doubtful accounts in connection with the acquisition of SPS. Id. ¶ 34. Plaintiffs

assert that Defendants' scheme served to 1) manipulate and overstate Accredo's financial statements

and financial results; 2) artificially inflate the price of Accredo's stock to allow insiders to profit by

selling Accredo stock; 3) cause Plaintiffs and other class members to purchase Accredo stock at

inflated prices; 4) enable Accredo to file a shelf registration with the SEC for the sale of $500

million of Accredo stock; and 5) allow Accredo to acquire SPS. Id. ¶ 33.

Section 10(b) of the Securities Act makes it unlawful, directly or indirectly, "[t]o use or

employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive

device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b). Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly. . . , (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To establish a claim pursuant to § 10(b) of the Securities Act and Rule 10b-5, a plaintiff must allege in connection with the purchase or sale of securities "(1) a misrepresentation or omission, (2) of a material fact, (3) made with scienter, (4) [which was] justifiably relied on by plaintiffs, [and that] (5) proximately caus[ed] them injury." In re Ford Motor Co. Sec. Litig., Class Action, 381 F.3d 563, 567 (6th Cir. 2004) (quoting Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001)). Moreover, in securities fraud cases, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In other words, allegations of securities fraud must satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b). In re Comshare, 183 F.3d at 548. Pursuant to Rule 9(b), when a plaintiff alleges fraud, "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). To satisfy this requirement of Rule 9(b), a plaintiff must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." In re SCB Computer

7

*Tech., Inc., Sec. Litig.,* 149 F. Supp. 2d 334, 343 (W.D. Tenn. 2001) (quoting Coffey v. Foamex, 2 F.3d 157, 161-62 (6th Cir. 1993)).

Defendants assert that the consolidated complaint fails to sufficiently plead that Defendants made misrepresentations or omissions of material fact. In support of their argument, Defendants argue that the consolidated complaint is deficient because it merely pleads fraud by hindsight, alleges nothing more than mismanagement, fails to adequately identify the confidential witnesses on which Plaintiffs rely, and provides nothing more than general allegations that Accredo's bad debt reserve was understated or that Defendants violated Generally Accepted Accounting Principals ("GAAP"). The Court must consider the consolidated complaint in its entirety to evaluate Defendants' arguments.

Plaintiffs allege that the following communications made by Defendants were false and misleading: 1) the June 16, 2002 press release; 2) the June 17, 2002 investor/analyst conference call; 3) the June 17, 2002 press release; 4) the August 26, 2002 press release; 5) the August 26, 2002, investor/analyst conference call; 6) the September 30, 2002 Form 10-K; 7) the November 4, 2002 press release; 8) the November 4, 2002 investor/analysis conference call; 9) the November 5, 2002 news Article in the *Commercial Appeal*; 10) the November 14, 2002 Form 10-Q; 11) the November 20, 2002 news article published in the *Commercial Appeal*; 12) the February 2, 2003, second quarter earnings conference call; and 13) the February 14, 2003 Form 10-Q. Consol. Compl. ¶¶ 35-38, 41-44, 47-50, 53-57.

      a.   June 16 and 17, 2002 Press Releases and June 17, 2002 Investor/Analyst Conference Call

The June 16, 2002 press release, entitled "Accredo Health, Inc. Increases Estimates for Fiscal

2003 As A Result of the Acquisition of the SPS Division," provided in pertinent part:

> With inclusion of estimated results from operations of the newly acquired SPS division, Accredo's revenues for fiscal 2003 are projected to be in the range of $1,450,000,000 to $1,500,000,000, up from the previous estimates of $760,000,000 to $780,000,000. Earnings per share estimates are being increased. . . .
>
> . . .
>
> Joel Kimbrough, Accredo's chief financial officer, added, "We are excited about the financial outlook for the combined companies and the immediate accretive value of the acquisition. The acquisition of the SPS division should create broader revenue diversification, higher gross profit margin percentages and increased cash provided from operations for the Company.

Consol. Compl.¶ 36. During the June 17, 2002 investor/analyst conference call hosted by Defendants, Defendants Stevens and Kimbrough discussed the 2002 fourth quarter earnings expectations. Id. Defendant Kimbrough stated:

> As a result of the [SPS] acquisition, we are now raising our estimates for the operating results, for fiscal year 2003 to the following: Revenues for fiscal year 2003 are projected to be in the range of $1.45 billion to $1.5 billion, up from the previous estimate of $760 million to $780 million. . . . In addition, we are also increasing our estimates of gross profit margin to a range of 19% to 20% from the previous range of 16% to 17%.

Id. ¶ 37. During the June 17 conference call, Defendant Kimbrough also responded to a question posited by an analyst concerning Accredo's DSO. Id. Defendant Kimbrough stated, "long story short in terms of answering your question, we're in the low 60s for Accredo, Gentiva numbers are in the 105 to 110 range, and the combined rates are from somewhere in the 85 to 86 day range." Id. The June 17, 2003 press release indicated that "Accredo gave a forecast for fiscal 2003 results on Sunday, which helped lift the stock nearly 6 percent. . . ."

Plaintiffs assert that Defendants knew that the statements made in the June 16 and 17, 2002 press releases and in the June 17, 2002 investor/analyst conference call were false and misleading

when they were made because Defendants Stevens and Kimbrough were aware that the reserve for SPS's gross patient receivables was grossly deficient given that approximately $60 million of SPS patient receivables were uncollectible and DSO was in excess of 300 days.  Id. ¶ 39(a).  Plaintiffs maintain that Defendants knew that these statements were false and misleading because they were involved in the due diligence of SPS and had discussions and negotiations regarding the terms of the asset purchase agreement, including the assets and liabilities to be acquired by Accredo.  Id. ¶ 68. As discussed *infra*, the complaint additionally includes the statements of confidential witnesses related to what Defendants Kimbrough and Stevens knew when they made the allegedly false or misleading statements.  Plaintiffs assert that the 2003 fiscal year earnings per share projections made by Defendants on June 16 and 17, 2002, would have been 114% lower if Defendants had timely written-off the impaired portion of Accredo's consolidated gross patient receivables totaling $58.5 million.  Id. ¶ 39(b).  The complaint continues to allege that Defendants statements resulted in the artificial inflation of the per share cost of Accredo stock.  Id. ¶ 40.

> b.  <u>August 26, 2002 Press Release and Investor/Analyst Conference Call and September 30, 2002 Form 10-K</u>

The August 26, 2002 press release provided *inter alia*:

> Accredo Health, Incorporated [] today reported record results for the quarter and year ended June 30, 2002.  Revenues for the quarter increased 51% to $188,242,000 compared to $124,413,000 for the same period in fiscal 2001.  For the year, revenues increased 41% to $653,573,000 compared to $462,140,000 in fiscal 2001. . . .

> Net income, before restructuring charges, increased 103% to $10,033,000, or $[0.24] per diluted share, for the quarter ended June 30, 2002 and 86% to $32,115,000, or $[0.79] per diluted share, for the year ended June 30, 2002.  These results include the recently acquired [SPS] Division of Gentiva Health Services, Inc. [] from June 14, 2002.

> . . .

10

"We are very pleased with the record revenues and earnings achieved in the fourth quarter as we again exceeded our estimates," said David D. Stevens, Accredo chairman and CEO. "We have made tremendous progress towards integrating the SPS division into our operations," continued Stevens. "The division immediately began contributing to our results on June 14, adding approximately $1.3 million of net income in the June quarter."

. . .

Joel Kimbrough. Accredo's chief financial officer, added, "We are pleased with the continued overall revenue growth in our core products and the integration thus far of the SPS division into the Accredo family companies. As a result, we are confirming our previously announced FY 2003 estimates. We estimate that for our fiscal year ending June 30, 2003, we will achieve revenues in the $1,450,000,000 to $1,500,000,000 range and earnings per share of $[1.25] to $[1.31]." These estimates are subject to numerous assumptions and uncertainties.

In addition to the previous discussions, we are providing the following questions and answers related to our operating results and our on-going business:

. . .

Q2) What were the G&A and bad debt margins, excluding the impact of the SPS acquisition?

A2) The general and administrative expenses increased to 7.4% in the June quarter from 6.6% in the March quarter. The increase is primarily a result of product mix changes and the reduction in revenues from $178.5 million in the March quarter to $158.2 million in the June quarter as the SYNAGIS(R) season effectively ended in the March quarter. Bad debts decreased from 1.0% in the March quarter to .9% in the June quarter.

. . .

Q4) What was the final purchase price paid for the SPS division?

A4) On June 13, we paid Gentiva . . . $207.5 million in cash and 5,060,976 shares of our common stock. In accordance with generally accepted accounting principles, the value of the stock portion of the purchase price was $48.75 per share for total stock consideration of $246.7 million. The total preliminary purchase price of $454.2 million is subject to adjustment based upon the net book value of the SPS division as determined by a final closing balance sheet. We have reduced the purchase price by $4.1 million to $450.1 million based upon the closing balance sheet prepared by Gentiva.

11

Q5) What is the status of the disposition of the SPS division's Acute pharmacy division?

A5) As previously disclosed, we have reorganized the product lines that were obtained in the acquisition and some of the products formerly classified as acute by Gentiva are considered chronic therapies by us. We remain on schedule in our effort to exit the acute pharmacy business obtained in the acquisition and expect to dispose of this business before our self-imposed deadline of December 31, 2002.

. . .

Q7) Are Mr. Stevens and Mr. Kimbrough planning to certify the contents of the Company's financial reports?

A7) Yes, the Company will file its Annual Report on Form 10-K with the Securities and Exchange Commission on or before September 28, 2002. As the respective CEO and CFO of the Company, Mr. Stevens and Mr. Kimbrough will make the certifications required by the "Sarbanes-Oxley Act of 2002" with regard to the Company's 10-K for the fiscal year ended June 30, 2002.

Id. ¶ 41.  On the same day, Defendants conducted an investor/analyst conference call in which Defendants Stevens and Kimbrough discussed the allegedly false and misleading 2002 fourth quarter financial results. Id. ¶ 42.  During the conference call, Defendant Kimbrough answered questions related to Accredo's financial results. Id. Defendant Stevens indicated that the SPS acquisition added approximately $1.3 million in profits to Accredo's income statement through the end of June 2002. Id.

On September 30, 2002, Accredo filed its Form 10-K with the SEC, which included its financial results for the 2002 fourth quarter and 2002 fiscal year.[4] Id. ¶ 44. Defendants Stevens and Kimbrough signed the Form 10-K, reaffirming Accredo's financial results. Id. The September 30, 2002 Form 10-K further stated with respect to Accredo's financial results and conformity with

---

[4]On August 28 and 29, 2002, Defendants Stevens and Kimbrough sold 123,750 cumulative shares of their Accredo stock at prices greater than $33.50.

GAAP:

> In our opinion, the consolidated financial statement referred to above present fairly, in all material respects, the financial position of Accredo. . . at June 30, 2001 and 2002, and the results of its operations and its cash flows for each of the three years in the period ended June 30, 2002, in conformity with accounting principles generally accepted in the United States. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects information set forth herein.

Id.

Plaintiffs assert that Defendants knew that the statements made in the August 26, 2002 press release and conference call and the September 30, 2002 Form 10-K were false and misleading when made because Defendants Stevens and Kimbrough were aware that the reserve for SPS's gross patient receivables was grossly deficient given that approximately $60 million of SPS patient receivables were uncollectible and DSO was in excess of 300 days. Id. ¶ 45(a). Plaintiffs maintain that Defendants knew this because they were involved in the due diligence of SPS and had discussions and negotiations regarding the terms of the asset purchase agreement, including the assets and liabilities to be acquired by Accredo. Id. ¶ 68. The complaint further alleges that a timely write-off of the impaired portion of Accredo's consolidated gross patient receivables of $58.5 million would have reduced Accredo's reported receivables, operating income, and earnings per share for the 2002 fiscal year and 2002 fourth quarter. Id. ¶ 45. Plaintiffs contend that for the fiscal year ending June 30, 2002, Accredo should have reported:

> (i) net accounts receivable of $276.8 million as opposed to $335.3 million - an overstatement of 17.4%; (ii) a [sic] $8.8 million loss of income from operations as opposed to a profit of $49.7 million - an overstatement of 117.7%; (iii) a $28.7 million net loss of (excludes tax effect) as opposed to net income of $29.8 million - an overstatement of 196.6%; and (iv) a loss per share of - $0.70 (excludes tax effect) as opposed to EPS of $0.73 - an overstatement of 196.6%.

Id. (emphasis omitted). Plaintiffs assert that for Accredo's 2002 fourth quarter ending June 30, 2002, Accredo should have reported:

> (i) net accounts receivable of $276.8 million as opposed to $335.3 million - an overstatement of 17.4%; (ii) a $45.0 million loss of income from operations as opposed to a profits of $13.5 million - an overstatement of 433.9%[;] (iii) a $50.8 million net loss of income (excludes tax effect) as opposed to net income of $7.7 million - an overstatement of 761.9%; and (iv) a loss per share of approximately - $1.86 (excludes tax effect) as opposed to EPS of $0.28 - an overstatement of 761.9%.

Id. (emphasis omitted).

> c. November 4, 2002 Press Release and Investor/Analyst Conference Call; November 5, 2002 News Article; and November 14, 2002 Form 10-Q

The November 4, 2002 press release issued by Accredo stated in pertinent part:

First Quarter Earnings Increase 138%

Accredo. . . today reported record results for its first quarter ended September 30, 2002.  Net earnings increased 138% to $13,970,000. . . for the quarter ended September 20, 2002 compared to $5,877,000. . . for the same period in fiscal 2002....

"We are extremely pleased with the company's performance including our record revenues and earnings achieved in the first quarter as we again exceeded our estimates," said David D. Stevens, Accredo chairman and CEO.  "This continued growth is being driven by an increase in patients and market share from our core products, the addition of new products and the integration of our recent acquisitions," continued Mr. Stevens.  "Furthermore, our increased margin is the result of better product mix, favorable product acquisition terms and the economic benefits of operating a significantly larger company.  Many of these gains have been accelerated due to the rapid integration of the [SPS] division into the Accredo family of companies.  The results generated by the SPS acquisition continue to exceed our expectations."

. . .

Mr. Kimbrough added, "We are pleased with the continued overall revenue growth, which will be supplemented in the next two quarters with revenue from the seasonal drug Synagis. . . . [D]ue to the improvement in margins achieved in the September quarter, we are increasing our previously announced earnings estimates. We estimate that for our fiscal year ending June 30, 2003, we will achieve earnings

per share of $[1.33] to $[1.38]. This is an increase from the estimates announced last quarter, when we gave earnings per share estimates of $[1.25] to $[1.31]. . . ."

In addition to previous discussions, we are providing the following questions and answers related to our operating results and our on-going business:

. . .

Q3) Why was bad debt expense 2.1% of revenue compared to .8% in the same quarter last year?

A3) The increase in bad debts as a percentage of revenues is primarily due to the SPS acquisition, which resulted in an increase in the percentage of our revenues that were reimbursed by major medical benefit plans versus prescription card benefits. The majority of the reimbursements provided by major medical benefit plans are subject to much higher co-payment and deductible amounts resulting in higher bad debts.

Q4) What is the status of the disposition of the SPS division's acute pharmacy business?

A4) On January 2, 2002, upon the announcement of our intent to purchase the SPS division of Gentiva. . . , we stated our intent to retain only certain chronic therapies included in the SPS's revenues. The remaining acute pharmacy services business would be held for sale and disposed of prior to December 31, 2002.

After reviewing offers for the sale of the acute pharmacy services business, we have decided to retain the acute accounts receivable and either sell the remaining acute branch assets to individual regional home infusion therapy providers or close branches that are not sold. Accordingly, negotiations have been entered into and some contracts executed. We expect to receive approximately $30 to $35 million in cash from the collection of the acute accounts receivable and the sale of the remaining acute assets. We expect to have fully divested the acute business by December 31, 2002.

Id. ¶ 47. Accredo conducted an investor analyst conference call during which Defendants Stevens

and Kimbrough discussed the 2003 first quarter results. Id. ¶ 48. Defendant Kimbrough stated that

"combined DSO, including SPS and acute business was 91 days at September 30th. . . . [W]e are

increasing our previously announced earnings estimates. We estimate the fiscal - - for the fiscal year

15

ending June 30th, 2003, we will achieve earnings per share in the range of $[1.33] to $[1.38] per share. . . ." Id. Defendant Kimbrough continued to opine that he was pleased with the first quarter results, despite concerns that a sharp change in DSOs would occur as a result of the SPS acquisition. Id. Defendant Kimbrough further stated that, despite Defendants' concerns, there was no sharp change in DSOs as a result of the SPS acquisition. Id.

In a November 5, 2002 news article, Defendant Stevens stated that "Accredo's profit margin improved because it shipped out more high-profit products, negotiated good terms for acquiring products and reaped benefits from operating a larger company than before the SPS deal." Id. ¶ 49. The November 14, 2002 Form 10-Q that Defendants filed with the SEC included Accredo's financial results for the 2003 first quarter and was signed by Defendants Stevens and Kimbrough. Id. ¶ 50. The November 14, 2002 Form 10-Q mirrored the earlier statements made by Defendants concerning the 2003 first quarter. Id. The Form 10-Q further provided that it complied with GAAP, and in management's opinion, "all adjustments. . . considered necessary to present fairly the condensed consolidated financial position, results of operations and cash flows of Accredo. . . have been included." Id.

Plaintiffs contend that Defendants knew that these statements were materially false and misleading when they made them because Defendants were involved in the due diligence of SPS and knew that the reserve for SPS's gross patient receivables was grossly deficient given that approximately $60 million of SPS patient receivables were uncollectible and DSO exceeded 300 days. Id. ¶ 51(a). Plaintiffs further allege that as of September 30, 2002, Defendants should have reported:

(i) net accounts receivable of $272.2 million as opposed to $330.7 million - an

16

overstatement of 17.7%; (ii) a $32.6 million loss of income from operations as
opposed to a $25.9 million gain - an overstatement of 226.1%; (iii) a $44.5 million
net loss of income (excludes tax effect) as opposed to net income of $14.0 million -
an overstatement of 418.8%; and (iv) a loss per share of approximately - $.92
(excludes tax effect) as opposed to EPS of $0.29 - an overstatement of 418.8%.

Id. ¶ 51(b) (emphasis omitted).

> d.    November 20, 2002 News Article; February 2, 2003 Earnings Conference Call;
> February 3, 2003 Press Release; and February 14, 2003 Form 10-Q

On November 20, 2002, a news article appeared in *The Commercial Appeal*, wherein

Defendant Stevens was attributed with making statements that

> Accredo. . . revenues should grow to nearly $1.5 billion in its year ending June
> 30, 2003. . . .

> Accredo's acquisition in June of the [SPS] division of Gentiva. . . basically doubled
> Accredo's annual revenues. . . .

> "We're ahead of the game on timing and cost" in merging SPS into Accredo....

>              . . .

> Even with the sale of SPS's acute care business, revenues for the year ending
> June 30, 2003, should rise 18 to 22 percent over the combined companies'
> performance in the last year. . . .

Id. ¶ 53. On February 2, 2003, Accredo conducted an earnings conference call for the 2003 second

quarter.  Id. ¶ 55.  Defendants Stevens and Kimbrough participated in the call.  Id.  Defendant

Stevens provided responses to questions and requests posed to him:

> Q44. (Michael Schecter, Mitchell Partners): Break down the DSOs between the SPS
> receivables and your existing business receivables[.]

> A. (David Stevens): The existing ACDO receivables pre-SPS were going to run in
> the mid-60 day range.  The SPS receivables are running approaching 100 days.
> That's coming down some as the acute business, which is older, starts to be collected.
> On a composite basis, we're at 88 days.

17

Q45. (Michael Schecter, Mitchell Partners): How much time is that SPS receivable business taking up?

A. (David Stevens): We've have [sic] brought down the acute business some. We have a ways to go: $30m worth of acute receivables to collect. Hopefully we're making some progress on that. We clearly have to concentrate on it because it's real dollars and something I want to collect. We have consolidated all of the chronic receivables into Pittsburgh, which was one of the first things we did over the last six months, and left all the acute collection in Dallas. We will collect those receivables there and then phase out that financial services unit there. We're starting to reorganize and get some more structure involved. It does take up some time. Don't get me wrong. But it's part of the normal thing we have to do as part of the integration. Cash flow has been surprisingly good and we have made more progress on DSO to this point than I thought we would. We have a way to go but we're making some good progress.

Id. ¶ 55 (emphasis omitted). On February 3, 2003, Defendants issued a press release, which stated in pertinent part:

Second Quarter Earnings Increase 136%, Revenues Increase 127%

Accredo. . . today reported record results for its second quarter ended December 31, 2002. . . .

"We are extremely gratified with our financial performance achieved in the second quarter as we again exceeded our earnings estimates," said David D. Stevens, Accredo chairman and CEO. "These results were attained during a period of significant transition for the company as we successfully integrated the [SPS] acquisition," continued Mr. Stevens. "During the quarter, we completed the merger of virtually all of the operational and sales functions from the SPS acquisition. The one significant remaining integration task started in October as we began migrating from the previous Accredo Health information system onto the SPS platform and will result in one common system throughout the company. . . . In addition, we exited the acute pharmacy business, acquired through the SPS acquisition, prior to our self-imposed deadline of December 31, 2002. . . ."

. . .

In addition to the previous discussions, we are providing the following questions and answers related to our operating results and our on-going business:

. . .

18

> Q3) Why was bad debt expense 2.1% of revenue compared to .6% in the same quarter last year?
>
> A3) The increase in bad debts as a percentage of revenues is primarily due to the SPS acquisition, which resulted in an increase in the percentage of our revenues that were reimbursed by major medical benefit plans versus prescription card benefits. The majority of the reimbursements provided by major medical benefit plans are subject to much higher co-payment and deductible amounts resulting in higher bad debts.

Id. ¶ 56. (emphasis omitted). On February 14, 2003, Accredo filed its Form 10-Q with the SEC, which included the financial results for the 2003 second quarter. Id. ¶ 57. Defendants Stevens and Kimbrough signed the February 14, 2003 Form 10-Q, which purported to comply with GAAP. Id. Plaintiffs assert that Defendants knew that the statements they made in the press release, conference call, news article, and Form 10-Q were materially false and misleading when they made them because Defendants were involved in the due diligence of SPS and knew that the reserve for SPS's gross patient receivables was grossly deficient given that approximately $60 million of SPS patient receivables were uncollectible and DSO exceeded 300 days. Id. ¶ 59 (a). Plaintiffs further allege that as of December 31, 2002, Defendants should have reported:

> (i) net accounts receivable of $296.8 million as opposed to $355.3 million - an overstatement of 16.5%; (ii) a $28.1 million loss of income from operations as opposed to a $30.4 million gain - an overstatement of 192.5%; (iii) a $41.5 million net loss of income (excludes tax effect) as opposed to net income of $17.0 million - an overstatement of 343.1%; and (iv) a loss per share of approximately -$.85 (excludes tax effect) as opposed to EPS of $0.35 - an overstatement of 343.1%.

Id. ¶ 58(b) (emphasis omitted).

      2.    <u>Allegations Related to Why Defendants Knew That Their Statements Were False and Misleading</u>

To support the contention that the aforementioned statements were false and that Defendants knew or recklessly disregarded that they were false when made, the consolidated complaint includes

the statements of seven confidential witnesses.  Confidential Witness 1 ("CW1") was a former

Gentiva and Accredo financial services unit manager who worked for Defendants during the Class

Period.  Id. ¶ 28(a).  CW1 asserted that he/she observed that Defendant Kimbrough, others who

reported directly to Defendant Kimbrough, and Defendant Kimbrough's accounts receivable expert

were directly involved in the due diligence process for the SPS acquisition.  Id. CW1 also stated that

the ATB reports were provided to Defendants Kimbrough and Stevens and that they knew that the

acute therapy segment of SPS suffered from DSO of 300 days prior to its acquisition by Accredo.

Id.

Confidential Witness 2 ("CW2"), a former Gentiva national director of credit and collections,

worked for Gentiva until shortly before the start of the Class Period.  CW2 indicated that he/she

knew that once Gentiva's accounts receivable reached 200 days, they were deemed "impossible to

collect."  CW2 further stated that he/she was aware that Gentiva had reclassified old or uncollectible

accounts receivable as current, which made the SPS acute therapy 300 day DSO appear lower than

it was.  Id. ¶¶ 28(b), 75.

Confidential Witness 3 ("CW3"), a former Gentiva and Accredo Accounts Receivable

Specialist Team Leader who worked for Defendants during the Class Period, alleged that he/she

observed that the actual collectible value of the SPS acute therapy segment's accounts receivable at

the time of acquisition was approximately $10 million.  Id. ¶ 28(c).  CW3 alleged that he/she

observed that Defendants Stevens and Kimbrough were aware of the true, but unreported value, of

the SPS accounts receivable no later than July 2002 because Defendants Stevens and Kimbrough

received monthly ATB reports after the acquisition.  Id. ¶¶ 28(c), 77.  The ATB reports for June 2002

through March 2003 contained and analyzed information regarding the aging of SPS's accounts

receivable. 78. The ATB reports included specific information related to SPS receivables, including the age of each receivable, how many days each was past due, and the percentage of each account receivable likely to be collected. Id. CW1 and CW3 asserted that at the time of the acquisition it was widely known that only $10 million of the $70 million of the SPS acute therapy accounts receivable were collectible. Id. ¶¶ 75, 77.

Confidential Witness 4 ("CW4"), a former Gentiva and Accredo Accounts Receivable Collections Specialist who worked for Defendants during the Class Period, alleged that he/she participated in meetings with the Accredo due diligence team before the Accredo's acquisition of SPS. Id. ¶ 28(d). The due diligence team, which included Defendant Kimbrough, specifically reviewed the issue of uncollectible accounts receivable at SPS. Id. Similarly, Confidential Witness 6 ("CW6"), a former Gentiva and Accredo Accounts Receivable Supervisor who worked for Defendants for a few months after SPS's due diligence, asserted that Defendants Stevens and Kimbrough knew of the impairment of SPS's accounts receivables because they began receiving the ATB reports after the acquisition. Id. ¶ 28(f), 78.

CW1 and CW6 asserted that the SPS acute therapy segment's DSO ranged from 300 to 360 days. Id. ¶ 75. The SPS acute therapy segment's DSO was approximately 235 days greater than Accredo's DSO prior to the acquisition. Id. Confidential Witness 5 ("CW5"), a former Gentiva and Accredo Accounts Receivable Supervisor who worked for Accredo during the Class Period, asserted that he/she observed that when Gentiva's accounts receivable were older than 200 days, and they were deemed impossible to collect. Id. ¶ 28(e).

3.     <u>Sufficiency of Collective Allegations</u>

a.     <u>Misstatements and Omissions</u>

As detailed *supra*, the complaint includes allegations that Defendants made materially false and misleading statements with respect to two areas: 1) the financial value of the SPS acquisition, and 2) the financial performance of Accredo. Likewise, the complaint continues to assert that Defendants knew or recklessly disregarded that these statements were false. To establish the falsity of the statements or omissions, Plaintiffs included the statements of confidential witnesses, some of whom assert that Defendant Kimbrough and Stevens were provided monthly ATB reports beginning in July 2002 that detailed information related to SPS's receivables, including the likelihood of their being collected. Moreover, the complaint asserts that Defendant Kimbrough was directly involved in the due diligence of SPS, and as such, knew prior to the acquisition of SPS that SPS's acute therapy segments accounts receivables were impaired. The Court finds that these allegations sufficiently specify the statements alleged to have been misleading, the reason or reasons why the statements are misleading, and the facts on which Plaintiffs' belief is formed.

Contrary to Defendants' assertion, Plaintiffs provide more than just Defendants' April 8, 2003 Press Release and other post-class period statements to substantiate that Defendants' statements and omissions were allegedly false. In <u>In re Comshare</u>, the Court determined that the plaintiffs' reliance on the defendants' revenue recognition errors to establish a misstatement or omission was made was insufficient because the plaintiffs failed to allege facts establishing that the defendants knew or could have known of the errors previously. <u>In re Comshare</u>, 183 F.3d at 553 (stating that the plaintiffs' "claim that a subsequent revelation of the falsehood of previous statements implies scienter lacks merit, since '[m]ere allegations that statements in one report should have been made

22

in earlier reports do not make out a claim of securities fraud.'"). Thus, if a plaintiff relies solely on accounting "errors," subsequent accounting filings or statements, or subsequent news releases in order to establish that a previous statement was false, the plaintiff must also specifically allege that the defendants knew or should have known of the falsity of the statements before making them. Id. In the instant case, the complaint includes allegations of confidential witnesses who contend that Defendants Stevens and Kimbrough knew the status of the SPS accounts receivable and of SPS's DSO prior to making statements that overstated Accredo's financial position and overstated the value of SPS receivables. As such, Plaintiffs have pled more than "fraud by hindsight."

Defendants further argue that the complaint is deficient because it simply alleges mismanagement based on Defendants' accounting decisions. Defendants rely on Sante Fe Industries, Inc. v. Green, 430 U.S. 462 (1977), in which the Court determined that claims alleging only corporate mismanagement and breach of fiduciary duty are not actionable. Santa Fe Indus., Inc., 430 U.S. at 474 (determining that breach of fiduciary duty, without any deception, misrepresentation or nondisclosure, does not violate Securities Exchange Act or related SEC rule that prohibits the use of manipulation and deception). However, a misrepresentation is actionable if "a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement." In re Sirrom Capital Corp. Sec. Litig., 84 F. Supp. 2d 933, 941 (M.D. Tenn. 1999) (citing Hayes v. Gross, 982 F.2d 104, 106 (3d Cir.1992)). As noted *supra*, in the instant case, the complaint asserts deceptive conduct, misrepresentations, and nondisclosure of material facts by Defendants. Defendants' assertion, therefore, that the instant action is like Sante Fe Industries, Inc., is unavailing.

Defendants next argue that Plaintiffs' reliance on confidential witnesses does not provide the

required specificity in pleading such claims. As discussed *infra*, the allegations in the complaint related to the confidential witnesses are sufficiently particularized and detailed for the Court to consider them in determining whether Plaintiffs have alleged with specificity that Defendants made material misstatements or omissions.

The amount of detail the plaintiff must provide to describe a confidential witness varies based on the circumstances of the case. In re Metawave Communications Corp. Sec. Litig., 298 F. Supp. 2d 1056, 1069 (W.D. Wash. 2003) (citing In re Secure Computing Corp. Sec. Litig., 184 F. Supp. 2d 980, 988 (N.D. Cal. 2001)). The confidential witness need not be named, see Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000), "however, allegations attributed to unnamed sources must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge." In re Metawave Communications Corp. Sec. Litig., 298 F. Supp. 2d at 1069 (quoting In re NorthPoint Communications Group, Inc., Sec. Litig., 221 F. Supp. 2d 1090, 1097 (N.D. Cal. 2002)). The complaint must plead "'with substantial specificity' how confidential witnesses 'came to learn of the information they provide in the complaint.'" Id. (citation omitted). To determine if the statements of the confidential witnesses are sufficient, courts may consider "the level of the detail provided by the confidential witnesses, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." Id. (quoting In re Cabletron Sys., Inc., 311 F.3d 11, 29- 30 (1st Cir. 2002)). The confidential witness must be speaking from personal knowledge, not "merely regurgitating gossip and innuendo." Id. (citation omitted).

As detailed *supra*, the consolidated complaint includes the statements of seven confidential witnesses. The consolidated complaint asserts that CW1, CW3, CW4, CW5, CW6, and CW7

worked for both Gentiva and Accredo. All of these witnesses, except CW6, worked for Accredo during the Class Period. The complaint continues to assert the specific positions these confidential witnesses held at Accredo, all of which were related to accounts receivable/financial services. The Court finds that the complaint establishes with a reasonable certainty the bases of these confidential witnesses' knowledge of their assertions concerning what Defendants allegedly knew. Likewise, the Court finds that the number of confidential witnesses, the level of detail of their allegations, and the positions held by the confidential witnesses support the consideration of the confidential witnesses' allegations in determining whether Defendants made misstatements or omissions.[5]

Some of the confidential witnesses indicated that they were aware that Defendants Stevens and Kimbrough received monthly ATB reports beginning in July 2002. For a plaintiff to rely "on the existence of reports as a means of establishing knowledge, she must 'include adequate corroborating details,' such as the 'sources of her information with respect to the reports, how she learned of the reports, who drafted them, . . . which officers received them,' and 'an adequate description of their contents.'" In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1087-88 (9th Cir. 2002) (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 985 (9th Cir. 1999)). Plaintiffs alleged that the ATB reports contained "specific information about SPS receivables, including the

---

[5]Defendants argue that Plaintiffs' reliance on excessive DSO, as asserted by confidential witnesses, is legally deficient to establish that Defendants' allocation of bad debt expense was inappropriate. DSO shows "the average number of days that a receivable remains outstanding prior to collection." In re Health Mgmt., Inc., 184 F.R.D. 40,41 (E.D.N.Y. 1999). The Court agrees that a general allegation that DSO was "high" or established that accounts were "uncollectible," without more, cannot support a determination that the defendant inappropriately allocated the bad debt expense. In the instant case, however, Plaintiffs allege that Accredo's own DSO was substantially lower than SPS acute therapy segment's DSO. Moreover, the complaint alleges that SPS's DSO greatly exceeded the industry standard, being approximately 245 days greater than Accredo's closest competitor. Accordingly, the Court finds that DSO may be used to evaluate whether Defendants adequately allocated Accredo's doubtful account reserve.

age of each receivable, how many days each was past due, the percentage of each account receivable likely to be collected[,]" as well as identifying approximately $60 million in uncollectible accounts receivable.  Consol. Compl.¶ 78.  Plaintiffs cited specific reports, the approximate dates of the reports, and the contents of reports.  Plaintiffs further alleged that some of the confidential witnesses were aware of the reports and of their dissemination to Defendants.  The Court finds, therefore, that the allegations of the confidential witnesses concerning the reports may be considered to determine the sufficiency of Plaintiffs' complaint.  Considering the preceding allegations, the Court finds that Plaintiffs have specified the statements alleged to have been misleading, the reasons why the statements are misleading, and the facts on which Plaintiffs' beliefs are based.

        b.    <u>Scienter</u>

Defendants next contend that Plaintiffs have failed to plead a strong inference of scienter. "'Scienter' is 'mental state embracing intent to deceive, manipulate or defraud.'"  <u>In re Comshare, Inc. Sec. Litig.</u>, 183 F.3d at 548 (<u>quoting</u> <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 194 (1976)). Scienter may either be established by showing that the defendant made the misstatements with knowledge or recklessness.  With respect to statements of present or historical fact, plaintiffs may "satisfy the scienter requirement 'by alleging facts giving rise to a strong inference of recklessness.'" <u>In re Ford Motor Co. Sec. Litig., Class Action</u>, 381 F.3d 563, 567 (6th Cir. 2004) (<u>quoting</u> <u>In re Comshare</u>, 183 F.3d at 549).  "Recklessness is 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.  While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'"  <u>Fidel v. Farley</u>, 392 F.3d 220, 227 (6th Cir. 2004) (<u>quoting</u> <u>Mansbach v. Prescott, Ball & Turben</u>, 598 F.2d 1017, 1024 (6th Cir.1979)). Moreover, recklessness is "a mental state apart from negligence and akin to conscious disregard."

Id. (quoting In re Comshare, 183 F.3d at 550).

With respect to forward-looking statements,[6] pursuant to the safe harbor provision enunciated in 15 U.S.C. § 78u-5(c)(1), defendants are liable for such statements only if 1) they were material; 2) the defendants "had actual knowledge that the statements were false or misleading"; and 3) the defendants did not identify them as forward-looking or qualify them with "meaningful cautionary language." In re Ford Motor Co., 381 F.3d at 568 n. 3 (quoting Helwig, 251 F.3d at 547-48). If the forward-looking statements are accompanied by meaningful cautionary language, then the statement is protected regardless of whether or not the defendants knew they were false. Miller v. Champion Enterprises Inc., 346 F.3d 660, 672 (6th Cir. 2003). However, if the forward-looking statements are

---

[6]A forward-looking statement is:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

not accompanied by meaningful cautionary language, the plaintiff must establish that the defendants had actual knowledge of their false or misleading nature.  Id.

A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

> Inferences must be reasonable and strong--but not irrefutable.  "Strong inferences" nonetheless involve deductive reasoning; their strength depends on how closely a conclusion of misconduct follows from a plaintiff's proposition of fact.  Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder.  Rather, the "strong inference" requirement means that plaintiffs are entitled only to the most plausible of competing inferences.

Miller, 346 F.3d at 673.

To determine whether Plaintiffs sufficiently plead scienter, the Court must first determine whether each of the allegedly false statements discussed *supra* were forward looking or historical/present in nature.  Upon examination of the statements, the Court finds that the following statements were forward looking: 1) the June 16, 2002 press release; 2) the June 17, 2002 press release; and 3) November 20, 2002 News Article.  Plaintiffs have alleged that these statements were not accompanied by meaningful cautionary language and that Defendants knew that the statements were false when they made them because they knew about the uncollectible accounts of SPS's acute therapy division and the 300 day DSO prior to the statements being made.  The Court finds that Plaintiffs have sufficiently alleged that Defendants knew that the statements were false when they made them and that meaningful cautionary language was not given.  Accordingly, the statements are not entitled to safe harbor protection.

The following statements are deemed to be either historical or present in nature: 1) the August 26, 2002 investor/analyst conference call; 2) the September 30, 2002 Form 10-K; 3) the

November 14, 2002 Form 10-Q; 4) the February 2, 2003 earnings conference call; and 5) the Form

10-Q. As such, Plaintiffs must establish that Defendants were reckless in making these statements.

The following statements are primarily historical or present in nature: 1) June 17, 2002

investor/analyst conference call; 2) August 26, 2002 press release; 3) November 4, 2002 press

release; 4) November 4, 2002 investor/analyst conference call; and 5) February 3, 2003 press release.

Plaintiffs have alleged that Defendants knew that these statements were false when they made them,

given their awareness of the 300 day DSO and SPS's uncollectible accounts receivable of $60

million.

Defendants further contend that the June 16, 2002 press release; the June 17, 2002 press

release; the November 4, 2002 press release; and the February 3, 2003 press release are not

actionable because they are statements of corporate optimism. "A misrepresentation or an omission

is material only if there is a substantial likelihood that 'a reasonable investor would have viewed the

misrepresentation or omission as "having significantly altered the total mix of information made

available."'" In re Ford Motor Co. Sec. Litig., 381 F.3d at 570 (citations omitted). Reading the

statements made by Defendants in the June 16, 2002 press release, the June 17, 2002 press release,

the November 4, 2002 press release, and the February 3, 2003 press releases, the Court finds that

each is material in its entirety given that each contains detailed, substantive information related to

Accredo's performance.    The Court will now consider whether the complaint alleges a strong

inference of scienter. Plaintiffs contend that eight bases, considered together, support a finding of

a strong inference of scienter. These bases are: 1) the divergence between internal reports and

Defendants' public statements; 2) Defendants' April 8, 2003 admission that Accredo's financial

results were misstated; 3) material violations of GAAP; 4) unusual and suspicious insider trading;

29

5) Defendants' Class Period bonuses and compensation; 6) Defendants' motivation to meet earnings estimates; 7) the filing of a $500 million shelf registration when Accredo's stock was artificially inflated; and 8) Defendants' executive positions. Considering the complaint in its entirety, the Court finds that Plaintiffs have alleged a strong inference of scienter, *i.e.*, that Defendants recklessly or knowingly made misstatements or omissions.

The United Stated Court of Appeals for the Sixth Circuit employs a totality of the circumstances approach to evaluate whether the complaint pleads a strong inference of scienter. See Helwig, 251 F.3d at 552. Among the factors courts should consider are:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

Id. (citation omitted).

The complaint alleges that Defendants knew, based on Defendants' involvement in the SPS

30

due diligence and Defendants' monthly receipt of the ATB reports, that the SPS acute therapy segment had approximately $60 million in uncollectible receivables.  The complaint continues to assert that despite Defendants' knowledge that these accounts receivable were uncollectible, Defendants made statements that over represented Accredo's financial position.

The Court finds that Plaintiffs' allegations of knowledge or reckless disregard premised on Defendants' involvement in the due diligence process of SPS are not sufficient to establish a strong inference of scienter.  As CW2 admitted, Gentiva allegedly manipulated its accounts receivables, and as a result, SPS's acute therapy DSO appeared lower than it actually was.  The Court cannot conclude, therefore, that Defendants would have known that the statements they made were misstatements based on their participation in the SPS due diligence process.  In fact, as Defendants argue, the terms of the Acquisition Agreement would have allowed Accredo to lower its purchase price of SPS based on the uncollectible receivables.  Likewise, Defendants could have allocated $58.6 million to goodwill in June 2002.  Thus, an inference that Defendants knowingly or recklessly made misstatements based on knowledge obtained during the due diligence process is not the most plausible of competing inferences.

The complaint continues to allege, however, that Defendants knowingly or recklessly made misstatements about the financial condition of Accredo because Defendants received ATB reports, which allegedly included data that indicated that SPS's acute therapy segment had a DSO of 300 days and further indicated that approximately $60 million of SPS's accounts receivable were uncollectible.  The confidential witnesses further alleged that a DSO of 300 days would make an account receivable nearly impossible to collect.  More importantly, however, Accredo's own DSO of 65 days and the DSO of Accredo's closest competitor were substantially lower than the SPS acute

31

therapy segment's DSO of 300 days.  Defendants allegedly received the information contained in

the ATB reports beginning in June 2002, after the acquisition of SPS.  Defendants continued to

receive these ATB reports on a monthly basis.  Thus, Defendants allegedly knew that the statements

they were making concerning Accredo's revenue and earnings were misstatements because a

substantial part of the revenue included in Defendants' projections and financial evaluations were

not collectible for at least two fiscal periods before Defendants' April and May 2003 press releases.

Defendants' subsequent determination that a charge of $58.5 million against Accredo's fiscal

2003 earnings income was necessary further supports Plaintiffs' assertion that Defendants knew or

recklessly disregarded that the SPS acute therapy segment's accounts receivable were impaired.  As

the Court previously noted, fraud by hindsight, by itself, is insufficient to establish that a statement

was a misstatement when made.  Likewise, such allegations, standing alone, do not establish a strong

inference that Defendants knowingly or recklessly made statements that misrepresented Accredo's

financial position.  Plaintiffs allege, however, that Defendants knew or recklessly disregarded for at

least two fiscal periods prior to taking a charge to income that approximately $60 million of SPS's

accounts receivable were uncollectible.  In light of this,  Defendants' subsequent determination that

a charge to income was necessary is probative of whether Defendants knowingly or recklessly made

misstatements that served to inflate Accredo's stock price.

Plaintiffs also contend that Defendants' alleged violations of GAAP support a finding that

Defendants knowingly or recklessly made misstatements related to Accredo's financial position.

"The failure to follow GAAP is, by itself, insufficient to state a securities fraud claim."  Chandler,

364 F.3d at 684 (quoting In re Comshare, 183 F.3d at 553).  A complaint alleging "accounting

irregularities" does not raise a strong inference of scienter if it "allege[s] no facts to show that

32

Defendants knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did." Id. (quoting In re Comshare, 183 F.3d at 553). As such, "a strong inference of scienter cannot be drawn from speculative and conclusory allegations of GAAP violations." Id. (citation omitted). However, "the nature of the misapplication of accounting principles--in terms of number, size, timing, frequency, and context--is relevant circumstantial evidence of a defendant's state of mind." Id. (citing In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp.2d 620, 635 (E.D. Va. 2000)).

Plaintiffs contend that Defendants delayed incurring a charge to income in the hope that they could sell the SPS acute therapy segment. As such, Plaintiffs maintain that Defendants violated GAAP by failing to comply with Statement of Financial Accounting Standard ("SFAS") No. 5, Accounting for Contingencies,[7] which provides:

> An estimated loss from a loss contingency [e.g., collectibility of receivables]... shall be accrued by a charge to income if both of the following conditions are met: (a) Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements... (b) The amount of loss can be reasonably estimated.....

Consol. Compl. ¶ 86. As a result of this alleged violation, Plaintiffs assert that Defendants overstated net income for first quarter 2003 by 418.8% and second quarter 2003 by approximately 343.1%.

The Court finds that the complaint sufficiently alleges that Defendants knew or should have known of the alleged accounting errors, such that the alleged GAAP violations should be considered in determining whether Defendants acted with knowing or reckless scienter. Plaintiffs have alleged

---

[7]Plaintiffs additionally allege that Defendants violated a variety of other generally accepted accounting principles. The Court, however, does not need to consider those allegations for purposes of the instant motion.

that there were "red flags," such as the 300 day DSO and $60 million dollars worth of uncollectible accounts receivable, that should have been obvious to Defendants, or that Defendants consciously disregarded. Those red flags were allegedly indicators that a charge to income was required before Defendants relied on those receivables in making their public statements. See In re Comshare, Sec. Litig., 183 F.3d at 554. Moreover, the amount of the alleged overstatements, the timing of the charge to income, and the fact that Defendants were allegedly aware of the uncollectible nature of these receivables for over nine months weigh in favor of considering the GAAP violation as evidence of Defendants' scienter.

The Court finds that the aforementioned allegations are sufficient for Plaintiffs to meet their burden of alleging the existence of a strong inference of scienter, *i.e.*, that Defendants allegedly knew, or it was so obvious that a reasonable person should have known, that their press releases, financial statements, and conference calls included misstatements or omissions. Moreover, Plaintiffs' assertions that Defendants sold stock after announcing "record" results, received bonuses during the Class Period, filed a $500 million shelf registration on January 24, 2003, and held executive positions further support a finding of scienter. The Court recognizes that such allegations standing alone cannot support a finding of scienter. However, when considered in the aggregate, the allegations discussed *supra* are sufficient for the Court to determine that Plaintiffs alleged a strong inference of scienter. Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' claims for violation of § 10(b) and Rule 10b-5.

B.    Section 20(a) of the Securities Exchange Act Claim

Defendants assert that Plaintiffs' claim for control person liability pursuant to Section 20(a) of the Exchange Act should be dismissed. Section 20(a) of the Securities Act provides:

34

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce that act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To establish a claim pursuant to Section 20(a), Plaintiffs must allege that 1) "the 'controlled person' . . . committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder. . . ," 2) the controlling person defendant "directly or indirectly controlled the person liable for the securities law violation." PR Diamonds, Inc. v. Chandler, 364 F.3d at 696. Defendants contend that Plaintiffs failed to establish a Section 20(a) claim because Plaintiffs failed to allege a primary violation of the securities law. As discussed *supra*, however, the Court has determined that Plaintiffs have sufficiently pled a claim pursuant to § 10(b) of the Securities Act. Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' claim pursuant to Section 20(a) of the Securities Act.

## IV.    CONCLUSION

For the aforementioned reasons, the Court denies Defendants' motion to dismiss.

**IT IS SO ORDERED** this _\_\_11th\_\_\_ day of April, 2005.

BERNICE B. DONALD
UNITED STATES DISTRICT COURT

35

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 119 in case 2:03-CV-02216 was distributed by fax, mail, or direct printing on April 12, 2005 to the parties listed.

---

Linda F Burnsed
CHERNAU, CHAFFIN & BURNSED
424 Church St
Ste 1750
Nashville, TN 37219

John H. Goselin
ALSTON & BIRD
1201 West Peachtree St.
Atlanta, GA 30309--342

Samuel H. Rudman
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
200 Broadhollow Rd.
Ste. 406
Melville, NY 11747

Shpetim Ademi
ADEMI & O'REILLY, LLP
3620 East Layton Ave.
Cudahy, WI 53110

Quitman Robins Ledyard
BOROD & KRAMER
80 Monroe Ave.
Ste. G-1
Memphis, TN 38103

Fred Taylor Isquith
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
270 Madison Ave.
New York, NY 10016

Carol V. Gilden
MUCH SHELIST FREED DENENBERG AMENT & RUBENSTEIN, P.C.
191 N. Wacker Dr.
Ste. 1800
Chicago, IL 60606--161

Ramzi Abadou
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
401 B St.
Ste. 1700
San Diego, CA 92101

Steven J. Brogan
JONES & DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001--211

William S. Lerach
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
401 B St.
Ste. 1700
San Diego, CA 92101

Paul Kent Bramlett
BRAMLETT LAW OFFICES
P.O. Box 150734
Nashville, TN 37215--073

Guri Ademi
ADEMI & O'REILLY, LLP
3620 East Layton Ave.
Cudahy, WI 53110

Stanley M Chernau
CHERNAU, CHAFFIN & BURNSED
424 Church St
Ste 1750
Nashville, TN 37219

David A. Rosenfeld
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
200 Broadhollow Rd.
Ste. 406
Melville, NY 11747

Ronald B. Hauben
ERNST & YOUNG
5 Times Square
New York, NY 10036--653

Oni A. Holley
ALSTON & BIRD
1201 West Peachtree St.
Atlanta, GA 30309--342

James E. Gauch
JONES & DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001--211

Nadeem Faruqi
FARUQI & FARUQI, LLP
320 East 39th St.
New York, NY 10016

Karen M. Hanson
LOCKRIDGE GRINDAL NAUEN, PLLP
100 Washington Ave., South
Ste. 2200
Minneapolis, MN 55401

Mary-Helen Perry
JONES & DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001--211

Michael E. Moskovitz
MUCH SHELIST FREED DENENBERG AMENT & RUBENSTEIN, P.C.
191 N. Wacker Dr.
Ste. 1800
Chicago, IL 60606--161

Douglas M McKeige
BERNSTEIN LITOWITZ BERGER & GROSSMAN
1285 Ave of the Americas
38th Floor
New York, NY 10019

Douglas S. Johnston
BARRETT JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN 37201--160

Dixie W. Ishee
WOOD CARLTON & ISHEE
1407 Union Ave.
Ste. 711
Memphis, TN 38103

Timothy L. Miles
BARRETT JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN 37201--160

Martin D. Chitwood
CHITWOOD & HARLEY
1230 Peachtree St., N.E.
2900 Promenade II
Atlanta, GA 30309

Mark Solomon
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
401 B St.
Ste. 1700
San Diego, CA 92101

F. Guthrie Castle
CASTLE & ASSOCIATES
6555 Quince Rd.
Ste. 109
Memphis, TN 38119

Erin P. McDaniel
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
401 B St.
Ste. 1700
San Diego, CA 92101

Gregory M. Egleston
BERNSTEIN LIEBHARD & LIFSHITZ, LLP
10 East 40th Street
New York, NY 10016

Nancy Kaboolian
ABBEY GARDY, LLP
212 East 39th St.
New York, NY 10016

Eitan Misulovin
BERNSTEIN LITOWITZ BERGER & GROSSMAN
1285 Ave of the Americas
38th Floor
New York, NY 10019

Gregory M. Nespole
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
270 Madison Ave.
New York, NY 10016

Javier Bleichmar
BERNSTEIN LITOWITZ BERGER & GROSSMAN
1285 Ave of the Americas
38th Floor
New York, NY 10019

Heather Guilette Walser
JONES & DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001--211

Richard A. Lockridge
LOCKRIDGE GRINDAL NAUEN, PLLP
100 Washington Ave., South
Ste. 2200
Minneapolis, MN 55401

George E. Barrett
BARRETT JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN 37201--160

Peter Q. Bassett
ALSTON & BIRD
1201 West Peachtree St.
Atlanta, GA 30309--342

Douglas F. Halijan
BURCH PORTER & JOHNSON
130 N. Court Avenue
Memphis, TN 38103

Emily C. Komlossy
GOODKIND LABATON RUDOFF & SUCHAROW
3595 Sheidan St.
Ste. 206
Hollywood, FL 33021

Trig R. Smith
LERACH COUGHLIN STOIA GELLER RUDMAN &
401 B St.
Ste. 1700
San Diego, CA 92101

Karen M. Campbell
GARY K. SMITH & ASSOCIATES, PLLC.
100 Peabody Place
Ste. 1050
Memphis, TN 38103

Mel E. Lifshitz
BERNSTEIN LIEBHARD & LIFSHITZ, LLP
10 East 40th Street
New York, NY 10016

Gary K. Smith
GARY K. SMITH & ASSOCIATES, PLLC.
100 Peabody Place
Ste. 1050
Memphis, TN 38103

Kevin Hunter Sharp
PRESTON & SHARP, P.C.
216 19th Ave.,N.
Nashville, TN 37203

David A. Thorpe
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
401 B St.
Ste. 1700
San Diego, CA 92101

B. J. Wade
GLASSMAN EDWARDS WADE & WYATT, P.C.
26 N. Second Street
Memphis, TN 38103

Marc A. Topaz
SCHIFFRIN & BARROWAY
3 Bala Plaza East
Ste. 400
Bala Cynwyd, PA 19004

Lauren S. Antonino
CHITWOOD & HARLEY
1230 Peachtree St., N.E.
2900 Promenade II
Atlanta, GA 30309

Saul C Saul C. Belz
GLANKLER BROWN
One Commerce Sq.
Ste. 1700
Memphis, TN 38103

Marc S. Henzel
LAW OFFICES OF MARC S. HENZEL
273 Montgomery Ave.
Ste. 202
Bala Cynwyd, PA 19004

Jef Feibelman
BURCH PORTER & JOHNSON
130 N. Court Avenue
Memphis, TN 38103

Mark C. Gardy
ABBEY GARDY, LLP
212 East 39th St.
New York, NY 10016

Darren J Robbins
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
401 B St.
Ste. 1700
San Diego, CA 92101

Robert M. Roseman
SPECTOR ROSEMAN & KODROFF, P.C.
1818 Market St.
Ste. 2500
Philadelphia, PA 19103

Amy E Amy E. Ferguson
GLANKER BROWN
One Commerce Square
Seventeenth Floor
Memphis, TN 38103

Tor Gronborg
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
401 B St.
Ste. 1700
San Diego, CA 92101

Honorable Bernice Donald
US DISTRICT COURT