UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TENNESSEE

WESTERN DIVISION

| | | |
|---|---|---|
| In re ACCREDO HEALTH, INC. SECURITIES LITIGATION | ) ) ) ) | Civil Action No. 03-2216-BBD |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) | LEAD PLAINTIFFS' MEMORANDUM IN OPPOSITION |
| ALL ACTIONS. | ) ) ) | TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| | ) ) | ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ iii

I.      INTRODUCTION ................................................................................... 1

II.     THE EVIDENCE CREATES GENUINE ISSUES OF
        FACT ...................................................................................................... 8

        A.      Defendants Willfully And Recklessly Disregarded
                The Accuracy Of The SPS Balance Sheet ................................ 8

                1.      Defendants Acquired SPS – Along With
                        Millions Of Dollars In Overvalued
                        Receivables ...................................................................... 8

                2.      Defendants Knew Of Significant Red Flags
                        Relating To SPS's Accounts Receivable
                        Value ............................................................................. 10

                3.      Defendants Acquired SPS Without
                        Disclosing Its True Value To Shareholders ................. 12

                4.      Defendants Used Outdated And Inaccurate
                        Collections Data Resulting In Materially
                        Inaccurate Financial Results ......................................... 13

        B.      Defendants Finally Documented The Reserve
                Calculation And Knowingly Concealed The
                Findings ................................................................................... 13

        C.      The Fraud And The True Value Of The SPS
                Division Are Revealed ............................................................ 14

        D.      Defendants' Cover-Up Confirms The Fraud .......................... 15

III.    LEGAL STANDARD ON SUMMARY JUDGMENT ......................... 17

IV.     DEFENDANTS' STATEMENTS REGARDING THE SPS
        ACCOUNTS RECEIVABLE WERE FALSE AND
        MISLEADING WHEN MADE ............................................................ 19

V.      DEFENDANTS HAVE NOT AND CANNOT
        ESTABLISH THE ABSENCE OF A GENUINE ISSUE
        OF MATERIAL FACT ON THE ELEMENT OF
        SCIENTER ............................................................................................ 22

        A.      Defendants Knowingly Issued False Financial
                Statements And Recklessly Ignored The
                Overvalued Receivables .......................................................... 25

B.    Summary Judgment Is Inappropriate Where Stevens
And Kimbrough Signed And Issued False Sarbanes-
Oxley Certificates ..................................................................................... 30

C.    A Reasonable Jury Could Conclude That
Defendants Had Both The Motive And The
Opportunity To Defraud Accredo's Shareholders ................................. 31

D.    Defendants Were Responsible For Accredo's False
Financial Statements .............................................................................. 34

E.    Defendants' Reliance On Selected Motion To
Dismiss Opinions Does Not Support Summary
Judgment ............................................................................................... 37

VI.    DEFENDANTS' MISSTATEMENTS WERE MATERIAL
TO ACCREDO INVESTORS ......................................................................... 39

A.    The SPS Receivables Were A Material Part Of
Accredo's Financial Statements ............................................................ 40

B.    The Truth On The Market Defense Does Not Apply ........................... 42

C.    Accredo's Financial Statements And The SPS
Reserves Were Not "Forward Looking Statements" ............................ 43

VII.    LOSS CAUSATION IS NOT APPROPRIATELY
DISPUTED ....................................................................................................... 44

VIII.    THE INDIVIDUAL DEFENDANTS WERE CONTROL
PERSONS ......................................................................................................... 48

IX.    CONCLUSION .................................................................................................. 48

# **TABLE OF AUTHORITIES**

Cases                                                                                    Page

*In re Accredo Health, Inc. Sec. Litig.,*
    2006 WL 1716910 (W.D. Tenn. 2006)...................................................................1

*Alaska Elec. Pension Fund v. Adecco S.A.,*
    434 F. Supp. 2d 815 (S.D. Cal. 2006)............................................................37, 38

*Aldridge v. A.T. Cross Corp.,*
    284 F.3d 72 (1st Cir. 2002).............................................................................29

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. at 255...............................................................................................18

*Basic, Inc. v. Levinson,*
    485 U.S. 224 (1988)........................................................................4, 6, 18, 39

*Benjamin v. Kim,*
    1999 WL 249706 (S.D.N.Y. Apr. 28, 1999)......................................................22

*Berson v. Applied Signal Technology, Inc.,*
    2008 WL 2278670 (9th Cir. 2008) ..................................................................43

*Brewer v. Lincoln Int'l Corp.,*
    148 F. Supp. 2d 792 (W.D. Kan. 2000) ...........................................................40

*Burket v. Hyman Lippitt, P.C.*
    2008 WL 1837355 (E.D. Mich. April 23, 2008) ...............................................23

*In re Cardinal Health Inc. Sec. Litig.,*
    426 F. Supp. 2d 688 (S.D. Ohio 2006) ........................................................32, 44

*Caremark, Inc. v. Coram Healthcare Corp.,*
    113 F.3d 645 (7th Cir. 1997) ..........................................................................45

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)........................................................................................17

*City of Monroe Employees Retirement System v. Bridgestone Corp.,*
    399 F.3d 651 (6th Cir. 2005) ......................................................................19, 32

*In re Columbia Sec. Litig.,*
    155 F.R.D. 466 (S.D.N.Y. 1994) .................................................................42, 43

*In re Comshare Inc. Sec. Litig.,*
    183 F.3d at 548 ..............................................................................................22

*In re Daou Systems, Inc. Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005) .................................................................45

*In re Direct General Corp. Sec. Litig.*,
  398 F. Supp. 2d 888 (M.D. Tenn. 2005).................................................21

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005).........................................................7, 18, 44, 45

*In re Enron Corp. Securities, Derivative & "Erisa" Litigation*,
  2005 WL 3504860 (S.D. Tex. Dec. 22, 2005).......................................18

*EP MedSystems, Inc. v. EchoCath, Inc.*,
  235 F.3d 865 (3d Cir. 2000).....................................................................45

*Epstein v. Itron, Inc.*,
  993 F. Supp. 1314 (E.D. Wash. 1998)...............................................6, 23

*Fidel v. Farley*,
  392 F.3d 220 (6th Cir. 2004) ...............................................................22, 24

*In re FirstEnergy Corp. Sec. Litig.*,
  316 F. Supp. 2d 581 (N.D. Ohio 2004)................................................32, 33

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d. Cir. 2000)...................................................................42

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) ........................................................... passim

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)...................................................................................23

*In re JWP Inc. Securities Litigation*,
  928 F. Supp. 1239 (S.D.N.Y. 1996).......................................................22

*Kane v. Madge Networks N.V.*,
  2000 WL 33208116 (N.D. Cal. May 26, 2000)....................................38

*Lattice Semiconductor Sec. Lit.*,
  2006 WL 538756 (D. Or. Jan. 3, 2006) ................................................30

*Levinson v. Basic Inc.*,
  786 F.2d 741, 749 (6th Cir. 1986),
  *rev'd on other grounds*, 485 U.S. 224 (1988).......................................18

*Michaels Bldg. Co. v. Ameritrust Co., N.A.*,
  848 F.2d 674 (6th Cir. 1988) .................................................................20

*Miller v. Material Sciences Corp.*,
    9 F. Supp. 2d 925 (N.D. Ill. 1998) .......................................................................22

*Mittman v. Rally's Hamburgers, Inc.*,
    278 F. Supp. 2d 831 (W.D. Ky. 2003)..................................................................42

*In re Motorola Sec. Litig.*,
    2007 WL 487738 (N.D. Ill. Feb. 8, 2007) ..................................................... passim

*In re NUI Sec. Litig.*,
    314 F. Supp. 2d 388 (D.N.J. 2004) .................................................................22, 43

*Payne v. DeLuca*,
    433 F. Supp. 2d 547 (W.D. Pa. 2006).................................................................38

*In re PEC Solutions, Inc. Sec. Litig.*,
    125 Fed. App'x. 490 ........................................................................................38, 39

*In re PMA Capital Corp. Sec. Litig.*,
    2005 WL 1806503 (E.D. Pa. July 27, 2005).........................................................22

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ....................................................................22, 31, 34

*In re Proquest Securities Litigation*,
    527 F. Supp. 2d 728 (E.D. Mich. 2007).................................................................30

*In re PSS World Med., Inc. Sec. Litig.*,
    250 F. Supp. 2d 1335 (M.D. Fla. 2002).................................................................44

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) ............................................................................44

*Shapiro v. UJB Financial Corp.*,
    964 F.2d 272 (3d Cir. 1992)...................................................................................43

*In re Sirrom Capital Corp. Sec. Litig.*,
    84 F. Supp. 2d 933 (M.D. Tenn. 1999).................................................................21

*Stavroff v. Meyo*,
    1997 WL 720475 (6th Cir. 1997) ....................................................................37, 39

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)..............................................................................5, 23, 24

*In re Telxon Corp. Sec. Litig.*,
    133 F. Supp. 2d 1010 (N.D. Ohio 2000)...............................................................44

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)..................................................................................6, 18, 39, 41

*U.S. v. DeSantis*,
    134 F.3d 760 (6th Cir. 1998) .................................................................................40

*In re Unicapital Corp. Sec. Litig.*,
    149 F. Supp. 2d 1353 (S.D. Fla. 2001) .................................................................42

*In re Unumprovident Corp. Sec. Litig.*,
    396 F. Supp. 2d 858 (E.D. Tenn. 2005).................................................................21

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ...............................................................................23

Statutes, Rules & Regulations

15 U.S.C.
    § 78u-5(b)(2)(A) .............................................................................................43, 44
    § 78u-5(c)(1)(A)(i)...................................................................................................43
    § 7241 .....................................................................................................................30

17 C.F.R. 202.5(d) ......................................................................................................29

Federal Rules of Civil Procedure
    Rule 56..............................................................................................................1, 5, 37

Secondary Authorities

Hon. Bernice B. Donald and William C. Plouffe, Jr., *The Summary Judgment Process:*
    *When the Solution Becomes Part of the Problem*,
    194 F.R.D. 262, 266-267 (2000)........................................................................5, 18

Louisiana School Employees' Retirement System and Debra Swiman (together, "Lead Plaintiffs") respectfully submit this opposition to Defendants' Fed. R. Civ. P. 56 motion for summary judgment.  Filed concurrently herewith are Lead Plaintiffs' Response to Defendants' Statement of Undisputed Facts ("RSUF"), Supplemental Statement of Undisputed Facts in Support of Lead Plaintiffs' Opposition to Motion for Summary Judgment ("SSUF"), Declaration of Trig R. Smith in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Smith Decl.") and Motion to Exclude and Strike the Attorney Affidavits of J. Allen Overby and Randall Thomas.

I.      <u>INTRODUCTION</u>

This is a securities fraud class action brought by Accredo Health, Inc. ("Accredo" or the "Company") shareholders against Accredo, and its former top executives, David D. Stevens and Joel R. Kimbrough (collectively "Defendants"), for violations of the Securities Exchange Act of 1934 (the "Exchange Act").  Lead Plaintiffs represent the certified class of all purchasers and acquirers of Accredo securities during the period June 16, 2002 through April 7, 2003 (the "Class Period").  *See In re Accredo Health, Inc. Sec. Litig.*, 2006 WL 1716910 (W.D. Tenn. 2006).

Five years ago, Accredo shareholders brought this suit following disclosures that Defendants had fraudulently inflated the value of Accredo's assets and issued false financial statements from June 2002 through April 2003.  Now, Lead Plaintiffs have developed extensive evidence which directly supports the allegations in their Consolidated Complaint for Violation of the Federal Securities Laws ("Complaint"), and establishes that Defendants violated §§ 10(b) and 20(a) of the Exchange Act, causing nearly $200 million in damages to Accredo shareholders.

Driven by a desperate effort to increase the size of Accredo, and unable to do so organically, Defendants pursued the acquisition of Gentiva Health Services, Inc.'s ("Gentiva") Specialty Pharmaceutical Services Division ("SPS Division" or "SPS") in late 2001.  On January 3, 2002, Defendants announced the deal to buy SPS, and touted the acquisition to the market as "immediately accretive."  Accredo's stock price reacted positively, jumping 26%.  While risks were identified internally and red flags were raised about the largest asset associated with the SPS acquisition – the accounts receivable – Defendants forged ahead and completed the acquisition in June 2002.

In doing so, Defendants failed to disclose that the SPS accounts receivable were overvalued by more than $50 million and that outdated, *"stale"* data was being utilized to calculate the associated allowance for doubtful accounts in violation of Generally Accepted Accounting Principles ("GAAP").  Defendants' false statements and omissions covered up the materially overstated value of the SPS receivables and related accounting errors, and obfuscated the fact that the SPS acquisition would not be immediately accretive.

Six months after the acquisition, a junior finance executive at Accredo reviewed the SPS accounts receivable reserve and immediately uncovered a $50 million shortfall in the allowance for doubtful accounts.  As defendant Kimbrough, Accredo's then Chief Financial Officer ("CFO"), admitted when confronted with the staggering size of the accounting error, "*[t]here's no question that's material within the reading of the financial statements for our readers.*"[1] SSUF ¶38.  Defendants' admission, however, came far too late for Accredo's investors.

On April 8, 2003, ten months after the SPS acquisition, Defendants finally acknowledged that the value of the SPS receivables was materially overstated and that the allowance for the

---

[1]  All emphasis added and citations omitted unless otherwise noted.

doubtful SPS accounts receivable was inadequate.  As a securities analyst covering Accredo reported in response to Defendants' disclosures, "if [the SPS] deal had been communicated off of modest accretion . . . then it is likely that ACDO shares would have traded down on the [January 2, 2002] announcement[s], not up, which would certainly have made the deal much more costly to the company."  SSUF ¶47; RSUF ¶128.  Shareholders reacted immediately and harshly.  Accredo's stock price plummeted 44%, from $25.40 per share to $14.29 per share in a single day.  All together, Accredo shareholders, including the Louisiana School Employees Retirement System ("LSERS") and Mrs. Swiman, lost nearly $200 million as a result of Defendants' fraud.

On May 5, 2003, Defendants announced that Accredo would be forced to increase the allowance for doubtful accounts and took a "special charge" of $58.5 million.  Also on May 5, 2003, after investors filed this class action and in an effort to deflect the blame for their false and misleading statements, Defendants fired and sued their outside auditors, Ernst & Young LLP ("E&Y").  Defendants' complaint against E&Y, which Defendants completely disregard in their moving papers, admits that the SPS receivables were overvalued by as much as $53.3 million during the Class Period.  Defendants' complaint further concedes that, "the collections rates and other data used in the method for calculating the SPS Division's allowance for doubtful accounts *were not updated after September 30, 2000*, and *as a result the SPS Division's method for calculating its allowance for doubtful accounts generated materially inaccurate results . . . for all financial periods after September 2000."*  SSUF ¶¶26, 33.  Defendants also admitted that the "failure to use the correct and pertinent available data and the misuse of stale data . . . resulted in the SPS Division's Financial Statements *not being fairly presented in accordance with GAAP*" and that the massive losses suffered by Accredo investors on April 8, 2003 "*result[ed] from the*

***understatement of the reserves for doubtful accounts related to the accounts receivable for the SPS Division***." SSUF ¶¶25-26.

In sum, Defendants have conceded that the financial statements relied upon by Accredo's investors during the Class Period were erroneous, that the SPS receivables were materially overvalued by as much as $53.3 million, that the false financials were the result of the "***failure to use the correct and pertinent available data and the misuse of stale data***" and that the disclosure of this failure caused Accredo's stock price to plummet 44%. SSUF ¶¶24, 33, 49. What Defendants left out of their complaint against E&Y and public pronouncements – indeed, what they have tried to keep hidden from investors – is the fact that they were specifically informed in December 2001, ***six months before the Class Period***, that the SPS allowance for doubtful accounts was being calculated using the very stale data upon which they premised their lawsuit against E&Y, and that they recklessly disregarded known, critical red flags identifying that the allowance for the SPS accounts receivable was grossly understated. Given the fundamental requirement and purpose of the federal securities laws to ensure a philosophy of full disclosure, this is a clear case of securities fraud. *Basic, Inc. v. Levinson*, 485 U.S. 224, 230 (1988) ("there cannot be honest markets without honest publicity.")

Ignoring a plethora of damning admissions and other material evidence, Defendants argue that, as a matter of law, Lead Plaintiffs cannot prove scienter, materiality, loss causation or control person liability. *See* Defendants' Memorandum In Support Of Their Motion For Summary Judgment ("Defs. MSJ" or "Defendants' Motion"). Not only are Defendants' assertions wholly unsupported by the record, but Defendants further attempt to cloud the record by leveling serious accusations that Lead Plaintiffs' counsel have "grossly exaggerated and misrepresented" factual allegations and engaged in "bad faith conduct." *See* Defs. MSJ at 1, 33,

45.   These personal attacks are unrelated to the inquiry on summary judgment and provide no

basis for granting a Rule 56 motion.    Far worse, Defendants' attacks misrepresent the

documentary evidence and sworn testimony and are blatantly and demonstrably incorrect.  *See*

Smith Decl., (discussing both contemporaneous records of Lead Plaintiffs' investigation and the

evidentiary record developed in this case establishing the veracity of Lead Plaintiffs' allegations

and refuting Defendants' spurious accusations).[2]

Once past the personal attacks, it is obvious that Defendants' motion is premised on self-

serving conjecture that ignores critical evidence.  In doing so, Defendants pay no heed to learned

advice on the limited application of a motion for summary judgment:

> Too often, it appears, motions for summary judgment are presented which claim
> that there are no genuine issues of material fact when, in fact, there are clear and
> obvious genuine issues of fact which are apparent in the record of which the
> moving attorney should have been aware before filing the motion . . . .  [I]t is
> improper and likely an abuse of process for an attorney to file a motion for
> summary judgment ***while ignoring available evidence which clearly and
> obviously creates a genuine issue of material fact.***

Hon. Bernice B. Donald and William C. Plouffe, Jr., *The Summary Judgment Process: When the*

*Solution Becomes Part of the Problem*, 194 F.R.D. 262, 266-267 (2000).  For each challenged

element, there is substantial evidence which not only establishes genuine issues of material fact,

but proves Defendants' liability for securities fraud.

The element of "scienter" concerns whether the Defendants acted with the required state

of mind, whether Defendants knowingly or recklessly failed to disclose material information to

shareholders.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007).  The

strict standards of the Private Securities Litigation Reform Act ("PSLRA") "puts securities fraud

claims in the interesting posture of requiring plaintiffs to plead more than they must prove at

---

[2]  Defendants' counsel should certainly be familiar with Rule 11 of the Federal Rules of Civil Procedure and know
full well how to bring a motion for sanctions.  If Defendants truly want to pursue their unsupported accusations of
misconduct, they are free to take that course of action.

trial, where a simple inference of scienter is sufficient to support a jury's verdict." *See, e.g.* *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1323-24 n.9 (E.D. Wash. 1998). *See also* Order Denying the Motion of Defendants' To Dismiss the Consolidated Complaint [Docket No. 119] ("MTD Order") at 26-34 (finding that the facts alleged by Lead Plaintiffs *are sufficient*). Now, the totality of Lead Plaintiffs allegations, which the Court previously found supported a strong inference of scienter, have been established by the evidentiary record and buttressed by Defendants' own admissions and additional evidence of Defendants' knowing and reckless disregard of the materially overvalued SPS receivables. *See* § V., *infra*.

Materiality focuses on whether an alleged false statement or omission would have been viewed by the reasonable investor as having altered the "total mix" of information available. *Basic*, 485 U.S. at 231-32; *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Defendants concede, as they must, that the overstatement of the SPS receivables by more than $50 million was material to the Company's shareholders, but argue that (1) there is *no evidence* the receivables were overvalued during the Class Period (Defs. MSJ at 12-17) and, despite clear evidence to the contrary, (2) the truth about the receivables and Accredo's accounting errors was already known to shareholders (Defs. MSJ at 40-41). On the first argument, Defendants' own documents, including their complaint against E&Y, not only create a genuine issue of material fact, but prove that the SPS receivables were materially overvalued at all times during the Class Period. *See* § VI.A., *infra*. On the second argument, Defendants' reliance on the "truth-on-the-market defense" is misplaced. There was no disclosure prior to April 8, 2003 that the SPS receivables were materially overvalued and Defendants' suggestion that the mere identification of the SPS days sales outstanding ("DSO") provided shareholders with all material information is wrong. *See* § VI.B., *infra*.

6

Finally, to prove loss causation, Accredo shareholders need only establish that a disclosure connected to the alleged fraud resulted in a decline in the value of Accredo's stock price. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Defendants do not actually argue that there is no evidence of the connection between the fraud and the undisputed April 8, 2003 decline in Accredo's stock price, but only claim that Lead Plaintiffs have not ***proven*** how much of the April 8, 2003 decline was caused by the disclosure of the fraud. Defs. MSJ at 41-44. Of course, Lead Plaintiffs are not required to ***prove*** any element on summary judgment – they only have to establish that there is a genuine issue of material fact. Ultimately, it will be up to a jury to determine whether and how much of the decline in Accredo's stock price was the result of Defendants' fraud. *In re Motorola Sec. Litig.*, 2007 WL 487738, at \*39 (N.D. Ill. Feb. 8, 2007). Notably, Defendants have already ***admitted*** that the 44% drop in Accredo's stock price on April 8, 2003 was the "result [of] the understatement of the reserves for doubtful accounts related to the accounts receivable for the SPS Division." SSUF ¶49. Accordingly, if summary judgment is appropriate, it is in favor of Lead Plaintiffs on this element. *See* § VII., *infra*. *See also* Lead Plaintiffs' Motion For Partial Summary Judgment [Docket No. 360] ("Lead Plaintiffs' MSJ") at 11-13.

In short, Defendants' baseless attacks on Accredo's shareholders and willful ignorance of obviously unfavorable evidence do not equate to the absence of a genuine issue of material fact. Accordingly, Defendants' Motion should be denied in its entirety.

II.     THE EVIDENCE CREATES GENUINE ISSUES OF FACT

    A.     Defendants Willfully And Recklessly
        Disregarded The Accuracy Of The SPS Balance Sheet

        1.     Defendants Acquired SPS – Along With
            Millions Of Dollars In Overvalued Receivables

In 2001, Accredo was a niche player in the specialty pharmaceutical distribution business.  In order to transform the Company into an attractive target for potential corporate acquirers, Defendants sought to impress equity analysts who had repeatedly highlighted the lack of diversity in Accredo's revenue stream as a significant business risk.  *See* SSUF ¶1-2.  To address such risk, Defendants developed a "growth through acquisition" strategy, a move Defendants hoped would alleviate analyst concerns and catapult Accredo's stock price upward.  This strategy culminated with the identification of Gentiva's SPS Division as Accredo's "top objective," a move that would virtually double Accredo's size and provide the Company with revenue diversity.  *See* RSUF ¶2, 55; SSUF ¶¶1-2.  On November 17, 2001, Accredo executed a mutual confidentiality agreement for the potential purchase of SPS.  RSUF ¶5.  Shortly thereafter, Stevens, Accredo's Chief Executive Officer ("CEO"), and Kimbrough, the CFO, along with others from Accredo, E&Y and consultant Thomas Weisel Partners ("TWP"), engaged in legal, operational and financial due diligence of SPS until January 3, 2002.[3]

SPS operated as two segments – "chronic" and "acute."  The chronic segment was traditionally profitable.  The acute segment, on the other hand, was a money loser, generating negative $16 million in EBITDA.  SSUF ¶16.  Accordingly, Defendants initially tried to limit the acquisition to just the chronic segment.  RSUF ¶4.  Gentiva, however, insisted that the SPS

---

[3]  RSUF ¶8.  Stevens and Kimbrough confirmed during a January 3, 2002 conference call announcing the SPS acquisition that Accredo's due diligence "was finished" and that there was no "due diligence contingency" in the asset purchase agreement.

Division be purchased as a whole.[4]  Most of SPS's value was derived from the outstanding accounts receivable, which totaled nearly $300 million.  RSUF ¶33.  A crucial component of the outstanding accounts receivable was the "loss reserve" or "allowance for doubtful accounts" – a reserve established to account for receivables that might not be collected.

The SPS allowance for doubtful accounts was valued using a reserve methodology, established by Gentiva in September 2000, that was applied against all acute and chronic receivables and had two critical inputs:

> (1) Total Cash as a % of Billings ("Top Line"); and

> (2) Cash Received at Measurement Period ("Second Line").

RSUF ¶12; SSUF ¶11.  The Top Line was the percentage of receivables Accredo estimated to collect over the long-term (*e.g.* 95% of receivables *will be* collected).  SSUF ¶12; RSUF ¶¶25, 28.  The Second Line was supposed to reflect the actual amount of cash collected to date on outstanding receivables (*e.g.* 25% *has been* collected).  SSUF ¶13; RSUF ¶25.  Both inputs were derived from the historical SPS collections as reflected in "cash triangles" or "payment rainbows."  RSUF ¶¶24-25, 28, 36.  These inputs were used to develop "reserve percentages," which were in turn supposed to be applied to the outstanding SPS receivables to calculate the reported loss reserve.  RSUF ¶24.

The SPS reserve methodology and its underlying assumptions had not been critically analyzed for accuracy since September 2000, and, as Defendants were aware, the methodology's outputs and assumptions did not reflect either current or historical average cash collection trends. RSUF ¶¶21, 24-25, 28.  For example, Accredo used 95% for the Top Line number throughout the Class Period, despite information readily available to Defendants indicating that SPS

---

[4]  RSUF ¶4.  Accredo attempted to condition the SPS acquisition on TWP acquiring the acute segment.  After TWP refused, Defendants were forced to acquire both segments.  SSUF ¶¶7-8.

collection rates actually averaged less than 92%.  RSUF ¶¶23-25, 27, 71, 76.  Additionally, the Second Line was calculated in September 2000 using a "blended average" of collections information from the past sixteen quarters.  RSUF ¶25.  By 2002, however, that average was no longer accurate or applicable to the SPS receivables.  Nevertheless, Defendants continued to value the receivables and calculate the SPS loss reserve using these "stale" inputs and ignoring "available and pertinent" collections data.  As a result, the SPS receivables were dramatically overvalued throughout the Class Period.  SSUF ¶¶35-36.

Even before Accredo acquired SPS, the Company's Controller, Sam Daniel ("Daniel"), knew that old and stale data was being used to calculate the reserve percentages.  RSUF ¶21; SSUF ¶9.  In a December 24, 2001 memorandum, Daniel described this very fact to Stevens, Kimbrough and Accredo's Board of Directors as a "major issue . . . related to the accounts receivable reserves," and warned that "*E&Y had used the percentages calculated for CY00* as the basis for the required reserve as of September 2001 as this was the latest information presented to them."  RSUF ¶21; SSUF ¶9.  Kimbrough admitted that he knew throughout the Class Period that the reserve percentages used to calculate the allowance for doubtful accounts were, "if . . . not exactly, . . . [then] very similar" to the "stale" September 2000 percentages.  SSUF ¶10; RSUF ¶13.  Moreover, Defendants used the outdated information to calculate the allowance for doubtful accounts despite knowing of several "what if" analyses including an updated December 2000 reserve worksheet (the "Updated Worksheet"), identifying reserve percentages "*more in line with reality*."   SSUF ¶37; RSUF ¶¶12-13, 20, 24-25, 28, 75.

        2.     Defendants Knew Of Significant Red Flags
              Relating To SPS's Accounts Receivable Value

In addition to knowing that stale data was being used to value the SPS receivables, and being aware of the Updated Worksheet and failing to utilize it, Defendants repeatedly received

warnings that the SPS allowance for doubtful accounts was not calculated correctly.  For instance, in September 2000, Gentiva had taken a $91 million charge to income because of substantial collectibility issues with the SPS receivables, including for failure to timely submit over $40 million in accounts to major payers.  RSUF ¶¶7, 21.  Defendants also learned that SPS suffered from a DSO that was considered "industry worst."  RSUF ¶35.

Further, as Defendants were fully aware, every third party who evaluated the SPS receivables quickly identified significant red flags and valuation issues.  In May 2002 an equity analyst informed Kimbrough that Express Scripts, Inc. ("ESI") and Priority Healthcare, two Accredo competitors, rejected acquisition of the SPS Division because of significant "receivables risk."  SSUF ¶23.  Even after being made aware of this fact, Kimbrough failed to follow-up with ESI, Priority Healthcare, E&Y or PricewaterhouseCoopers LLP ("PwC"), Gentiva's auditor.  SSUF ¶68.

After TWP refused to acquire the acute segment, other potential acquirers of the segment also expressed outright concern regarding SPS's receivables.   On May 10, 2002, Apria Healthcare, Inc. commented ***"Why DSOs so high?"*** SSUF ¶19.  Ambient Healthcare, Inc. noted on June 28, 2002 that "we can't ignore the fact that the receivables histor[y] is 120 or so days but pay for the business as if it were operated with 75-80 days."  SSUF ¶20.  Ambient concluded, "***The receivables profile clearly has to impact the multiple.***"  *Id.*  Kohlberg and Company informed Stevens and Kimbrough on July 9, 2002, "[o]ur review of DSO performance and recent bad debt levels suggests that ***failure to improve in this area is . . . a threat to the value of Accredo's primary asset . . . going forward.***"  RSUF ¶¶64-67; SSUF ¶21.  Again, Defendants failed to address these warnings.

Defendants also knew prior to the acquisition, and throughout 2002, that Accredo faced SPS integration challenges, including the use of less-experienced temporary employees in the collections department and the closing of the Dallas collection facility, which could have "affected the collectibility of the accounts receivable" at SPS. SSUF ¶22. Nevertheless, Defendants' continued to use "stale" data to value the SPS receivables and improperly calculate the allowance for doubtful accounts throughout the Class Period.

### 3. Defendants Acquired SPS Without Disclosing Its True Value To Shareholders

On January 2, 2002, Accredo publicly announced that it had signed an agreement with Gentiva to purchase SPS for $415 million. RSUF ¶¶45-46. Defendants touted the acquisition as "immediately accretive," and stated that it would alleviate revenue concerns by doubling the number of products Accredo distributed. RSUF ¶128. As a direct result, Accredo stock increased 26% from $38.68 to $48.67 per share. SSUF ¶17.

On June 13, 2002, Accredo closed the SPS acquisition at a final price of $462.3 million. RSUF ¶55. The SPS receivables were by far the largest asset, comprising 63% of the purchase price. RSUF ¶6. After the acquisition, the SPS receivables accounted for 70% of Accredo's total receivables, and 41.8% of its assets as of fiscal year 2002. *Id.* On June 17, 2002, Defendants announced they were increasing Accredo's revenue and earnings per share guidance for fiscal year 2003 by over 90% and 30% respectively, as a direct result of the SPS acquisition. SSUF ¶66. Accredo's stock price responded positively, increasing from $51.04 to $53.75. In sum, Defendants' positive announcements relating to the SPS acquisition led to a $9.40 per share (36%) relative increase in Accredo's stock price between January 2002 and June 18, 2002. SSUF ¶17.

12

4.      Defendants Used Outdated And
        Inaccurate Collections Data Resulting
        In Materially Inaccurate Financial Results

After the close of the SPS deal on June 13, 2002, and despite the existence of the red flags described above, Defendants' continued use of stale and incorrect data to calculate the allowance for doubtful accounts directly resulted in Accredo's net accounts receivable, as publicly reported in the Company's fiscal year 2002 and 1Q and 2Q 2003 financial statements, being in error and overvalued by $55.8 million, $55.1 million and $55.3 million, respectively. SSUF ¶35.  Had Accredo properly calculated the allowance for doubtful accounts based on the actual, current collections data, the Company would have reported a *loss* of $7.0 million for fiscal year 2002, as opposed to income before taxes of $48.8 million, and Accredo's financial results for the first and second quarters of 2003 would also have been materially impacted. SSUF ¶36.  Indeed, properly accounting for the SPS receivables would have eliminated any accretive effect of the SPS acquisition.  SSUF ¶47.

B.      Defendants Finally Documented The Reserve
        Calculation And Knowingly Concealed The Findings

In December 2002, six months *after* the SPS acquisition, and long after Defendants had already signed and publicly filed certifications stating that they had reviewed and approved all material accounting procedures, an effort was finally made to review the SPS receivables and loss reserve.   RSUF ¶¶31, 73-77, 79-80.   At that time, Daniel directed Brian Johnson ("Johnson"), a finance director at an Accredo subsidiary, to document the SPS reserve process. Almost immediately, Johnson realized that no one at Accredo actually understood the basis for the SPS loss reserve or receivables valuation.  RSUF ¶74.  After going back to Gentiva personnel for help, it took Johnson only a matter of days to identify the "possible error in the manner in which collection rates and other data" were being used to calculate the SPS loss reserves.  RSUF

¶¶75-76.   Johnson quickly saw that the reserve percentages being used by Defendants were understated because the collection percentages (the Top Line and Second Line) had not been updated to reflect the actual collection rates for the SPS receivables.[5]   When Johnson calculated the reserve percentages using the actual collection trends, he realized that the value of the receivables was overstated by approximately $50 million.   RSUF ¶¶75-77.   Significantly, Johnson's review and calculation used information readily available to Defendants throughout the Class Period.  SSUF ¶37; RSUF ¶¶4, 71-77.

On February 12, 2003, Johnson and Daniel informed Kimbrough of the accounting error and conclusion that the SPS receivables were overstated by $50 million.   Kimbrough immediately informed Stevens that the error with the SPS receivables had been uncovered. RSUF ¶77.  Nevertheless, on February 14, 2003, despite ***actual knowledge*** of the magnitude and materiality of the massive shortfall – which eclipsed Accredo's total fiscal year 2002 net income – Defendants signed and filed Accredo's 2Q 2003 10-Q with the SEC.  Again, Defendants failed to disclose the problems with the SPS receivables to Accredo's shareholders.  RSUF ¶¶78-79.

C.    The Fraud And The True Value
      Of The SPS Division Are Revealed

Finally, prior to the market opening on the morning of April 8, 2003, Accredo disclosed in a press release that it was "examining the adequacy of the reserves of the accounts receivable that it acquired on June 13, 2002 as part of its purchase of [SPS]" and that it was revising fiscal year 2003 revenue and earnings estimates.  RSUF ¶92.  In a conference call later that day,

---

[5]   RSUF ¶¶76-77.  Had Defendants conducted Johnson's analysis prior to the Class Period, they would have discovered that the reserve percentages used during the Class Period unrealistically assumed that Accredo was collecting SPS receivables at a rate approaching 100%.  For example, in order for the reserve percentages used by Accredo in preparation for filing the 2002 10-K not to have been understated, the Company would have had to been collecting 98.8% of receivables that were two quarters old.   The number increased to 98.9% for receivables that were three quarters old.  SSUF ¶32.  As stated, these numbers far exceeded the evidence of past collections available to Accredo and there was absolutely no basis to conclude that such collections rates approached reality.   RSUF ¶¶71-77.

Defendants faced repeated questions about the SPS receivables and admitted that the total magnitude of the understatement was in the range of $30 to $70 million.  RSUF ¶91.  By the end of the trading day, Accredo's common stock plummeted 44%, to close at $14.29 per share. RSUF ¶94.

        D.    <u>Defendants' Cover-Up Confirms The Fraud</u>

On May 5, 2003, Defendants announced that Accredo would be forced to take a "special charge" to earnings, increase the Company's loss reserve by $58.5 million and that approximately $56.8 million of the misstated reserves was attributable to the SPS receivables acquired on June 13, 2002.  RSUF ¶¶40-41.  That same day, Accredo fired and sued its independent auditor, E&Y.  Accredo's pleading against E&Y (the "E&Y Complaint"), which Defendants reviewed and approved, admitted that Defendants failed to properly calculate the SPS allowance for doubtful accounts throughout the Class Period.  In Defendants' own words:

- "[T]he collection rates and other data used in the method for calculating the SPS Division's allowance for doubtful accounts were not updated after September 30, 2000, and as a result the SPS Division's method for calculating its allowance for doubtful accounts generated **materially inaccurate results.**"

- "This failure to use the correct and pertinent available data and **the misuse of stale data** resulted in improper calculations of the reserve for doubtful accounts for the SPS Division for all of the financial periods after September 2000 and resulted in **the SPS Division's Financial Statements not being fairly presented in accordance with GAAP.**"

- **"After the markets opened on April 8, 2003, Accredo's stock value plummeted from a price of $25.40 per share on April 7, 2003 to a price of $14.29 per share** at the close of business on April 8, 2003 . . . .  Accredo has now been named as a defendant in multiple class action lawsuits, and its officers and directors have been named as defendants in a shareholders' derivative lawsuit, **all of which result from** the understatement of the reserves for doubtful accounts related to the accounts receivable for the SPS Division."

- The "loss of market capitalization, decrease in public perception regarding the stability of Accredo's stock [and] loss of good will" that occurred on April 8 and 9, 2003 were **"reasonably foreseeable damages proximately caused by"** Accredo's **materially inaccurate results.**

SSUF ¶¶25-27, 29, 33, 49.

Pursuant to GAAP, Accredo was required to report the $58.5 million increase in allowance for doubtful accounts as either a "change in estimate" or "correction of an error," depending on the reason for the increase. RSUF ¶108. An "error" would require a restatement of all financial statements related to, and following, the acquisition. RSUF ¶¶105, 107. To avoid restating, Defendants improperly "chose" to classify the massive SPS reserve shortfall charge as a "change in estimate." RSUF ¶110, 111, 120, 122.

On June 10, 2003, after deciding to classify the charge as a change in estimate, Accredo retained Deloitte & Touche LLP ("D&T") to replace E&Y as its independent auditor. RSUF ¶117. D&T quickly noted that the E&Y Complaint contained numerous "glaring inconsistencies" with "change in estimate" accounting. SSUF ¶52. In response to D&T's concerns, Defendants withdrew the E&Y Complaint and crafted an Amended Complaint ("E&Y Amended Complaint"). RSUF ¶¶ 105, 119-120. As noted by D&T, however, the E&Y Amended Complaint continued to contain allegations "that could be construed to be contradictory" to change in estimate accounting. *Id.*

On or about September 2, 2003, just 28 days before Accredo's 2003 10-K was due to be filed, D&T informed Accredo that, if the allegations in the E&Y Amended Complaint were not reconciled immediately, "we will not continue our audit work after Friday." SSUF ¶54. In response, Defendants composed a narrative, known as the "Kimbrough Memo," aimed at appeasing D&T and justifying management's treatment of the $58.5 million accounts receivable reserve shortfall as a "change estimate." SSUF ¶¶55-56; RSUF ¶¶105, 118-120. The Kimbrough Memo did not contradict any of the claims in the E&Y Complaint, but purported to cite numerous "interim factors" which ***could*** have affected the collectibility of the accounts receivable balances. SSUF ¶¶56-57; RSUF ¶¶118-121. These included challenges that Accredo

faced during the SPS integration, such as the use of less-experienced temporary employees in the collections department and the closing of the Dallas collection facility.  SSUF ¶22.

The initial drafts of the Kimbrough Memo were insufficient because, as D&T observed, Defendants failed to describe any financial due diligence performed on SPS, were "still blaming − EY, Gentiva, PWC," and that "all [of Defendants' explanations] points to − error".  SSUF ¶58. In demanding that Accredo cite to evidence to justify its accounting conclusion, D&T noted: *"Convince us you thought the June 30, 2002 reserve was right . . . .  Don't tell us what PwC believed, or [what] E&Y believed . . . .  You are responsible for your financial statements."* RSUF ¶¶9, 27, 29, 61; SSUF ¶59.

Thereafter, Defendants revised their story and churned, along with their legal counsel, through at least ten versions of the Kimbrough Memo before finally satisfying D&T.  SSUF ¶¶55-56.  Relying on the "interim factors" conjured up by Defendants, none of which were audited, quantified, or tested, D&T agreed to continue as Accredo's auditor (collecting more than $1.7 million in fees) and issued its audit opinion on Accredo's 2003 10-K.  SSUF ¶65.  Notably, Defendants themselves *never quantified or evaluated any of the "interim factors"* included in the final version of the Kimbrough Memo or rebutted the evidence that they knew stale and incorrect data was used to value the SPS receivables during the Class Period.  SSUF ¶57; RSUF ¶118.

III.   LEGAL STANDARD ON SUMMARY JUDGMENT

A court cannot grant summary judgment unless the moving party shows there is "no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The non-moving party need only "designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Because of the extreme nature of the summary judgment remedy, "[t]he evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court's "function is not to weigh evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Accordingly, as noted earlier, "it is improper and likely an abuse of process for an attorney to file a motion for summary judgment while ignoring available evidence which clearly and obviously creates a genuine issue of material fact." Hon. Bernice B. Donald and William C. Plouffe, Jr., *The Summary Judgment Process: When the Solution Becomes Part of the Problem*, 194 F.R.D. at 267.

Here, Defendants move for summary judgment on materiality, scienter and loss causation.[6] The law is well-established, however, that summary judgment is generally inappropriate for these elements. *See Levinson v. Basic Inc.*, 786 F.2d 741, 749 (6th Cir. 1986), *rev'd on other grounds*, 485 U.S. 224 (1988) ("[s]ummary judgment generally is inappropriate for issue of scienter, knowledge and intent"); *Helwig*, 251 F.3d at 563 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)) (". . . the issue of materiality is a mixed question of law and fact . . . . Courts generally reserve such questions for the trier of fact"); *In re Enron Corp. Securities, Derivative & "Erisa" Litigation*, 2005 WL 3504860, at *18 (S.D. Tex. Dec. 22, 2005) (generally when defendants claim that the loss was not a consequence of any misrepresentation "the issue becomes a 'matter of proof at trial'").

---

[6]   To prove securities fraud, Accredo shareholders must show: Defendants disseminated (1) materially ("Materiality"); (2) false and misleading statements or omissions ("Falsity"); (3) with knowledge or reckless disregard ("Scienter"); that (4) shareholders relied on those statements in purchasing Accredo securities ("Reliance"); and (5) the eventual disclosure of the truth caused ("Loss Causation") (6) Accredo shareholders' damages ("Damages"). *Dura*, 544 U.S. at 341-42; *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554 (6th Cir. 2001).

IV.    DEFENDANTS' STATEMENTS REGARDING THE SPS ACCOUNTS
       RECEIVABLE WERE FALSE AND MISLEADING WHEN MADE

Defendants' Class Period statements to Accredo shareholders were false and misleading because they failed to disclose that the Company's most significant asset, the SPS receivables, was materially overvalued and that the allowance for doubtful accounts associated with the SPS receivables was grossly deficient.[7]   This Court has already held that Lead Plaintiffs have specifically identified those statements alleged to be false and the basis for why the statements were false and misleading when made.   MTD Order at 22, 26 ("the complaint includes allegations that Defendants made materially false and misleading statements with respect to two areas:   1) the financial value of the SPS acquisition, and 2) the financial performance of Accredo" and "the Court finds that Plaintiffs have specified the statements alleged to have been misleading, the reasons why the statements are misleading, and the facts on which Plaintiffs' beliefs are based.")  This conclusion remains true today.

Defendants do not challenge the Court's Order or move for summary judgment on the element of falsity.  Indeed, to do so would be futile in light of their own complaint against E&Y stating unequivocally that the "failure to use the correct and pertinent available data and the misuse of stale data resulted in improper calculations of the reserve for doubtful accounts for the SPS Division for all of the financial periods after September 2000 and resulted in the SPS Division's Financial statements not being fairly presented in accordance with GAAP."  SSUF ¶33.

Nevertheless, Defendants repeatedly suggest that the claims of Accredo shareholders should be limited to just a portion of the false financial statements.  Specifically, Defendants try

---

[7]  A statement is "actionable" when it is a misrepresentation or omission of a material fact "that the defendant had a duty to disclose."  *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005); *Helwig,* 251 F.3d at 561, 668 ("[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions 'assume[s] a duty to speak fully and truthfully on those subjects.'").

to rewrite the Complaint to concern only a fraction of the SPS accounts receivables, those from the acute segment, and then argue that these rewritten allegations are factually inaccurate.  Defs. MSJ at 1, 4, 10-12, 26-30, 40, 43.  Defendants, however, ignore the plain language of the Complaint, this Court's Order denying their motion to dismiss and basic rules of pleading.

As set forth in the Complaint, this case centers on Defendants' knowing and reckless decision to "overlook *SPS's accounting errors* and overstated income – thereby concealing from Accredo shareholders and the investing public that *SPS's accounts receivables were impaired* by nearly $60 million."  Complaint at ¶¶4, 39, 45, 51, 58, 65 ("the reserve for *SPS's gross patient receivables* was grossly deficient").  While the Complaint discusses the acute portion of SPS in some detail (the acute receivables suffered from an extremely high rate of uncollectibility), the pleadings are clearly focused on the SPS receivables as a whole and Defendants' false and misleading statements about those receivables.[8]

In denying Defendants' motion to dismiss, this Court recognized that Lead Plaintiffs' allegations, and Defendants' fraud, concerns the SPS receivables as a whole, not just the acute segment.  For example, the Court noted that Accredo shareholders allege that Defendants "were aware that the reserve for *SPS's gross patient receivables*" was materially understated and "knew the status of the *SPS accounts receivable* and *SPS's DSO* prior to making statements that overstated Accredo's financial position and overstated the value of *SPS receivables*."  MTD Order at 10, 23.  Indeed, Fed. R. Civ. P. 8 and 9(b) are to be read in conjunction with each other and a complaint need only afford the defendant notice of the claims against him.  *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988).  Here, Defendants have always

---

[8]   The sharp distinction Defendants now try to draw between the different portions of the overvalued SPS receivables is rendered meaningless in light of the fact that the various therapies that were considered "chronic" and "acute" changed prior to and during the Class Period.  These were not fixed designations and, thus, the receivables associated with particular therapies would be considered chronic at one point in time and acute in another.  RSUF ¶¶4, 98, 101.

been on notice that the shareholders' claims relate to Defendants' misstatements and omissions about the SPS receivables as whole, and their belated effort to narrow the scope of the allegations has no basis in the pleadings or procedural history.[9]

In the proper context of Lead Plaintiffs' allegations, Defendants' arguments that "only a fraction of the $60 million dollar [accounts receivable error]" was related to the acute receivables is irrelevant.  Defs. MSJ at 11-12.  The evidence, which corroborates the allegations in the Complaint, clearly shows that the SPS receivables – both chronic and acute – were overvalued throughout the Class Period.  Taken together – Accredo always reported (albeit inaccurately) the value of the two segments of the SPS receivables together as a single asset – there is no dispute that Accredo recorded a $58.5 million charge to correct for the overvalued SPS receivables.  RSUF ¶¶92, 102.  Defendants' failure to disclose the true value of the SPS receivables and attendant GAAP violations rendered Accredo's Class Period financial statements false and misleading.

Even a cursory review of private securities fraud cases identifies dozens of cases, like this one, involving overvalued receivables and understated reserves.  *See In re Direct General Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 891-92, 895-97 (M.D. Tenn. 2005) (defendant made material misrepresentations to investors with requisite scienter by misrepresenting that reserves were presently adequate).  *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 884-900 (E.D. Tenn. 2005) (defendant made material misrepresentations about its claim-handling practices to investors with requisite scienter by, *inter alia*, understating and under-reserving for potential liabilities); *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 941-43, 945 (M.D. Tenn. 1999) (defendants made material misrepresentations with requisite scienter by overvaluing loan

---

[9]   Notably, through the nearly three years of discovery in this case, Defendants never objected to producing documents related to all of the SPS receivables, as opposed to limiting discovery to the acute segment, and never argued that deposition testimony or other discovery should be limited to the acute receivables.

portfolio, failing to timely write down problem loans, and failing to provide adequate loan loss reserves).[10]

V.   DEFENDANTS HAVE NOT AND CANNOT
     ESTABLISH THE ABSENCE OF A GENUINE ISSUE
     OF MATERIAL FACT ON THE ELEMENT OF SCIENTER

Scienter is a "mental state embracing intent to deceive, manipulate or defraud" and is established "either[] by showing that the defendant made the misstatements with knowledge *or* recklessness." MTD Order at 26 (citing *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999)). Accordingly, the inquiry on Defendants' motion is only whether there is a genuine issue of material fact as to whether Defendants knowingly or recklessly issued false statements about the SPS receivables and Accredo's financial results.[11] At this stage, Lead Plaintiffs do not need to prove that Defendants acted knowingly or recklessly, and "all justifiable inferences are to be drawn in [their] favor." *Anderson*, 477 U.S. at 255; *see also Benjamin v. Kim*, 1999 WL 249706 (S.D.N.Y. Apr. 28, 1999) (a reasonable juror could find that a CEO should have been aware of true state of accounts receivables, or at least suspicious about possible accounting irregularities, and that failure to discover such facts amounted to willful blindness); *In re JWP Inc. Securities Litigation*, 928 F. Supp. 1239, 1260 (S.D.N.Y. 1996) (summary judgment in defendants' favor was inappropriate where "[t]he plaintiffs have . . . presented evidence that

---

[10]  *See also In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 WL 1806503, at *1-7 (E.D. Pa. July 27, 2005) (defendant made material misrepresentations about its financial condition to investors with requisite scienter by setting loss reserves at materially inadequate levels, failing to maintain sufficient internal controls relating to underwriting reserve setting, and making false and misleading statements about the adequacy of reserve levels.); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 401-13 (D.N.J. 2004) (defendant made material misrepresentations to investors with requisite scienter by mischaracterizing uncollectible debt as accounts receivable and overstating earnings by over 20% in its financial statements and failing to reserve for the bad debt as required).

[11]  Recklessness is defined as "'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" MTD Order at 26 (quoting *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004)). Ignoring information indicating improper accounting practices, GAAP violations, and internal control deficiencies can "constitute the sort of recklessness necessary to support § 10(b) liability." *Miller v. Material Sciences Corp.*, 9 F. Supp. 2d 925, 928-29 (N.D. Ill. 1998). Accordingly, "the nature of the misapplication of accounting principles – in terms of number, size, timing, frequency, and context – is relevant circumstantial evidence of a defendant's state of mind." *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir. 2004).

raises a question of fact regarding whether the audit committee defendants were willfully blind to the fraud going on around them").

Unlike standard fraud cases brought under Rule 9(b), Accredo shareholders have already pled particularized facts giving rise to a strong inference of scienter.  MTD Order at 34.  In order to meet the strict pleading requirements set forth in the PSLRA, the Complaint had to set forth the very facts and evidence of scienter that would create a genuine issue for trial.  While the PSLRA dramatically heightened the pleading burden for scienter, it did not alter the substantive requirements for proving scienter, thus putting "securities fraud claims in the interesting posture of requiring plaintiffs to plead more than they must prove at trial."  *Epstein*, 993 F. Supp. 1323-34; *see also In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1097 (9th Cir. 2002) ("what was sufficient to avoid summary judgment [] is not necessarily sufficient to avoid a motion to dismiss under the PSLRA.").  In *Tellabs*, 127 S. Ct. 2499, the Supreme Court recently analyzed the relevant pleading standards for scienter, and concurred that the standard of ***proof*** for plaintiffs at trial is essentially the same as that which a plaintiff must ***allege*** to survive a motion to dismiss under the PSLRA:

> We emphasize, as well, that under our construction of the 'strong inference' standard, a plaintiff is not forced to plead more than she would be required to prove at trial.  A plaintiff alleging fraud in a § 10(b) action, we hold today, must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference.  ***At trial, she must then prove her case by a 'preponderance of the evidence.'***  Stated otherwise, she must demonstrate that it is ***more likely than not that the defendant acted with scienter.***

*Id.* at 2512 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983)); *accord Burket v. Hyman Lippitt*, *P.C.*, 2008 WL 1837355 (E.D. Mich. April 23, 2008).

Recognizing that Lead Plaintiffs have already set forth facts evidencing a "strong inference of scienter," and that discovery has buttressed all of those facts, Defendants now argue that the scienter standard this Court employed on the motion to dismiss was too lax.  Defs' MSJ

at 3, fn. 5.  Defendants' argument is premised on the claim that the Supreme Court's decision in *Tellabs* created a more rigorous scienter standard than that applied by this Court.  *Id*.  This argument is easily refuted.  First, the Supreme Court explicitly rejected as ***too strict*** the 6th Circuit standard that was in place at the time this Court denied Defendants' motion to dismiss.  *Tellabs*, at 2510 ("[t]he inference that the defendant acted with scienter ***need not be irrefutable***, *i.e.*, of the "smoking-gun" genre, ***or even the "most plausible of competing inferences***," citing *Fidel*, 392 F.3d at 227 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) (en banc))).  Thus, on the motion to dismiss, Lead Plaintiffs have already prevailed under a more rigorous standard than that applied to scienter pleadings now.  *See* MTD Order at 26-30 (relying on *Fidel* and *Helwig*).  Second, despite Defendants' claim to the contrary (Defs. MSJ at 3, fn. 5), this Court specifically weighed competing inferences of scienter, as required by *Tellabs*, and did not simply construe all inferences in Lead Plaintiffs' favor.  *See* MTD Order at 31 ("an inference that Defendants knowingly or recklessly made misstatements based on knowledge obtained during the due diligence process is not the most plausible of competing inferences.").  The guidance provided by *Tellabs* would not have changed the outcome on Defendants' motion to dismiss and does not support summary judgment now.

In denying the motion to dismiss, this Court held that Lead Plaintiffs had alleged a strong inference of scienter based on the following factual allegations: (1) Defendants' receipt of internal documents, including aging ("ATB") reports which indicated that the SPS accounts receivable had an extremely high DSO, particularly in comparison to competitors, and "further indicated that approximately $60 million of SPS's accounts receivable were uncollectible" (MTD Order at 31-32); (2) the timing and magnitude of Defendants' subsequent $58.5 million charge related to the SPS receivables despite earlier evidence that the receivables were impaired

(MTD Order at 32); (3) Defendants' violations of GAAP and reckless disregard of red flags "indicat[ing] that a charge to income was required before Defendants relied on those receivables in making their public statements" (MTD Order at 32-34); and (4) "Plaintiffs' assertions that Defendants sold stock after announcing 'record' results, received bonuses during the Class Period, filed a $500 million shelf registration [] and held executive positions further support a finding of scienter."[12]  As detailed below, each of the factors has been validated by documentary evidence and deposition testimony, along with substantial additional evidence of Defendants' knowing and reckless misconduct, and motive and opportunity to commit this fraud.

> A.     Defendants Knowingly Issued False
>        Financial Statements And Recklessly
>        Ignored The Overvalued Receivables

There is ample evidence in this case that proves, let alone creates a material question of fact, that Defendants knowingly and recklessly overvalued the SPS receivables and falsified Accredo's financial statements.  For example, Defendants admitted they signed and publicly filed Accredo's 2Q 2003 financial statement on February 14, 2003, after being told that the SPS loss reserve was understated by approximately $50 million, but without so much as a warning about the SPS receivables or the shortfall in the allowance for doubtful accounts.  SSUF ¶¶40-41; RSUF ¶¶20-21, 75-79.  Six months prior to the Class Period, when Defendants knew that SPS's single largest asset was the outstanding receivables, they were told that data more than a year old was being used to value the SPS receivables and that E&Y had not used updated

---

[12]  MTD Order at 34.  The Court also noted that the mere fact that Defendants were involved in due diligence prior to the SPS acquisition did not strongly support an inference of scienter.  MTD Order at 31.  The Court's finding was based only on the allegations of the Complaint and, with the denial of the motion to dismiss, did not foreclose Lead Plaintiffs from seeking or presenting evidence that Defendants became aware of or recklessly disregarded that the SPS receivables were materially overstated prior to the acquisition of SPS.  In fact, as detailed herein, Defendants were both specifically warned about the overvalued SPS receivables and stale data being used to calculate the SPS loss reserve during the due diligence period and were highly motivated not to alter the terms of the SPS acquisition and to keep the truth about the uncollectible receivables a secret from shareholders and the market.  SSUF ¶63; RSUF ¶¶8, 20, 21, 75-79.

collection rates in the valuation process.  SSUF ¶9; RSUF ¶6.  Yet, Defendants ignored the accuracy of the allowance for doubtful accounts, failed to document the SPS loss reserve policy and procedure and did ***nothing*** to evaluate or change the two major inputs to the methodology Accredo used to calculate the allowance for doubtful accounts until January 2003.  SSUF ¶37; RSUF ¶¶71-77.

The evidence also establishes that Defendants learned during "due diligence" that the SPS Division's history of serious collections problems forced Gentiva to write off more than $91 million of SPS receivables in 2000.  SSUF ¶14.  Indeed, both before and after the Class Period, Defendants knew that SPS suffered from "industry worst" DSOs, a strong signal that the receivables were overvalued.  RSUF ¶¶36, 38-39, 41, 63-68.  Moreover, despite the fact that the receivables comprised 63% of the SPS purchase price, when defendant Kimbrough was told that two separate Accredo competitors, ESI and Priority Healthcare, "passed on [SPS] because of receivables risk," Defendants did nothing.[13]

Defendants completed the SPS acquisition with full knowledge of these explicit warnings.  Accredo's shareholders knew that the acute segment was for sale, but were not informed that prospective buyers almost immediately identified the problem with the overvalued SPS receivables as an imminent and serious threat.  SSUF ¶¶19-21; RSUF ¶4.  While Accredo had given up on selling the acute receivables, various third parties looking to purchase the acute segment reviewed the receivables in order to evaluate the business.  SSUF ¶¶19-21.  Just as ESI and Priority Healthcare had quickly recognized the SPS "receivables risk," these third parties

---

[13]  SSUF ¶23.  Defendants also knew the following:  the loss reserve methodology had not been updated since September 2000 (SSUF ¶26); data existed in the Updated Worksheet, and in RxHome, which indicated the loss reserve calculations were not ". . . in line with reality" (SSUF ¶37); and Accredo faced SPS integration challenges (including the use of less-experienced temporary employees in the collections department and the closing of the Dallas collection facility) which could have "affected the collectibility of the accounts receivable" at SPS (SSUF ¶22).

warned Defendants that the "receivables profile clearly has to impact the multiple" and that the "DSO performance and recent bad debt levels suggests that failure to improve in this area is . . . a threat to the value of Accredo's primary asset . . . going forward."  RSUF ¶¶63-68; SSUF ¶¶21, 23.  These warnings again went unheeded and undisclosed.

Despite actual knowledge of these red flags, Defendants **did nothing** to evaluate or change the two major inputs to the reserve calculation.  At all times until January 2003, the "Top Line" number remained 95%, despite the fact that information readily available to Defendants indicated that current SPS long-term average collection rates were materially lower.  RSUF ¶20, 24-25, 28-29, 71, 75-76.  Further, the "Second Line" remained a "blended average," based on "*stale*" collection data *from September 2000 and the previous sixteen quarters*."  RSUF ¶¶23-25, 26, 28.  By comparison, it is undisputed that when Defendants finally reassessed the accuracy of the reserve calculation in 2003, they ultimately used *only the most recent single quarter's collection data*.  RSUF ¶¶25, 28.

While Defendants boldly assert that "there is no supporting evidence for [the] allegation" that old and stale data was used to calculate the SPS allowance for doubtful accounts or loss reserve (Defs. MSJ at 16), one need go no further than Defendants' own words to put this assertion to rest:

> [T]he failure to use the correct and pertinent available data and the *misuse of stale data resulted in improper calculations* of the reserve for doubtful accounts for the SPS Division for all of the financial periods after September 2000 and resulted in the SPS Division's Financial statements not being fairly presented in accordance with GAAP.[14]

---

[14]  RSUF ¶¶12-14, 22, 24-25, 28-30, 42, 85, 100, 104, 108-110, 112.  In arguing that they always used "the same Methodology" to calculate the SPS loss reserves, Defendants confuse the "methodology" with the data used for the reserve calculation.  Defs. MSJ at 20.  To wit, the calculation 2x2=4 and 50x2=100 both employ the same methodology, but obviously generate different results.  Similarly, multiplying $300 million of outstanding receivables by a 99% collection rate (identifying $3 million in uncollectible receivables) would generate a significantly different result than employing the same methodology with an 85% collection rate ($45 million

The Updated Worksheet Defendants received further warned Defendants about the overvalued SPS receivables and erroneous accounting. RSUF ¶¶20, 75-76, 85, 87. Reviewed by Defendants, discussed during the SPS due diligence in late 2001 and later referred to as the "what if" analysis, the Updated Worksheet was admittedly "more in line with reality" and would have required a material increase in the SPS allowance for doubtful accounts.[15] Nevertheless, Defendants continued to knowingly misuse stale data to calculate the SPS allowance for doubtful accounts. The monthly SPS reserve calculations – which were "ATB" reports in and of themselves, combined with the monthly "cash triangles" – clearly communicated the severe collectability risks associated with the SPS receivables.[16] These reports that Defendants do not dispute they received, identified that the relevant collection rates for SPS receivables were nowhere near what Defendants used month after month to value the receivables. RSUF ¶¶24-25, 28, 42-44.

Fundamental to Defendants' fraud was the fact that they knowingly failed to account for the actual, historical collection rates for the SPS receivables when valuing the receivables and calculating the allowance for doubtful accounts. The cash triangles available to Defendants that were supposedly used to verify the SPS allowance for doubtful accounts, plainly identified that the reserve rates used by Defendants during the Class Period were inaccurate. RSUF ¶¶24-25,

---

uncollectible). While oversimplified, this demonstrates the fallacy of Defendants' claim that their fraud is excused because they continued to employ "the same Methodology."

[15] RSUF ¶¶12-13, 24-25, 28, 71, 75, 85. In trying to comply with D&T's requests to develop a story that would excuse the accounting errors that had occurred under his watch, Kimbrough initially included in the Kimbrough Memo that he had seen and reviewed the "more in line with reality" worksheet. Only later, as D&T pressed Defendants to revise and sanitize their historical account, did Kimbrough remove any reference to his review of the Updated Worksheet. SSUF ¶55; RSUF ¶¶118-121.

[16] Defendants' argument that the ATB reports were "an historical report, not an analysis or a predicator of future collections" is odd in its duplicity. Defs. MSJ at 28. There has never been any question that an aging report is historical, identifying collection trends. Nor, however, should there be any dispute that the aging reports are used to calculate allowances for doubtful accounts or loss reserves. Indeed, it is a basic principle of accounting that past collections experience is used to calculate a loss reserve. SSUF ¶28. *See* RSUF ¶¶42-44 for a detailed discussion of the information disclosed in the ATB reports.

28-29, 36.   As previously discussed, throughout the Class Period, Defendants valued the SPS receivables on the erroneous assumption that 95% of receivables were being collected.   RSUF ¶¶20, 24-25, 28-29, 71, 75-76.   Even a cursory review of the cash triangles, however, identifies that there was not a single period in two years for which 95% of receivables had been collected, and the actual collection rate, even for receivables outstanding for more than six months, was as low as 83%. *Id*.  Only after the end of the Class Period did Defendants correct this blatant error, resulting in a significant increase in the SPS allowance for doubtful accounts.  RSUF ¶¶23-28.

Internally, Defendants calculated the impact of their accounting violations and concluded that the value of the SPS receivables on Accredo's financial statements had been overstated by $55.8 million for fiscal year 2002, $55.1 million for Q1 2003 and $55.3 million for Q2 2003. RSUF ¶¶24, 87, 100.   Moreover, Defendants have repeatedly admitted and informed E&Y that the overvalued SPS receivables were due to an "error" and that Accredo's financial results had been overstated.[17]

As hard as it is to reconcile Defendants' most recent storyline with the actual evidence of fraud, for the purposes of denying a motion for summary judgment no more is needed than a genuine issue of material fact about Defendants' knowing or reckless failure to disclose the truth.

---

[17]  RSUF ¶¶12-14, 22, 24-25, 28-30, 42, 85, 100, 104, 108-110, 112.  Defendants' decision not to restate Accredo's Class Period financial statements does not support summary judgment.  Defs. MSJ at 16, 20-21.  As the First Circuit explained in *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002), "the fact that the financial statements for the year in question were not restated does not end [plaintiff's] case," because, to do so "would . . . allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements."   Where, as here, Defendants had already been sued for securities fraud, their failure to restate Accredo's financial statements is hardly surprising.  Similarly, the lack of an SEC prosecution does not support Defendants' arguments.  Defs. MSJ at 16.  *See* 17 C.F.R. 202.5(d) (the lack of an SEC prosecution "must in no way be construed as indicating that the party has been exonerated or that no action may ultimately result from the staff's investigation of the particular matter.")

B.      Summary Judgment Is Inappropriate
        Where Stevens And Kimbrough Signed
        And Issued False Sarbanes-Oxley Certificates

Courts in this Circuit and others have held that false certifications pursuant to § 302 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241 ("SOX") are indicia of scienter because the certifications provide "evidence either that [the defendant] knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate." *In re Proquest Securities Litigation*, 527 F. Supp. 2d 728 (E.D. Mich. 2007); *see also Lattice Semiconductor Sec. Lit.*, 2006 WL 538756 (D. Or. Jan. 3, 2006).

Section 302 of SOX has two distinct requirements.  First, it requires that the CEO and CFO certify that they have designed internal controls and procedures to ensure that material information about a company's financial statements is made known to them and that they have evaluated those controls in the last 90 days.[18]  "Internal controls" encompasses a broad range of procedures which ensure accurate assembly and presentation of financial information to the public, including the processes related to valuation of a company's material assets.  Second, the executives must certify that to their knowledge, the financial statements do not contain any material misstatements or omissions.   Stevens and Kimbrough, as CEO and CFO, were responsible for establishing and maintaining internal controls at Accredo.  SSUF ¶5.

As detailed above, Stevens and Kimbrough failed to evaluate or correct the internal accounting controls for the SPS receivables and issued SOX certifications during the Class Period knowing that the SPS receivables were overvalued and that "stale" data was being used to

---

[18]   In full, § 302 requires that signing officers certify that they: "(A) are responsible for *establishing and maintaining internal controls*; (B) have designed such internal controls to ensure that *material information* relating to the issuer and its consolidated subsidiaries *is made known to such officers* by others within those entities, particularly during the period in which the periodic reports are being prepared; (C) *have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report*; and (D) have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date." 15 U.S.C. § 7241 (2002).

calculate the SPS allowance for doubtful accounts.  RSUF ¶¶12-14, 22, 24-25, 28-30, 42, 85,

100, 104, 108-110, 112.  Prior to January 2003, Defendants repeatedly signed SOX certifications

despite knowing that the SPS reserve methodology had never been documented.  SSUF ¶¶31, 43;

RSUF ¶¶73-79.   And, on February 14, 2003, only two days after being told that the SPS

receivables were overvalued by $50 million, Stevens and Kimbrough again signed and issued

SOX certifications, falsely certifying that they knew of no material misstatements or omissions

in Accredo's 2Q 2003 financial filing.  RSUF ¶79.  The failure to disclose the truth about the

SPS receivables was particularly egregious given the fact that Kimbrough testified that "a couple

hundred thousand dollars" in difference between the reserve calculation and the recorded reserve

would have been material.  SSUF ¶39.  Defendants' issuance of false SOX certifications and

reckless failure to comply with the requirements of SOX and evaluate Accredo's internal

accounting controls further supports a strong inference of scienter and raises a genuine issue of

material fact.

       C.      A Reasonable Jury Could Conclude That
                 Defendants Had Both The Motive And The
                 Opportunity To Defraud Accredo's Shareholders

This Court previously held that Defendants' personal motive and opportunity to commit

the fraud contribute to a strong inference of scienter.  MTD Order at 34.  All of the motives

identified in the pleadings – Defendants' insider trading, maintaining Accredo's inflated stock

price, saving their executive positions, significant bonuses and Accredo's shelf registration –

have been reconfirmed by the evidence and still exist as motives to commit fraud.[19]

It is undisputed that Defendants and their cohorts engaged in significant insider trading.

"By trading on inside information, executives stand to profit from what may turn out to be other

---

[19]   There is no question that, as the senior officers at Accredo, the Defendants had the "opportunity" to commit the
fraud.  *See*, *e.g.* *PR Diamonds*, 364 F.3d at 690 ("With respect to the Individual Defendants' opportunities to engage
in fraud, there can be little doubt that they could have, had they wanted to, commit such acts.")

shareholders' losses." *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 727 (S.D. Ohio 2006). Defendants' numerous attempts to justify their stock sales (Defs. MSJ at 22-26) go to nothing other than how much weight a jury should accord to Defendants' insider trading. Regardless of whether the Defendants later rewarded themselves with cost and risk free options or did not sell all of their stock, the fact remains that Stevens and Kimbrough sold 123,750 shares of Accredo stock on August 28 and 29, 2002, resulting in $4.1 million in insider trading proceeds.[20] These coordinated sales came immediately after Accredo's announcement of "record" 4Q 2002 financial results, were not pursuant to any historical trading plan or pattern and were unusual in both timing and amount. *See Helwig*, 251 F.3d at 552 (noting that "insider trading at a suspicious time or in an unusual amount" is probative of scienter); *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581 (N.D. Ohio 2004) (noting that insider selling at an opportunistic time supports an inference of fraudulent intent to mislead the market for personal gain and is therefore probative of scienter).[21]

Stevens and Kimbrough were not the only controlling officers at Accredo who profited from insider trading. Discovery exposed even more egregious insider trading by Accredo's Controller and second-ranking financial officer, Sam Daniel.[22] In December 2002, Daniel was tasked with finally attempting to document the SPS reserve methodology, which he assigned to Johnson. Johnson first reported the $50 million understatement results to Daniel. In a blatant attempt to profit from his insider knowledge, Daniel then sold a total of 23,400 shares of

---

[20] RSUF ¶¶64-66. The amount of total stock sold by Stevens, Kimbrough and other insiders is based on Form 4s filed with the SEC.

[21] None of the cases cited by Defendants (Defs. MSJ at 23-24) excuse Defendants' stock sales or suggest that they are not probative of scienter. Indeed, Defendants made the same unsuccessful arguments, relying on the same cases, in moving to dismiss the Complaint years ago.

[22] Daniel described himself as "[o]ne of three allowed by the [Accredo] Board to communicate with the investment community pursuant to the rule of Regulation FD (Full Disclosure)." SSUF ¶62. Given the responsibilities of his position, there can be no meaningful debate about his position as a control person at Accredo, his access to inside information or that his scienter can be imputed to Accredo. *See Bridgestone*, 399 F.3d at 688.

Accredo stock between February 2003 and the April 8, 2003 disclosure of the truth for proceeds of $542,744.   Despite clearly qualifying as a reporting person pursuant to § 16(a) of the Exchange Act, Daniel never filed Form 4s with the SEC.   SSUF ¶63.   As such, Daniel's illicit insider trading was disguised from the SEC, Accredo shareholders and the public until now.

Setting aside their insider trading, Defendants' current claim that they had "no reason to hide" the overvalued reserves is contradicted by the evidence.   Defs. MSJ at 21-22, 27.   After January 3, 2002, Accredo's stock price had increased significantly as a result of Defendants' announcement that the SPS acquisition would be "immediately accretive."   SSUF ¶17.   Seminal to Defendants' promise was the impression that the SPS receivables were being successfully collected and that Accredo would continue or even improve on those collections.[23]   Given the price Defendants were paying for SPS, and the fact that the evidence plainly shows that Defendants paid far more for SPS than Accredo's competitors were willing to pay given the condition of the receivables, the continued inflation of Accredo's stock price and approval of the acquisition were dependent on the image of healthy, collectible receivables.   *See FirstEnergy*, 316 F. Supp. 2d at 599 (motivation to complete a merger "additionally raise[s] a strong inference of scienter.")   Indeed, as one analyst commented after the truth about the SPS receivables was unveiled, "if [the SPS] deal had been communicated off of modest accretion, given the lower growth profile and the capital intensive home infusion business, then it is likely that ACDO shares would have traded down on the [January 2002] announcement, not up, which would certainly have made the deal much more costly to the company."   SSUF ¶47; RSUF ¶¶128.

---

[23]   RSUF ¶23, 35-36.  Defendants' claim that "it is reasonable to expect that the shareholders would have approved the acquisition" of SPS even if they had known the truth about the SPS receivables is pure speculation.  Defs. MSJ at 27.  Defendants were legally obligated to tell shareholders the truth about the receivables, and failed to do so. Moreover, when the truth finally emerged, shareholders dumped Accredo's inflated stock and analysts questioned the value of the SPS acquisition, refuting Defendants' speculation.  SSUF ¶47.

Keeping the stock price inflated was also critical to Defendants maintaining their executive lifestyle – they rewarded themselves with higher salaries and bonuses in the wake of the SPS acquisition – and allowing Accredo to post its shelf-registration and comply with debt covenants.  SSUF ¶61; RSUF ¶69.  *Helwig*, 251 F.3d at 552 ("the self-interested motivation of defendants in the form of saving their salaries or jobs" is probative of scienter); *PR Diamonds*, 364 F.3d at 690 (motivation to "preserve the Company's ability to borrow" capital is "suggestive of scienter").  In sum, the evidence of Defendants' financial motive and opportunity to falsify Accredo's financial results and defraud shareholders further contributes to a strong inference of scienter and raises genuine issues of material fact that can only be resolved at trial.

> ### D.   Defendants Were Responsible For
> ###       Accredo's False Financial Statements

In an unpersuasive attempt to avoid liability for their own fraudulent conduct, Defendants argue that various auditors or third parties − E&Y, PwC, D&T, Bank of America or Gentiva − approved of Accredo's financial statements.  Defs. MSJ at 12-17, 20-21.  As an initial matter, a public corporation is legally responsible for the accuracy of its own financial statements.[24] RSUF ¶¶61, 90, 114.  Recognizing this clear principle, Defendants have previously admitted that they, and not some other entity, were responsible for Accredo's Class Period financials.  SSUF ¶¶4-5.

Defendants' claim that the various third parties "approved" or "concurred" that Accredo's Class Period financial statements were accurate is easily dispatched.  As detailed

---

[24]   RSUF ¶¶61, 90, 114.  As prescribed by Generally Accepted Auditing Standards ("GAAS"), *"The financial statements are management's responsibility* . . . .  Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management.  The auditor's knowledge of these matters and internal control is limited to that acquired through the audit.  *Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility* . . . ."  RSUF ¶114.

extensively above, Accredo sued E&Y regarding the SPS transaction, alleging that the "unqualified audit opinions" it issued relating to the SPS receivables, which were incorporated into Accredo's financial statements, were "false and erroneous," and that as a result, Accredo paid an "excessive purchase price" for SPS.  Further, the E&Y Complaint, approved as factually accurate by both Stevens and Kimbrough, states that E&Y failed to: (1) exercise appropriate professional due care; (2) adequately plan and supervise the audit it performed; (3) understand and properly evaluate Gentiva's internal controls and method for evaluating its accounts receivable reserves; (4) obtain sufficient evidential matter to support its unqualified opinion; and (5) state whether generally accepted accounting principles had been applied consistently from one year to the next.  SSUF ¶15.

Neither PwC nor D&T ever issued an audit opinion or signed off on any of the false financial statements at issue here.  PwC was never even Accredo's auditor and never performed any assessment of the SPS allowance for doubtful accounts on a stand-alone basis.  RSUF ¶23, 29, 61, 79.  In fact, prior to providing Accredo access to its past work papers, PwC required Accredo to acknowledge that PwC's prior audits were **not** intended for the benefit of Accredo.  On November 19, 2001, Daniel signed the letter:

> Our audit of [Gentiva's] financial statements is not being planned or conducted in contemplation of the proposed transaction between Gentiva . . . and Accredo with respect to [the SPS Division].  ***Items of possible interest to Accredo may not have been specifically addressed*** . . . .  [O]ur audit, and the working papers prepared in connection therewith, ***are not intended for the benefit of Accredo*** and should not be taken to supplant other inquiries and procedures that Accredo should undertake for the purpose of satisfying itself regarding the [SPS Division's] financial condition . . . .

RSUF ¶23.

Defendants also point to D&T, a firm Accredo did not retain until ***after*** the Class Period and after Accredo's shareholders brought this suit.  D&T's staff immediately identified the

"glaring inconsistencies" between Accredo's accounting for the SPS reserves and the facts set forth in Defendants lawsuit against E&Y.  SSUF ¶52.  Moreover, D&T halted audit work until Defendants acknowledged their own responsibility for the Class Period financial statements and provided D&T with "audit evidence" to justify Accredo's May 2003 charge associated with the overvalued SPS receivables.  To comply, Defendants composed the Kimbrough Memo aimed at appeasing D&T and justifying their accounting decision.  The first draft of the Kimbrough Memo prevented D&T from issuing an audit opinion because Defendants were "still blaming − EY, Gentiva, PWC," and Accredo had failed to describe any financial due diligence performed on SPS.  SSUF ¶58.  In demanding that Accredo cite evidence justifying its accounting conclusion, a partner at D&T demanded: ***"Convince us you thought the June 30, 2002 reserve was right . . . Don't tell us what PwC believed, or [what] E&Y believed . . . You are responsible for your financial statements."***  RSUF ¶9.

Subsequent iterations of the Kimbrough Memo purported to identify "interim factors" which ***could*** have affected the collectibility of the accounts receivable balances.  SSUF ¶¶55-56. While D&T accepted these interim factors and proceeded with the Accredo audit, Kimbrough has since admitted that Accredo ***never quantified or evaluated any of the "interim factors"*** included in the final version of the Kimbrough Memo.  SSUF ¶57.  In sum, D&T's post-Class Period audit work does not exonerate Defendants from liability because D&T had a vested interest in agreeing with its new client's accounting treatment of the SPS reserve shortfall, $1.7 million in fees on the fiscal year 2003 audit alone, and did so based entirely upon Accredo's unaudited and false representations.[25]

---

[25]   Defendants throw their own accounting expert, Glennon Moyers, into the mix, and suggest that he too has approved of Defendants' accounting.  Defs. MSJ at 15-16, 19.  Setting aside that he has acted in concert with Defendants and their counsel, and is being paid to do so, Mr. Moyers never audited any of Accredo's financial

Finally, neither Gentiva nor Bank of America ever audited, approved or was responsible for any of Accredo's financial statements or Defendants' faulty accounting.   Contrary to Defendants' statements (Defs. MSJ at 18, fn. 17), Gentiva has never defended the adequacy of the SPS loss reserves recorded by Accredo during the Class Period and its auditor, PwC, has specifically disavowed any responsibility for Accredo's financial statements.   RSUF ¶¶23, 29, 61, 77.  Similarly, Bank of America never analyzed the net value of the SPS receivables and the Bank's own due diligence expert, Barber & Mooney, reported that it was ***unable to provide an opinion on the adequacy of the SPS loss reserve*** because E&Y had not completed its analysis of the bad debt reserve in connection with the SPS audits.[26]

> E.  Defendants' Reliance On Selected Motion To
> Dismiss Opinions Does Not Support Summary Judgment

While steadfastly ignoring this Court's denial of their motion to dismiss, Defendants ironically, and incorrectly, argue that a smattering of other decisions "militates in favor of summary judgment."  Defs. MSJ at 30-39.  With the exception of *Stavroff v. Meyo*, 1997 WL 720475 (6th Cir. 1997), which is easily distinguishable, all of the decisions are from outside the 6th Circuit and only concern motions to dismiss.  In their effort to make these decisions relevant, Defendants ignore key evidence and admissions from this case that are strikingly absent from any of the cases relied upon.

In *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 823 (S.D. Cal. 2006), the district court granted a motion to dismiss, finding that the complaint did not adequately allege

---

statements.  In any event, the accounting expert retained by Accredo's shareholders strenuously disagrees with Mr. Moyers, creating a genuine issue of material fact.  RSUF ¶¶14, 30, 122.

[26]  RSUF ¶17.  Given the nature of a Rule 56 motion, this is not intended to be a full discussion of the evidence disposing of Defendants' claim that various third parties approved of Accredo's financial statements.  What is presented should make clear that there is a genuine issue of material fact, and a jury will have the opportunity to determine whether these third parties' actions and findings, or lack thereof, support the Accredo shareholders' claims or Defendants' defenses.

falsity. *Adecco*, 434 F. Supp. 2d at 822-828. The district court noted that, unlike here, the complaint did not quantify the amount of the uncollectible receivables and only contained vague and conclusory assertions that the company had uncollectible receivables. *Adecco*, 434 F. Supp. 2d at 825. In addition, and in stark contrast to the evidence and admissions in this case, the district court found that the complaint did not include allegations of what the defendants knew and when they knew it. *Id.* at 830. Notably, the district court, unlike Defendants here, recognized that "[u]nderstatements of bad debt reserves **can support a securities fraud claim** because '[c]ompanies are obliged to make reasonable predictions about the collectibility of their accounts receivable. Underestimates of bad debt reserves lead to overstatement of income, and ultimately inflation of stock price.'" *Id.* at 823 (quoting *Kane v. Madge Networks N.V.*, No. C-96-20652-RMW, 2000 WL 33208116, at *5 (N.D. Cal. May 26, 2000)).

In *Payne v. DeLuca*, 433 F. Supp. 2d 547 (W.D. Pa. 2006), the district court found that the complaint adequately alleged the scienter of the company's CEO and CFO, but noted that there was no implication in any documents provided with the pleadings that the company had identified "mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared." *Id.* at 578. In contrast, the record here is replete with evidence that Defendants knew of the accounting misstatements and the misuse of "stale" data that existed at all times during the Class Period.[27]

Defendants' reliance on *In re PEC Solutions, Inc. Sec. Litig.*, 125 Fed. App'x. 490, an unpublished opinion from the Fourth Circuit affirming the granting of a motion to dismiss, is equally misguided. There, the complaint failed to even identify the company by name as one of

---

[27]   Nothing in *Payne* so much as suggests that a securities fraud claim cannot be grounded in the failure to properly value receivables or calculate loss reserves.

the subcontractors being audited by the federal government.  *Id.* at 496-497.   Likewise, the

complaint did not allege any facts inferring that defendants knew the audit – if one even existed

– was non-routine or that defendants knew they would not receive payment on the contract at the

time they made statements to the contrary.  *Id.*  The facts and posture of the case are so dissimilar

as to render the unpublished opinion irrelevant.

Finally, in *Stavroff*, the Sixth Circuit affirmed the district court's granting of summary

judgment based on the lack of evidentiary support for the claims.   In that case, the plaintiff

simply alleged earnings projections were false based solely on the company's internal

forecasting tools.  1997 WL 720475 at *16.  Without any "evidence in the record to support

plaintiff's allegations that defendants had prior knowledge that they failed to disclose," the Sixth

Circuit affirmed summary judgment.  *Id*.  No such lack of evidence exists here.  Indeed,

Defendants' own arguments center on excusing or trying to explain away their admissions and

the evidence of fraudulent misconduct.  In doing so, Defendants have drawn a sharp contrast to

the facts in *Stavroff*, and demonstrated that significant questions of material fact exist.

## VI.   DEFENDANTS' MISSTATEMENTS
##       WERE MATERIAL TO ACCREDO INVESTORS

Despite the clear record of evidence and admissions to the contrary, Defendants move for

summary judgment on materiality grounds.[28]  In § 10(b) actions, a false statement or omission is

material if there is a substantial likelihood that the misrepresentation "would have been viewed

by the reasonable investor as having significantly altered the 'total mix' of information made

available."  *Basic*, 485 U.S. at 231-32 (quoting *TSC Indus. Inc.*, 426 U.S. at 449).  Materiality is

a mixed question of law and fact and, like scienter, "[d]eterminations of materiality are generally

---

[28]  Based on Defendants' admissions, Lead Plaintiffs moved for partial summary judgment on materiality.  *See* Lead
Plaintiffs' MSJ at 6-10.

issues that are left to juries."  *Brewer v. Lincoln Int'l Corp.*, 148 F. Supp. 2d 792, 803 (W.D.

Kan. 2000) (citing *U.S. v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998)).

    A.    The SPS Receivables Were A Material
              <u>Part Of Accredo's Financial Statements</u>

Throughout the Class Period, the SPS receivables and associated allowance for doubtful

accounts were the largest asset and reserve on Accredo's financial statements and material to

Accredo's Class Period financial statements.[29]  Accredo's financial statements clearly specified

that the allowance for doubtful accounts was one of Accredo's "three critical accounting

policies" and was, at all relevant times, "***material to our financial statements***."  SSUF ¶¶30, 34,

44.  Defendants also readily admit that the size and significance of the SPS allowance for

doubtful accounts made this reserve material.  SSUF ¶3.  In fact, Accredo's due diligence

documents show that "[i]t was discussed with E&Y and E&Y understood that the accounts

receivables ***was a material concern*** regarding the SPS Division balance sheet."  *Id.*

Defendants further concede that the misstatements relating to the SPS receivables and

related loss reserve were material.  Specifically, in their suit against E&Y, Defendants admit

"that the SPS Division's reserves for doubtful accounts were not adequate" and that "as a result,

the SPS Division's method for calculating its allowance for doubtful accounts ***generated***

***materially inaccurate results*** . . . for all financial periods after September 2000."  SSUF ¶33.  In

fact, Kimbrough testified that Accredo's materiality band was a "couple hundred thousand

dollars:"

      Question:      Okay.  And what was Accredo's materiality band at that time?

      Answer:        Well, at that point in time, you know, it clearly would have been, you
                          know, something less than, you know, ***couple hundred thousand dollars,***

---

[29] RSUF ¶6.  William Drummond, head of the Accredo audit team at E&Y, concurred:  Question:  "Well, was the SPS allowance on Accredo's books after it acquired the SPS business, was it material to Accredo's financial statements?"  Response:  "Yes.  Yes it was."

> you know, $350,000 type thing.  We were looking at, you know, post tax, you know, penny a share was something roughly around $500,000.

SSUF ¶39.  As set forth in the chart below, the understatement of the SPS allowance for doubtful accounts during the Class Period exceeded this figure by several orders of magnitude:

| SPS Reserve Understatement (Amounts in Millions) | | | | |
|---|---|---|---|---|
| Reporting Period<br><br>(A) | SPS Reserve as Originally Reported<br><br>(B) | Corrected SPS Reserve<br><br>(C) | Understatement of Reserve as of Reporting Period ($)<br>(C) – (B) = (D) | Understatement of Reserve as of Reporting Period (%)<br>(D)/(C) = (E) |
| 6/13/02 | $68.4 | $121.7 | **$53.3** | **43.8%** |
| FY 2002 | $69.4 | $125.2 | **$55.8** | **44.6%** |
| 1Q03 | $72.9 | $128.0 | **$55.1** | **43.0%** |
| 2Q03 | $71.8 | $127.1 | **$55.3** | **43.5%** |

*See* SSUF ¶35.

Given the massive dollar and percentage understatement that resulted from Defendants' accounting manipulations, the SPS receivables issue is "so obviously important to an investor that reasonable minds cannot differ" as to materiality.  *TSC Indus. Inc.*, 426 U.S. at 450.  Kimbrough confirmed:

> Question:   Okay. So is the broad range referring to what the reserve was and what Mr. Johnson's summary?
>
> Answer:   The broad range would have been even what the reserve was actually calculated.  There would have been something plus or minus within that . . . that range would have been something plus or minus what was recorded up to an additional $50 million.  And so that would have created a range that was a two – that range if, in fact, that would have been the range is clearly too broad by which to – to record something in the middle of that because you would have, you know, $20 million one way of the other.  ***There's no question that's material within the reading of the financial statements for our readers.***

SSUF ¶38.

In short, any argument that the SPS allowance for doubtful accounts was not a material part of Accredo's financial statements is contradicted by Defendants' own testimony, Accredo's own financial statements and the due diligence conducted prior to acquisition. *See* Defs. MSJ at 6-10.

B.     The Truth On The Market Defense Does Not Apply

Ignoring their own admissions and the dramatic reaction of the stock market, Defendants now argue that the "truth on the market" defense supports summary judgment. Defs. MSJ at 39-41. Defendants are wrong.[30] To prevail, Defendants must show that information relating to their material misstatements was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression." *Mittman v. Rally's Hamburgers, Inc.*, 278 F. Supp. 2d 831, 838 (W.D. Ky. 2003). Defendants' burden is "extremely difficult, perhaps impossible, to meet at the summary judgment stage." *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 482-83 (S.D.N.Y. 1994). Indeed, Defendants do not even try to prove or even suggest that the market knew about the severe overvaluation of the SPS receivables. Instead, Defendants merely state that the market knew about the DSO associated with the SPS receivables. Defs. MSJ at 40-41. The mere identification of the DSO however, did not provide shareholders with all material information.

Regardless of what DSO numbers were reported, Defendants misrepresented the true value of the SPS receivables and falsely represented that the Company's accounts receivable and corresponding allowance for doubtful accounts were fairly stated in accordance with GAAP. SSUF ¶¶25, 27, 33. While the high DSO should have prompted Defendants to evaluate the receivables and use the realistic collection rates in calculating the SPS loss reserves, Defendants

---

[30] The truth on the market defense is only applicable where a defendant can prove that the allegedly false or omitted information is already known to the market. *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1373 (S.D. Fla. 2001) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d. Cir. 2000)).

defused investors' concerns by claiming that the reserves were adequate. Accredo's shareholders and the market did not have access to, or knowledge of, the vast number of warnings Defendants had received about the SPS receivables or any context in which to evaluate the high DSOs. In fact, the full truth about the receivables was not publicly disclosed until April 8, 2003, when Accredo announced for the first time that is was "examining the adequacy of the reserves of the accounts receivable that it acquired on June 13, 2002 as part of its purchase of [SPS]." SSUF ¶60. The market reaction, realized by an immediate 44% drop in the value of Accredo stock, is telltale evidence that investors were not aware of the SPS receivables issues. Defendants offer no evidence – and none exists – showing that the market knew, prior to April 8, 2003, that Accredo's allowance for doubtful accounts was understated, let alone by more than $50 million. *Id.*

      C.    Accredo's Financial Statements And The SPS
               Reserves Were Not "Forward Looking Statements"

The PSLRA provides a safe-harbor provision for forward-looking statements that are accompanied by meaningful cautionary language. 15 U.S.C. § 78u-5(c)(1)(A)(i). Notably, the PSLRA explicitly excepts from its safe-harbor provision any ". . . forward-looking statement . . . (2) that is . . . (A) ***contained in a financial statement*** prepared in accordance with generally accepted accounting principles . . . ." 15 U.S.C. § 78u-5(b)(2)(A). Further, any statement outside the context of the financial statements relating to reserves and their adequacy are not forward-looking. *See Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 281 (3d Cir. 1992) (noting that there is "nothing unique about representations . . . regarding loan loss reserves that removes them from the purview . . . of the federal securities laws"). *See also Berson v. Applied Signal Technology, Inc.*, 2008 WL 2278670, at *6 (9th Cir. 2008) (accounts receivable are not forward-looking); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 401-06, 416 (D.N.J. 2004) (company's

financial statements that failed to account for bad debt not forward-looking); *In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1340, 1351 (M.D. Fla. 2002) (same); *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1032 (N.D. Ohio 2000) (same).

In direct contrast to the statutory and case law above, Defendants argue that the misstatements relating to the SPS reserves contained in Accredo's financial statements cannot be, as a matter of law, material because they were forward-looking and accompanied by cautionary language. Defs. MSJ at 9 fn. 14; 39 fn.25. Once again, Defendants are mistaken.

First, because all of Accredo's Class Period financial statements were purportedly prepared in accordance with GAAP, any statements in those documents – whether related to the SPS reserves or not – are not protected as forward-looking statements. 15 U.S.C. § 78u-5(b)(2)(A). Second, statements about an allowance for doubtful accounts are necessarily ***present*** (as opposed to "forward-looking") representations as they set forth the value of the receivables ***at the time*** of the financial statements. Accordingly, statements about the SPS reserves are not "forward-looking" in any context. *See* MTD Order (finding that the '02 10-K the '03 1Q 10-Q and the '03 2Q 10-Q are historical or present in nature, and not forward-looking).

VII.    LOSS CAUSATION IS NOT APPROPRIATELY DISPUTED

To prove loss causation, Accredo shareholders need only establish that there is a "causal connection" between the alleged misrepresentations and the loss suffered by Lead Plaintiffs and investors. *Dura*, 544 U.S. 336, 342 (2005). In other words, a jury must find that a disclosure connected to the alleged fraud resulted in a decline in the value of Accredo's stock price. *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 758 (S.D. Oh. 2006). Moreover, the misrepresentation need only be a cause of the loss, not the sole cause:

> A plaintiff is not required to show 'that a misrepresentation was the *sole* reason for the investment's decline in value' in order to establish loss causation. *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n. 5

> (11th Cir. 1997) (emphasis added): *'[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery* under the loss causation requirement' but will play a role 'in determining recoverable damages.'

*In re Daou Systems, Inc. Sec. Litig.*, 411 F.3d 1006, 1025 (9th Cir. 2005) *cert. denied*, 126 S.Ct. 1335 (2006).

In order to carry their burden on summary judgment, Defendants "would have to establish that, as a matter of undisputed fact, the depreciation in the value of the [securities] **could not** have resulted from" its false and misleading statements. *See Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 650 (7th Cir. 1997); *accord Motorola*, 2007 WL 487738, at *39 ("[T]he burden . . . rests with Defendants, on summary judgment, to show that a decline in Motorola's share price, identified by Lead Plaintiff as occurring following the disclosure of . . . information [related to the misrepresentations] did **not** result from that disclosure") (emphasis in original). As a result of this heavy burden, and the fact that causation is a fact-specific inquiry, it "is usually reserved for the trier of fact." *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000).

Only relying on *Dura*, but misstating its very premise, Defendants fail to cite any case law in support of their incorrect assertion that the elements of loss causation and damages must be proven concurrently. Defs. MSJ at 42. In fact, the actual amount of the damages suffered by Lead Plaintiffs and Accredo shareholders is a separate element of a § 10(b) claim.[31] The burden of loss causation "does not . . . rest with Lead Plaintiff, at . . . the summary judgment stage [] to apportion and quantify which part of its loss is attributable to disclosures of . . . information

---

[31] *See Dura*, 544 U.S. at 342. Here, the parties have each put forth damages experts and there is a material question of fact as to the amount of damages actually suffered by Accredo shareholders as a result of the alleged fraud. The shareholders' expert has performed a damage analysis in preparation for trial. Based on this analysis, the Class suffered $7.80 per share, or approximately $200 million total, of damages directly relating to the April 8, 2003 disclosure. SSUF ¶17.

[related to the misrepresentations].”  *Motorola*, 2007 WL 487738, at *39.  Defendants cite no authority holding otherwise.

There is no question that the misrepresentations relating to the adequacy of the SPS accounts receivable were causally related to the drastic decline in value of Accredo stock immediately following the April 8, 2003 announcement.   In fact, two securities analysts immediately identified the accounts receivable issue as the utmost concern to investors:

- *“Of greater concern,* however, is management’s revelation of lingering *problems with the accounts receivable* purchased from Gentiva . . . via the SPS acquisition . . . ”, John Ransom, Raymond James & Associates, 4/8/03.

RSUF ¶95; SSUF ¶46.

- “*Biggest takeaway to us more challenges than thought around big SPS acquisition integration* . . . Raises questions about the prudence of communicating such significant year one EPS accretion back in 06/02 given what was known about DSOs within.”  Larry Marsh, Lehman Brothers 4/9/03.[32]

SSUF ¶47.

Moreover, Defendants have admitted the causal connection to the misrepresentations related to the SPS receivables to the stock’s immediate decline in value.  For example, in the E&Y Complaint, Defendants confirmed that: “After the markets opened on April 8, 2003, Accredo’s stock value plummeted from a price of $25.40 per share on April 7, 2003 to a price of $14.29 per share at the close of business on April 8, 2003,” and that Accredo and its officers were named as defendants in several lawsuits, “*all of which result from the understatement of the reserves for doubtful accounts related to the accounts receivable for the SPS Division.*”  SSUF ¶48-49.  Defendants also alleged that the “loss of market capitalization, decrease in public

---

[32]   Defendants mistakenly argue that “the A/R reserve issue was of little or no consequence” to investors. Defendants’ effort to interpret what investors thought on April 8, 2003 is contradicted by both the analyst reports identified here and this suit, brought by some of the very investors Defendants argue did not care about the SPS receivables.  Defs. MSJ at 43.  The fact that other analysts may have paid less attention to the SPS receivables problem does no better than create a genuine issue of material fact as to how much of the April 8 stock price drop (*i.e.*, shareholders’ damages) was the result of the disclosure.

perception regarding the stability of Accredo's stock [and] loss of good will" were "***reasonably foreseeable damages proximately caused by***" the inaccurate SPS loss reserves.  *Id.*

While Defendants now argue that the market primarily (but not solely) was concerned with the reduction in Accredo's earnings estimate (Defs. MSJ at 42), Defendants previously admitted that the April 8, 2003 reduction in guidance was directly related to the shortfall in SPS receivables value.  For example, in June 2003, Stevens made a PowerPoint presentation to the Center for Corporate Innovation, stating that, "ACDO's [Accredo's] March preliminary revenue and margins below estimates ***due to bad debt"*** and that as a result of the April 8, 2003 announcement ***"ACDO stock plummets."***  SSUF ¶45.  Further, Kimbrough further solidified the causal link between the earnings guidance and the SPS errors in his December 2004 testimony to the SEC:

> Question:    Could you briefly tell me what information was released to the public in Exhibit 2 [Accredo's April 8, 2003 press release]?
>
> Answer:      The information released to the public in Exhibit 2 was that we potentially had a provision for bad debt issue associated with the acquisition of the SPS assets that we purchased.  ***As a result of that, we were revising our 03 EPS outlook.***  We were reducing it from $1.33 to $1.22 to buy [sic] and that we would effectively give the public more information as it could be provided.

SSUF ¶50.

In sum, Accredo's April 8, 2003 announcement caused the truth regarding the value of SPS to reach the market for the first time.  As a direct result of this announcement, the inflation associated with Defendants' previous misrepresentations relating to SPS immediately exited Accredo's stock price, resulting in a one day 44% drop in the value of those securities. Defendants have admitted as much, and Accredo shareholders need not show more now, or even at trial.   Accordingly, Defendants' summary judgment motion on loss causation should be denied.

VIII.   THE INDIVIDUAL DEFENDANTS WERE CONTROL PERSONS

Lead Plaintiffs allege, and the evidence proves, that Stevens and Kimbrough are liable as controlling persons of Accredo under § 20(a) of the Exchange Act.[33]  Defendants do not contest that they were controlling persons of Accredo, but only argue that there is no genuine issue of fact that they committed an underlying violation of § 10(b) of the Exchange Act.  Defs. MSJ at 44.  As detailed herein, the evidence establishes Defendants' primary violations of § 10(b).  Accordingly, Defendants' motion with respect to the Accredo shareholders' § 20(a) claim also fails.

IX.   CONCLUSION

The substantial body of evidence in this case supports the Accredo shareholders' claims of securities fraud and demonstrates that there are genuine issues of material fact.  Accordingly, Lead Plaintiffs respectfully request that Defendants' motion be denied in its entirety.

Dated: July 2, 2008                    Respectfully submitted,

                                       BERNSTEIN LITOWITZ BERGER
                                          & GROSSMANN LLP


                                       ___s/ Timothy A. DeLange___
                                       TIMOTHY A. DeLANGE

                                       BLAIR A. NICHOLAS
                                       TIMOTHY A. DeLANGE
                                       BRETT M. MIDDLETON
                                       MATTHEW P. JUBENVILLE
                                       12481 High Bluff Drive, Suite 300
                                       San Diego, CA 92130
                                       Tel:   (858) 793-0070
                                       Fax:   (858) 793-0323

---

[33]  Section 20(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
TOR GRONBORG
DAVID W. MITCHELL
TRIG SMITH
NATHAN W. BEAR
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel:   (619) 231-1058
Fax:  (619) 231-7423

*Co-Lead Counsel for Plaintiffs Louisiana
School Employees' Retirement System and
Debra Swiman*

GLASSMAN EDWARDS WADE
  & WYATT, P.C.
B.J. WADE
26 N. Second Street
Memphis, TN 38103
Tel:   (901) 527-4673
Fax:  (901) 521-0904

*Liaison Counsel*

<u>DECLARATION OF SERVICE</u>

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United

States and a resident of the County of San Diego, over the age of 18 years, and not a party to or

interested in the within action; that declarant's business address is 12481 High Bluff Drive, Suite

300, San Diego, California 92130.

2.      That on July 2, 2008, declarant caused to be served the following document:

> o   LEAD PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
>      DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; and
>
> o   DECLARATION OF SERVICE.

by placing a true copy(ies) thereof enclosed in sealed envelopes addressed as follows:

### SEE ATTACHED SERVICE LIST

☐   **(BY U.S. MAIL)** I am personally and readily familiar with the business practice of Bernstein Litowitz Berger & Grossmann LLP for collecting and processing of correspondence for mailing with the United States Postal Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at San Diego, California.

☐   **(BY FACSIMILE)** I am personally and readily familiar with the business practice of Bernstein Litowitz Berger & Grossmann LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

X   **(BY ELECTRONIC MAIL)** Pursuant to F.R.C.P. 5(e) I am personally and readily familiar with the business practice of Bernstein Litowitz Berger & Grossmann LLP for collection and processing of document(s) to be transmitted electronically in Portable Document Format (PDF) and I certify that I caused such document(s) on this date to be filed electronically with the Clerk of the Court through ECF, and that ECF will send an e-notice of the electronic filing to the offices of the email addressee(s) listed below:

☐   **(BY OVERNIGHT MAIL)** I am personally and readily familiar with the business practice of Bernstein Litowitz Berger & Grossmann LLP for collection and processing of correspondence for overnight delivery, and I caused such

document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery (as indicated by *).

X        **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

3.        That there is a regular communication by mail between the place of mailing and

the places so addressed.

Executed this 2nd day of July, 2008, at San Diego, California.


_____/s/ Brandy M. Roberts_____
BRANDY M. ROBERTS

51

In re ACCREDO HEALTH INC.
Service List
July 2, 2008
Page 1

| ***ATTORNEYS FOR PLAINTIFF(S):*** | ***ATTORNEYS FOR DEFENDANTS:*** |
|---|---|
| Mark Solomon | Kelly Wilcove |
| Tor Gronborg | Jeffrey A. Kershaw |
| Trig R. Smith | Scott N. Sherman |
| David Mitchell | ALSTON & BIRD |
| Nathan W. Bear | One Atlantic Center |
| COUGHLIN STOIA GELLER | 1201 West Peachtree Street |
|    RUDMAN & ROBBINS, LLP | Atlanta, GA 30309-3424 |
| 655 W. Broadway, Suite 1900 | Tel:   (404) 881-7000 |
| San Diego, CA 92101-4297 | Fax:   (404) 881-7777 |
| Tel:   (619) 231-1058 | *Attorneys for Defendants Accredo Health,* |
| Fax:   (619) 231-7423 | *Inc.; David D. Stevens; Joel Kimbrough* |
| *Co-Lead Counsel for the Class* | |
| | Jef Feibelman |
| B.J. Wade | Douglas F. Halijan |
| GLASSMAN EDWARDS WADE | BURCH PORTER & JOHNSON |
|    & WYATT, P.C. | 130 North Court Avenue |
| 26 N. Second Street | Memphis, TN 38103-2288 |
| Memphis, TN 38103 | Tel:   (901) 524-5000 |
| Tel:   (901) 527-4673 | Fax:   (901) 524-5024 |
| Fax:   (901) 521-0940 | *Attorneys for Defendants Accredo Health,* |
| *Liaison Counsel* | *Inc.* |

14835v4