**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

In re ACCREDO HEALTH, INC.                )
SECURITIES LITIGATION                      )
_____               )
                                           )
This Document Relates To:                  )       CIVIL ACTION No.  03-2216-BBD
                                           )
    ALL ACTIONS                          )       **CLASS ACTION**
                                           )


**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Peter Q. Bassett
Kelly C. Wilcove
Scott N. Sherman
Mark D. Trainer

Alston & Bird LLP
1201 West Peachtree Street
Atlanta, Georgia 30309

Counsel for Defendants Accredo Health, Inc,
David D. Stevens, and Joel R. Kimbrough

# I.     <u>INTRODUCTION</u>

Defendants' Motion for Summary Judgment, Docket No. 363, ("Defendants' Motion"), filed with the Court on May 16, 2008, should be granted because Plaintiffs cannot prove the elements of their claims as set forth in the Consolidated Complaint, Docket No. 99 ("Complaint").  Despite Plaintiffs' protestations to the contrary, this case has, since its inception, been premised on faulty allegations concerning Defendants' knowledge relating to the collectibility of *acute* A/R that Accredo acquired as part of the SPS Division acquisition.  Plaintiffs' wholesale abandonment of their actual allegations and resultant attempt to change direction at this point in the litigation by arguing that the A/R Reserve for both acute *and* chronic was understated merely demonstrates their inability to prove the alleged "fraud."  But, just because the record evidence indisputably disproves Plaintiffs' unmistakable allegations that Defendants knew or should have known that the A/R Reserve was understated by approximately $60 million because "only $10 million of the $70 million of SPS *acute* therapy accounts receivable" was collectible (Comp. ¶ 77), they should not now be permitted to effectively amend their Complaint via their Opposition pleading.  As a result of Plaintiffs' inability to prove the case they alleged over five years ago, summary judgment is warranted.

Even if the Court allows Plaintiffs to include new allegations in an effort to salvage their baseless claims, Defendants are still entitled to summary judgment on the issues of scienter, materiality, and loss causation.  In their Memorandum in Opposition to Defendants' Motion, Docket No. 396, ("Plaintiffs' Opposition" or "Pls.' Opp.")[1], Plaintiffs argue that Defendants' knowingly issued false financial statements, recklessly ignored the allegedly overvalued A/R (in other words, recklessly

---

[1]  This Court should not take into account any factual arguments contained in the Declaration of Trig R. Smith in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Smith Dec.").  A declaration is meant only to set forth facts of which the declarant has actual personal knowledge, not to make additional factual arguments that, if included in Plaintiffs' Opposition Memorandum would have caused them to exceed their page limitation.  (*See* Fed. R. Civ. P. 56(e).)  Further, the Smith Dec. contains several inaccuracies.  *See* Declaration of Scott N. Sherman, attached as Exhibit "A."

set the A/R Reserve estimate too low), and had the motive and opportunity to commit fraud.  (Pls.'
Opp., pp. 25-34.)  Plaintiffs' arguments are fatally flawed.  First, Defendants did not knowingly issue
false financial statements.  The only "evidence" Plaintiffs cite is that Accredo issued its second quarter
financials on February 14, 2003, two days after Brian Johnson informed Defendants of a potential
issue regarding the A/R Reserve.  Plaintiffs conveniently omit, however, that everyone, including Mr.
Johnson himself, believed at that time that there was no possibility that his preliminary calculation was
correct.  Moreover, as discussed in Defendants' opening brief, a disagreement as to the timing of a
charge is not the stuff of fraud.  (*See* Defendants' Memorandum in Support of Their Motion for
Summary Judgment, p. 22, Docket No. 363-2 ("Defs.' Brief").)

Second, Defendants were not severely reckless in calculating the A/R Reserve estimate.
Plaintiffs would have this Court believe that Defendants' alleged use of "stale[2]" data in calculating the
A/R Reserve, as opposed to using only the most recent quarter's collection rates percentages, was such
a departure from reasonable conduct that anyone would have known that the A/R Reserve was
materially understated.  This is simply not the case.  Not only were Defendants not severely reckless,
they acted well within the realm of reason.  As the evidence shows, the so-called "stale" data actually
produced a higher, and, thus, a more conservative A/R Reserve estimate than would the use of the
updated historical averages.[3]  Thus, the evidence is wholly contrary to Plaintiffs' argument.  Further,
the use of historical average collection rates as opposed to only the most recent quarter's collection
rates is reasonable and was also used by Gentiva and approved by both PwC and E&Y, among others.
Indeed, well-reasoned case law instructs that the mere existence of a disagreement regarding an

---

[2]  The "stale" data Defendants allegedly used consisted of average collection percentages calculated in September 2000
using the previous sixteen quarters.  Plaintiffs argue that Accredo should have utilized only the most recent quarter's
collection rates percentages to calculate the A/R Reserve.
[3]  It is undisputed that these updated historical average collection percentages were, in fact, considered in the calculations of
the A/R Reserve.  Defendants' Response and Opposition to Plaintiffs' Statement of Undisputed Facts, Tab 33, Docket No.
349 ("Defs. Resp. to PSUF").

accounting methodology alone prevents a finding of scienter.  *See, e.g., In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 677 (3d Cir. 2002) ("highlighting different accounting methodologies that Ernst might have employed – particularly in the nebulous context of establishing reserves for vulnerable accounts – does not suggest that the approach actually chosen was an extreme departure from ordinary care."); *In re Digi Int'l, Inc. Sec. Litig.*, 14 F. App'x 714, 717 (8th Cir. 2001) (the District Court held, and the 8th Circuit agreed, that no reasonable jury could find that the defendants acted with scienter as reasonable people could have disagreed about the proper method of accounting used for the investments, even if the accounting treatment used was improper); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) ("[The disputed] items involved complex issues of accounting as to which reasonable accountants could reach different conclusions.  Indeed, . . . the Court heard diametrically opposing views from experts as to the reasonableness of [the] accounting and audit judgments.  It follows that no finding of fraud or recklessness can rationally be made in this case." (quoting *SEC v. Price Waterhouse,* 797 F. Supp. 1217, 1241 (S.D.N.Y. 1992))); *Payne v. Deluca*, 433 F. Supp. 2d 547, 580 (W.D. Pa. 2006) ("The plaintiff cannot satisfy the reckless behavior prong of showing scienter where the disputed items involve complex issues of accounting as to which reasonable accountants could reach different conclusions.").  As for the supposed "red flags" that Plaintiffs allege Defendants ignored, Plaintiffs either misunderstand or purposefully misrepresent the evidence.  Contrary to Plaintiffs' assertions, Defendants did not use a 95% overall collection rate throughout the Class Period.  Moreover, Plaintiffs concede that high DSOs are not enough to reveal a problem with an A/R Reserve.

Lastly, Plaintiffs' assertion that Defendants had the motive and opportunity to commit fraud is insufficient to establish scienter because the same could be said for every high ranking executive at every publicly-held company.  Accordingly, Plaintiffs cannot satisfy their burden of proving a strong

inference of scienter.

Defendants are also entitled to summary judgment because Plaintiffs fail to (1) prove the element of materiality based on the truth-on-the-market defense; and (2) establish loss causation.

## II.     LAW AND ANALYSIS

**A.     Plaintiffs Concede the Lack of Proof of Their Alleged Fraud.**

Defendants are entitled to summary judgment because Plaintiffs concede their inability to prove the element of scienter as alleged in the Complaint.  Plaintiffs attempt to gloss over this fatal deficiency by now arguing that their claim has always been that the SPS Division's A/R as a whole was "impaired by almost $60 million."  (*See* Pls.' Opp., p. 20.)  Although there are general statements in the Complaint referring to SPS Division's A/R, these are not enough to change the nature of Plaintiffs' claims when read as a whole.  *See Arar v. Ashcroft*, No. 06-4216-cv, 2008 WL 2574470, at *36 (2d Cir. June 30, 2008) ("We are, moreover, required to read the factual allegations in a complaint 'as a whole.'" (citing *Shapiro v. Cantor*, 123 F.3d 717, 719 (2d Cir. 1997))).   Reading the allegations in the Complaint as a whole, it is obvious that this case has always centered on the alleged uncollectibility of the SPS Division's ***acute*** A/R.

Plaintiffs readily admit that "this case centers on" the fact that the SPS Division's A/R was impaired by $60 million.  (Pls.' Opp., p. 20.)  Plaintiffs ask the Court to overlook the fact that they specifically and repeatedly pled, as they were required to do to satisfy the heightened pleading requirements of the Reform Act, that the entire $60 million impairment was solely related to the ***acute*** A/R.  For example, Plaintiffs allege the following in their Complaint:

▪       Leading up to the SPS acquisition, it was internally known that only $10 million of the $70 million of SPS ***acute*** therapy segment's accounts receivable were collectible. . . .  (Comp. ¶ 5(a).)

▪       At the beginning of the Class Period, having just succeeded in acquiring SPS, defendants could not reveal to Accredo's shareholders the dismal truth that more than 85%, or $60 million of the SPS ***acute*** therapy segment's accounts receivable, would have to be written off. . . .  (Comp. ¶

6.)

- . . . . the actual collectible value of the SPS *acute* therapy segment's accounts receivable at the time of the acquisition was approximately $10 million. . . .  (Comp. ¶ 28(c).)

- . . . . Despite the fact that SPS's *acute* therapy division had nearly $60 million in uncollectible accounts receivable on its books as of January 2, 2002, defendants executed an acquisition agreement with Gentiva.  (Comp. ¶ 31.)

- . . . in the time leading up to the acquisition it was widely known that only $10 million of the $70 million, or 14%, of patients' accounts receivable, belonging to the SPS *acute* therapy segment were collectible.  Therefore, the allowance for doubtful accounts relating to this segment of SPS should have been at least 86%. . . . Further, . . . the SPS *acute* therapy segment's DSO ranged between 300 and 360 days. . . . Thus, SPS's *acute* therapy 300 day DSO statistic appeared lower that it actually was.  (Comp. ¶ 75.)

- . . . . only $10 million of the $70 million of SPS *acute* therapy accounts receivable were collectible at the time of the SPS acquisition. . . .  (Comp. ¶ 77.) [4]

According to Plaintiffs' own statement, this "case centers on" an alleged $60 million A/R impairment. (Pls.' Opp., p. 20.)  As just demonstrated, Plaintiffs clearly and unequivocally alleged in their Complaint that the SPS Division's *acute* A/R was impaired by $60 million.  Therefore, if one reads the Complaint as a whole, it is undeniable that this case solely "centers on" the alleged impairment of the SPS Division's *acute* A/R.

Plaintiffs make additional allegations that further demonstrate that the alleged fraud about which they complain concerned only the SPS Division's *acute* A/R.  For instance, Plaintiffs unequivocally allege that Defendants attempted to hide the alleged *acute* A/R uncollectibility by selling the acute segment to an unsuspecting third party:

- While defendants were announcing "record" financial results in 4Q02, 1Q03 and 2Q03 and artificially inflating the Company's stock price, Stevens and Kimbrough were ***desperately trying to dump the SPS acute therapy segment and its undisclosed accounting fraud*** onto somebody else.  Originally, the defendants intended to dispose of the entire SPS acute segment by December 31, 2002.  As a result, defendants were forced to dispose of pieces of the SPS acute business that had value, but were left holding on to what remained — tens of millions of dollars of accounts receivable that shareholders had never been told was worthless. . . .  (Comp. ¶ 7.)

---

[4]  *See also* Plaintiffs' similar claims in their Opposition to Defendants Motion to Dismiss, pp. 6, 21, 24, Docket No. 113.

-     . . . . As such, defendants schemed to complete the acquisition of SPS and dump the *acute division and its attendant accounts receivable problems* rather than being truthful with investors.  (Comp. ¶ 32.)

-     Having failed in dumping the SPS *acute* therapy segment onto another party, defendants finally admitted that throughout the Class Period the SPS accounts receivable were overstated by approximately $58.5 million and that material accounting adjustments should have been incorporated into Accredo' s pro-forma consolidated financial information in the May 10, 2002 Joint Proxy Statement/Prospectus and Registration Statement, FY2002 Form 10-K, 1Q03 and 2Q03 Form 10-Qs and concurrent public statements.  (Comp. ¶ 63.)

-     . . . . However, defendants improperly delayed incurring such an expense in order to avoid the negative impact on Accredo's net income for as long as possible and in the hope that they could sell the SPS *acute* therapy segment without ever disclosing the truth to investors. . . .  (Comp. ¶ 83.) [5]

Notwithstanding these statements that blatantly rebut Plaintiffs' attempt to rewrite their fraud allegations, Plaintiffs try to bolster their specious claim that this case should involve the SPS Division's A/R as a whole, rather than just the acute A/R, by pointing to only two examples that the Court, in its Order Denying Defendants' Motion to Dismiss, Docket No. 119, (the "Order"), referenced.  This too is unpersuasive because it wholly ignores the fact that the Court, on numerous occasions in its Order, referenced the alleged fraud from the Complaint as centering on the SPS Division's *acute* A/R:

-     SPS's *acute* therapy division had nearly $60 million in uncollectible accounts receivable on its books as of January 2, 2002.  (Order at 2, citing Comp. ¶ 31.)

-     CW1 also stated that the ATB reports were provided to Defendants Kimbrough and Stevens and that they knew that the *acute* therapy segment of SPS suffered from DSO of 300 days prior to its acquisition by Accredo.  (Order at 20, citing Comp. ¶ 28(a).)

-     Confidential Witness 3 ("CW3"), a former Gentiva and Accredo Accounts Receivable Specialist Team Leader who worked for Defendants during the Class Period, alleged that he/she observed that the actual collectable value of the SPS *acute* therapy segment's accounts receivable at the time of acquisition was approximately $10 million.  (Order at 20, citing Comp. ¶ 28(c).)

---

[5]  Plaintiffs make similar admissions that the alleged fraud related solely to the acute A/R in their Opposition to Defendants Motion to Dismiss, pp. 1-2, 6, Docket No. 113, and Smith Dec., pp. 15-17, 20-21, 23-24, Docket No. 396-3.

- CW1 and CW3 asserted that at the time of the acquisition it was widely known that only $10 million of the $70 million of the SPS *acute* therapy accounts receivable were collectable. (Order at 21, citing Comp. ¶¶ 75, 77.)

- CW1 and CW6 asserted that SPS acute therapy segment's DSO ranged from 300 to 600 days. The SPS *acute* therapy segment's DSO was approximately 235 days greater that Accredo's DSO prior to the acquisition.  (Order at 21, citing Comp. ¶¶ 75.)

- Moreover, the complaint asserts that Defendant Kimbrough was directly involved in the due diligence of SPS, and as such, knew prior to the acquisition of SPS that SPS's *acute* therapy segments accounts receivables were impaired.  (Order at 22.)

- Plaintiffs have alleged that these statements were not accompanied by meaningful cautionary language and that Defendants knew that the statements were false when they made them because they knew about the uncollectible accounts of SPS's *acute* therapy division and the 300 day DSO prior to the statements being made.  (Order at 28.)

- The complaint alleges that Defendants knew, based on Defendants' involvement in the SPS due diligence and Defendants' monthly receipt of the ATB reports, that the SPS *acute* therapy segment had approximately $60 million in uncollectible receivables.  (Order at 31.)

- Defendants' subsequent determination that a charge of $58.5 million against Accredo's fiscal 2003 earnings was necessary further supports Plaintiffs' assertion that Defendants knew or recklessly disregarded that the SPS *acute* therapy segment's accounts receivable were impaired.  (Order at 32.)

- Plaintiffs contend that Defendants delayed in incurring a charge to income in the hope that they could sell the SPS *acute* therapy segment.  (Order at 33.)

Plaintiffs' allegations, statements in other pleadings, and this Court's Order establish that the fraudulent conduct and theory Plaintiffs allege against Defendants in this case is solely centered on the SPS Division's acute A/R.  Indeed, nowhere in the Complaint do Plaintiffs even mention chronic A/R as impaired or uncollectible.  Plaintiffs' attempt to now bring a fraud claim that looks nothing like the claim alleged in the Complaint is improper and should not be considered by the Court.  *See, e.g.*, *Rodriguez v. Pfizer Pharms., Inc.*, 286 F. Supp. 2d 144, 152 (D.P.R. 2003) (declining to consider new allegations raised in opposition to summary judgment and holding that "[t]he Court will not allow Plaintiff to attempt to amend his allegations through the Opposition pleading."); *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990) (affirming district court's grant of summary judgment on

7

basis that claim not raised in complaint, but rather raised in opposition to motion for summary judgment, was not properly before the court); *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (affirming grant of summary judgment on allegations raised in opposition to motion for summary judgment, on the basis that the claim was not properly before the court).[6]

Not only is Plaintiffs' belated attempt to salvage their baseless claims by trying to amend their allegations through their Opposition improper, it unequivocally shows that even Plaintiffs acknowledge that they cannot prove their allegations as pled.  Accordingly, Defendants are entitled to summary judgment, and Defendants' Motion should be granted.

**B.     Plaintiffs Cannot Prove the Requisite Element of Scienter.**

Defendants' Motion should be granted because Plaintiffs still cannot prove scienter.  Contrary to Plaintiffs' arguments, Defendants did not knowingly issue false financial statements, were not severely reckless in calculating the A/R Reserve estimate, and did not issue false or misleading Sarbanes-Oxley ("SOX") certifications.  Moreover, motive and opportunity are insufficient to establish scienter.

Notably, Plaintiffs' arguments regarding scienter were limited by the Court's April 11, 2005 Order, wherein the Court rejected Plaintiffs' argument that Defendants knew or should have known during due diligence (*i.e.*, pre-acquisition), that the A/R Reserve was materially understated: "Plaintiffs' allegations of knowledge or reckless disregard premised on Defendants' involvement in the due diligence process of SPS are not sufficient to establish a strong inference of scienter."  (Order at 31.)  Thus, Plaintiffs cannot establish scienter based on any pre-acquisition assertions of knowledge or

---

[6]  Importantly, Plaintiffs do not even argue that they are not bound by the allegations in the Complaint.  Recognizing this as a fundamental principal of the judicial system, Plaintiffs instead attempt to broaden the scope of their allegations.  Not only do the cases cited above (and Plaintiffs' silence on the issue) establish that such attempt is improper, this proposed broadening and generalizing of the Complaint would require a finding that Plaintiffs did not adequately plead with particularity the who, what, where, when, why, and how of the alleged fraud, as required by both the Reform Act and Fed. R. Civ. P. 9(b).  *See In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 741-42 (S.D. Ohio 2006).

recklessness.

    1.    <u>Defendants Did Not Knowingly Issue False Financial Statements.</u>

In opposing Defendants' Motion, Plaintiffs argue that the fact that Defendants issued financial statements on February 14, 2003, two days after Mr. Johnson informed them of the remote possibility of an issue with the A/R Reserve, establishes that Defendants knowingly issued false financial statements, thus rendering summary judgment on scienter improper.  (Pls.' Opp., p. 14.)  Plaintiffs' argument fails, however, as it conveniently ignores two critical facts: (1) the February 14, 2003 financial statements did not contain false or misleading statements; and (2) no one, not even Mr. Johnson himself, believed that his preliminary calculation could be correct or could result in an ultimate increase in the SPS Division's A/R Reserve estimate.  (*See* Defendants' Statement of Undisputed Facts at ¶ 79, Docket No. 363 ("DSUF").)  Even if Defendants believed, two days prior to issuing financial statements, that the A/R Reserve ***might*** be impaired, "'a delinquent write-down of the impaired assets, without anything more, does not state a claim of securities fraud.'"  *Alaska Elec. Pension Fund v. Adecco, S.A.*, 434 F. Supp. 2d 815, 823 (S.D. Cal. 2006) (quoting *In re ICN Pharms., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004)).  Because Plaintiffs have not and cannot point to "facts showing Defendants ***knew***, when preparing [] financials [], that the receivables should have been written off, but [] fraudulently chose to delay the write-down[,]" their argument fails.[7]

Moreover, the February 14, 2003 financial statements were not false or materially misstated and, thus, Defendants could not have knowingly issued false financial statements.  Defendants fully briefed and conclusively established the fact that throughout the Class Period, Accredo's financial statements were not materially misstated and were prepared in accordance with GAAP.  (*See* Defs.'

---

[7] *Adecco*, 434 F. Supp. 2d at 823 (emphasis added) (citing *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 993 (D. Ariz. 1999), wherein the court found the plaintiffs' allegations deficient because of a failure to present particularized facts showing that "the timing of the write-down was unusual or reckless.").

Brief, sect. III(b)(1)(b), pp. 12-17.)  Specifically relating to the February 14, 2003 financials, GAAP only allows for an adjustment if it is both estimable and probable.  (Glennon E. Moyers Expert Report, p 19, attached as Exhibit "B.")  In this case, it would actually have violated GAAP for Defendants to adjust their A/R Reserve on the basis of Mr. Johnson's February 12th preliminary calculation because it was neither estimable nor probable at that time.  No one at Accredo, not ever Mr. Johnson, believed it to be accurate.  (DSUF at ¶ 79.)  If nobody, including the person who actually made the preliminary calculation, believed that the calculation could possibly be correct, an adjustment at that time would not have been in accordance with GAAP.  Because the preliminary calculation was neither estimable nor probable as of February 14, 2003, the financials issued on that date were in accordance with GAAP.[8]

A natural corollary to the above is that, because Defendants and Mr. Johnson himself did not believe Mr. Johnson's preliminary calculation could be accurate, by definition they did not ***knowingly*** issue false or misleading financial statements.  (*Id*.)  Accordingly, Plaintiffs' argument that Defendants knowingly issued false or misleading financial statements on February 14, 2003 flounders, and thus cannot support their scienter theory.

        2.    <u>Defendants Were Not Severely Reckless in Calculating the A/R Reserve Estimate.</u>

There is not a scintilla of evidence that even hints that Defendants were severely reckless in calculating the A/R Reserve estimate.  In fact, the evidence indisputably shows that Defendants were reasonable in calculating the A/R Reserve estimate.  To support a finding of severe recklessness in a securities fraud case, Plaintiffs must establish that Defendants' conduct was such "an extreme

---

[8]  Further evidence that the A/R Reserve adjustment was neither estimable nor probable as of February 14, 2003, is that Gentiva assured Accredo on March 19, 2003 that the methodology and the resulting A/R Reserve estimate was in accordance with GAAP.  (DSUF at ¶ 83.)  Accredo worked diligently with E&Y to look into any potential A/R issue in response to Mr. Johnson's preliminary calculation.  (*See* DSUF at ¶¶ 80-82, 85.)  As the evidence shows, it was not until May 5, 2003 that an adjustment became both probable and estimable – and it is undisputed that Accredo disclosed the adjustment at that time.

departure from the standards of ordinary care" that any reasonable man would have known it.  *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999); *Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 847 (6th Cir. 2007) ("While the danger need not be known, it must at least be so obvious that *any reasonable man* would have known of it.") (quoting *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1025 (6th Cir. 1979) (emphasis added).).  In other words, Defendants' conduct in establishing the A/R Reserve must have been such an extreme departure from ordinary care that any reasonable person would have known that the A/R Reserve estimate was materially understated.  Plaintiffs simply cannot satisfy that burden, and the evidence proves that Defendants' conduct was reasonable.

> a.   Defendants' Use of 95% Was Reasonable.

Despite Plaintiffs' best efforts to criticize Defendants' use of 95% as the "Top Line" number in the A/R Reserve calculation, the evidence shows that Defendants were reasonable in the manner in which they used this percentage.  Plaintiffs argue that Defendants used 95% throughout the Class Period to represent the total amount of outstanding A/R that Defendants expected to collect.  (*See* Pls.' Opp., pp. 9-10, 28-29.)  In reality, however, Defendants used 95% as the "Top Line" number only for the A/R that was 0-9 months old and incrementally decreased that percentage until reaching 88% for A/R outstanding for 19 months or more.  (*See* Kimbrough Dep. 422:16-423:6, attached hereto as Exhibit "C.")  The use of 88%, not 95% as Plaintiffs allege, represents the actual percentage of A/R that Defendants expected to collect over the life of the A/R.  (*Id.*)  Although Plaintiffs argue that Defendants' use of 95% was reckless because they claim Defendants were aware that collection rates were less than 92% (*See* Pls.' Opp., pp. 9-10.), their argument must fail because throughout the Class Period Defendants actually used 88% as the amount ultimately expected to be collected.  (*See* Exhibit "C.")  In addition, Plaintiffs cannot provide any evidence that Defendants' judgment to use 95% as the

highest number in the calculation was severely reckless.  In fact, the evidence demonstrates that the use of 95% was reasonable.  (*See* Weld Dep. 146:23-147:14; Moyers Dep. 262:20-264:9, attached hereto collectively as Exhibit "D.")  And, what Plaintiffs wholly ignore is that the change from 95% to 93% as the "Top Line" number — which is what was ultimately used to record the change in estimate and is the percentage Plaintiffs allege should have been used at the acquisition closing — resulted in a change of only $4.8 million and, therefore, was immaterial.  (Sept. 19, 2003 E-mail from Thomas Corona to Chase White re: change in reserve analysis, DT 014119-20 (filed under seal and provided to the Court as an exhibit to ¶ 98 of Defendants' Statement of Undisputed Facts).)

> b. <u>Defendants' Use of the Allegedly "Stale" Data Was Reasonable.</u>

Plaintiffs' attempt to argue that Defendants' use of allegedly "stale" data was unreasonable is without merit.  (Pls.' Opp., pp. 9-10.)  According to Plaintiffs, the "stale" data used consisted of an historical collection average calculated in September 2000, utilizing collection data from the previous sixteen quarters and was never subsequently updated.  (*Id.*)  These average collection percentages were then allegedly inputed into the "Second Line" of Defendants' A/R Reserve methodology used to calculate A/R Reserve percentages.  As an initial matter, all of the testimony and documents in this case consistently prove that "stale" data was not in fact used and that the reserve percentages were calculated using updated collections information.  (*See* DSUF at ¶ 28.)  Even Plaintiffs' own accounting expert admitted that the calculations used updated collections information.  (*See id.*)

Moreover, even assuming that Defendants did use this "stale" data as Plaintiffs allege, such conduct cannot be deemed severely reckless.[9]  It is indisputable that the use of this allegedly "stale"

---

[9]  Plaintiffs' argument that Defendants were severely reckless in allegedly ignoring a purported "Updated Worksheet" from December 2000 that was "more in line with reality" fails.  (Pls.' Opp., pp. 10, 26-29.)  First, Plaintiffs cannot provide any proof that Defendants ever received or reviewed this document until January 2003, well after the SPS Division acquisition closed.  (Defs. Resp. to PSUF, Tab 14.)  Second, there is no evidence that this document is from December 2000 and only contains a handwritten notation that states "assume was 12/00."  (*Id.*)  Third, the "more in line with reality" statement found on this worksheet is a handwritten note from February 2003.  (*Id.*, SPS0463.)  As of February 2003, Defendants' possession

data from September 2000, which was compared to the updated average collection percentages from the most recent sixteen quarters at each reporting period, resulted in a higher, and thus more conservative, A/R Reserve estimate.[10]  (Defs. Resp. to PSUF, Tab 13.)  As such, the alleged use of this "stale" data as opposed to updated historical collection averages is clearly not severely reckless. Further, the increase in the A/R Reserve estimate resulted from Accredo's change from using an historical collection average to calculate its A/R Reserve estimate to using only the most recent quarter's collection data.  Therefore, Plaintiffs can only establish scienter if they can prove that no reasonable person would have used an historical collection average as opposed to only the most recent quarter's collection percentages.  They cannot.[11]

Plaintiffs' own statements dictate that, not only was using an historical average not severely reckless, but it was in fact quite reasonable.  Plaintiffs succinctly state that "it is a basic principle of accounting that past collections experience is used to calculate a loss reserve."  (Pls.' Opp., p. 28 n.16.) In addition, the evidence in this case demonstrates that Accredo's use of the historical average collection percentages was reasonable and certainly not such an "extreme departure from the standards of ordinary care" that no reasonable man would have followed the same course.[12]  *Comshare*, 183 F.3d

---

of a worksheet allegedly from December 2000 is irrelevant because it is undisputed that they had the most recent updated historical average collection percentages.  (DSUF at ¶24.)

[10]  In fact, E&Y specifically considered this and determined that it saw no basis to lower the A/R Reserve estimate based on the average collection percentages calculated using the most recent sixteen quarters.  (Dec. 10, 2001 Giants Project Financial Due Diligence Memo from Sam Daniel, ACDO-SD 044622-25, attached hereto as Exhibit "E.")

[11]  Plaintiffs attempt to argue that because Accredo alleged in 2003 in a matter against E&Y – that it withdrew only a few months later – that E&Y was negligent in using the allegedly "stale" data proves that Defendants were severely reckless in using the allegedly "stale" data.  This argument fails for two reasons.  First, a claim for negligence cannot form the basis for a securities fraud claim.  *See Comshare*, 183 F.3d at 550.  Second, any allegations in the E&Y Complaint that are not strictly factual in nature – such as negligence, proximate cause, and any other legal conclusions – are not admissions of any kind, either judicial or evidentiary.  *See Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC*, 477 F.3d 383, 394-95 (6th Cir. 2007) (reiterating that in the Sixth Circuit statements of opinion and legal conclusions, including those regarding negligence and cause, are not binding judicial admissions); *W.V. Realty, Inc. v. Northern Ins. Co. of New York*, 334 F.3d 306, 316 (3d Cir. 2003) (stating that "legal conclusions may not be used as evidentiary admissions"); *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996) (finding that, although statements made in one lawsuit may be evidence in another lawsuit, statements made in a prior lawsuit which constitute legal conclusions are neither competent evidence nor dispositive admissions of fact in subsequent lawsuits).

[12]  For a full briefing of the evidence proving the reasonableness of Defendants' calculation of the A/R Reserve estimate, *see* Defendants' Motion, Sect. III(B)(1)(b), pp. 12-17.

at 550 (citing *Mansbach*, 598 F.2d at 1025).  Rather, the record in this case shows that several other

entities reasonably believed the use of the historical average collection percentages was also

reasonable.[13]  Gentiva, another publicly-traded company, used the historical average collection

percentages in estimating its A/R Reserve estimate.  (*See* DSUF at ¶¶ 23-25.)  PwC, Gentiva's external

auditors, knowing that Gentiva was using historical average collection percentages, approved of this

A/R Reserve methodology and issued unqualified audit opinions certifying that Gentiva's financial

statements were not materially misstated and were prepared in accordance with GAAP.  (*See* DSUF at

¶¶ 113-15.)  E&Y, both during due diligence and after, knew that the A/R Reserve used historical

average collection percentages and agreed that this produced an A/R Reserve that was not materially

misstated and was prepared in accordance with GAAP.  (*Id.* at ¶¶ 9, 12-13, 16, 24, 29, 61.)  In fact,

E&Y even recommended that Defendants utilize this methodology to calculate the A/R Reserve on a

company-wide basis and not merely for the SPS Division A/R Reserve, which Accredo ultimately

implemented.  (*Id.* at ¶ 18.)

Not only did each of these entities, before and during the Class Period, agree that the use of

historical average collection rates was reasonable, D&T, Accredo's successor external auditors – in a

heightened litigation environment and with the benefit of 20/20 hind-sight – confirmed that the A/R

Reserve, which was calculated using the historical average collection percentages, was not materially

misstated as of June 13, 2002, and that the use of the historical average collection percentages

produced an A/R Reserve that was in accordance with GAAP.  (*See* DSUF at ¶¶ 118-20.)  Defendants'

retained accounting expert, Glennon E. Moyers, a KPMG partner, also agrees that the use of the

historical average collection percentages produced an A/R Reserve that was in accordance with

---

[13]  That Defendants point to the fact that others either used the methodology or agreed that it produced numbers in
accordance with GAAP in no way intimates that Accredo was not responsible for the accuracy of its own financial
statements.  Rather, it simply shows that other reasonable people would (and did) act just as Accredo did, thereby
foreclosing a finding of both knowledge and severe recklessness.

GAAP.[14]  (Glennon E. Moyers Expert Report, p. 14, attached hereto as Exhibit "F.")  Because all of these individuals and entities agree that the use of the average historical collection percentages was a reasonable way to calculate the A/R Reserve, there can be no question that Defendants' use of the same methodology was reasonable and not an extreme departure from the standards of ordinary care. Accordingly, Plaintiffs cannot prove that Defendants acted with severe recklessness.

Plaintiffs would have the Court believe that Defendants' use of and reliance upon information from various external auditors was neither reasonable nor appropriate.  (Pls.' Opp., pp. 34-37.) Despite Plaintiffs' arguments, the audit procedures and unqualified audit opinions, provided by multiple reputable and nationally-recognized auditing firms, are not without consequence and deserve attention.  Common sense dictates that if audits were of no consequence, no company would bother to expend the time, effort, or money necessary to obtain audit opinions from independent external auditing firms.  Nor would they be required to do so by law.  (*See* Regulation S-X, 17 CFR §§ 210.3-01(a), 3-02(a); 15 U.S.C. § 78j-1(a).)  Indeed, good faith reliance on an accountant is considered evidence which tends to negate a finding of scienter.  *See SEC v. Johnson*, 174 F. App'x 111, 114-15 (3d Cir. 2006); *In re Digi Int'l*, 14 F. App'x at 717; *Provenz*, 95 F.3d at 1388; *SEC v. Caserta*, 75 F. Supp. 2d 79, 94-95 (E.D.N.Y. 1999); *Mathews v. Centex Telemanagement, Inc.*, No. C-92-1837, 1994 WL 269734, at *7 (N.D. Cal. June 8, 1994); *Newton v. Uniwest Fin. Corp.*, 802 F. Supp. 361, 367-68 (D. Nev. 1990), *aff'd*, 967 F.2d 340 (9th Cir. 1992).  To establish a defense based on the good faith reliance on PwC, E&Y and D&T, Defendants must show that they "made a complete disclosure, sought the advice as to the appropriateness of the challenged conduct, received advice that the conduct

---

[14]  Plaintiffs' attempt to discount the opinions of D&T and Mr. Moyers by arguing that they either had incentive to unquestionably agree with Defendants or "acted in concert with Defendants and their counsel" as a result of receiving payment for their services is baseless.  (Pls. Opp., p. 25, 25 n.25)  There is absolutely no evidence in this case to support that either D&T, Mr. Moyers, or defense counsel engaged in any illegal and/or unethical conduct or provided false reports or lied under oath.  And, that E&Y and PwC also concurred renders Plaintiffs' baseless attack moot.  Plaintiffs' arguments should, therefore, be stricken.

was appropriate, and relied on that advice in good faith." *Caserta*, 75 F. Supp. 2d at 95.  Defendants have already fully established each of these requirements in detail in their Motion.  (Defs.' Brief, pp. 5-6, 12-20.)  Accordingly, Plaintiffs' claims must fail for this additional reason.

Plaintiffs' last ditch effort to create a genuine issue of material fact by arguing that their retained accounting expert "strenuously disagrees" is not enough to save their claims.  Because a finding of severe recklessness necessarily means that no other reasonable person would have acted in the same manner, Plaintiffs' reference to one accounting expert who may disagree with Defendants' accounting methodology is insufficient to satisfy the applicable standard.  Indeed, the mere existence of a disagreement regarding an accounting methodology alone prevents a finding of scienter.  The case law is clear on this point.  *See In re Ikon*, 277 F.3d at 677 ("highlighting different accounting methodologies that Ernst might have employed – particularly in the nebulous context of establishing reserves for vulnerable accounts – does not suggest that the approach actually chosen was an extreme departure from ordinary care."); *In re Digi Int'l*, 14 F. App'x at 717 (the District Court held, and the 8th Circuit agreed, that no reasonable jury could find that the defendants acted with scienter as reasonable people could have disagreed about the proper method of accounting used for the investments, even if the accounting treatment used was improper); *In re Worlds of Wonder*, 35 F.3d at 1426 ("[The disputed] items involved complex issues of accounting as to which reasonable accountants could reach different conclusions.  Indeed, . . . the Court heard diametrically opposing views from experts as to the reasonableness of [the] accounting and audit judgments.  It follows that no finding of fraud or recklessness can rationally be made in this case." (quoting *Price Waterhouse,* 797 F. Supp. at 1241)); *Payne*, 433 F. Supp. 2d at 580 ("The plaintiff cannot satisfy the reckless behavior prong of showing scienter where the disputed items involve complex issues of accounting as to which reasonable accountants could reach different conclusions.").

c.       Defendants Did Not Recklessly Disregard "Red Flags."

Plaintiffs argue that, notwithstanding all of the factors discussed above that demonstrate the reasonableness of the A/R Reserve, Defendants recklessly disregarded the SPS Division's higher than industry average DSOs and that other potential acquirers decided not to purchase the SPS Division. (Pls.' Opp., pp. 26-27.)  Defendants have already established in their opening brief that Plaintiffs' DSO argument is without merit.  (*See* Defs.' Brief, sect. III(B)(1)(d)(iv), pp.28-30.)  In addition, in a failed attempt to avoid the application of the truth-on-the-market defense and salvage their claims, Plaintiffs have ***admitted*** that DSOs are not sufficient to place any reasonable person on notice that there is an understatement of the A/R Reserve.[15]  (*See* Pls.' Opp., pp. 42-43.)

The assertion that Defendants recklessly ignored and did nothing upon learning that other potential purchasers of the SPS Division decided that it was not a suitable acquisition for them at the price Gentiva was requesting is simply false.  (*See* Pls.' Opp., p. 11.)  First, the evidence does not show that Defendants ignored any such information regardless of whether or why another potential acquirer determined not to purchase the SPS Division.  Rather, all of the evidence shows that Defendants specifically focused on the A/R and its associated Reserve during due diligence and, indeed, hired E&Y to perform special carve-out audits specifically to investigate and focus on the A/R Reserve. (DSUF at ¶ 9.)  Among other things, they also made the A/R Reserve their primary focus and increased the A/R Reserve by $3 Million twice prior to the close of the acquisition.  (*See* DSUF at ¶ 32.) Defendants also cautioned the public about the A/R Reserve and disclosed that it was "the most significant estimate" in its financial statements and could change.  (DSUF at ¶ 50.)  Second, the fact that one company decides an acquisition is appropriate and another decides it is not does not establish

---

[15]  If DSOs alone were sufficient to establish knowledge, the fact that the market was well aware of the SPS Division's high DSOs would necessarily mean that Accredo's announcement on April 8, 2003 regarding the adequacy of the A/R Reserve would not have come as a shock to the investing public, nor would it have disclosed anything of which they were not already aware.  (DSUF at ¶ 39.)

scienter; rather, it merely points to the fact that the acquisition is more valuable to one company than another – this is not fraud, but instead is a business judgment that is not actionable under the securities laws.  *See Miller v. Champion Enters. Inc.*, 346 F.3d 660, 681-82 (6th Cir. 2003); *In re Worlds of Wonder*, 35 F.3d at 1419 (citing the district court, 814 F. Supp. 850, 865 (N.D.Cal. 1993), in finding that, "'Plaintiffs cannot use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud.'").

Upon receiving an email from a T. Rowe Price analyst providing unconfirmed information she "picked up" about two competitors passing on SPS Division as a result of "receivable risk," Mr. Kimbrough did not simply ignore the information contained therein.[16]  Rather, Mr. Kimbrough provided this analyst with a reasoned response that showed that Defendants were already looking into any risk involved with the A/R and were looking at ways to improve any such collections risk.[17]  (*See* Kimbrough Dep. 306:6-308:7, attached hereto as Exhibit "H;" May 31, 2002 E-mail from Joel Kimbrough to Laurie Bertner, ACDO-JK-R 006884, attached hereto as Exhibit "I.")  That Defendants were already focusing on the A/R collectibility establishes that they did not simply ignore this supposed "red flag"; thus, there is no severely reckless behavior.

Further, that Defendants decided that the SPS Division was worth purchasing, while others may have decided it was not, is not evidence of severely reckless behavior, nor is there any support for such a conclusion.  As Plaintiffs have pointed out elsewhere, the SPS Division acquisition alleviated some concerns about Accredo's business and gave it the number one market share.  (*See* Plaintiffs' Statement of Undisputed Facts at Nos. 3, 21.)  For those who determined that the SPS Division did not

---

[16]  In fact, this analyst's implication that ExpressScripts did not acquire the SPS Division solely because of the SPS Division A/R risk is contrary to the testimony of ExpressScript's representative, Mathew Harper.  Specifically, Mr. Harper testified that there were multiple reasons why ExpressScripts decided not to acquire the SPS Division, entirely unrelated to the SPS Division A/R risk. (Harper Dep. 100:5-101:1, attached here to as Exhibit "G.")

[17]  Further discounting Plaintiffs' assertion of severe recklessness is that Mr. Kimbrough testified he had no way to know whether the statement made by the analyst was true or not and that neither of the competitors could disclose the information, even if they wanted to, because they were both under a confidentiality agreement.  (*See* Kimbrough Dep. 303:18-305:2, attached here to as Exhibit "J.".)

address their particular business needs or provide the same strategic opportunities, common sense dictates that the SPS Division may have been perceived as less valuable than it was to Accredo. Moreover, if every company only made deals that others were willing to make, no deals would ever get done because negotiations would reach a stale mate.  In almost every acquisition, the ultimate purchaser is the party willing to pay more than other interested parties; such circumstances do not evidence fraud, but basic facets of business and economics.

Plaintiffs also contend that Defendants ignored the concerns regarding DSOs and collectibility risk expressed by potential purchasers of the SPS Division's *acute* segment and a service provider seeking to provide services to Accredo that were made in the course of negotiations.[18]  First, these comments were either made in an attempted pitch to try to show Defendants that the commenter's services were needed or were made in the course of attempts to negotiate down the purchase price by individuals interested in purchasing the acute segment *and* its supposedly impaired A/R.  Moreover, the evidence is undisputed that Accredo and its external auditors, E&Y, conducted their own due diligence on the very subjects commented on by these third parties.  (DSUF at ¶¶ 9-10, 12, 19-20.)

3.   Defendants Did Not Issue False or Misleading SOX Certifications.

Plaintiffs contend that summary judgment is inappropriate because Defendants' alleged issuance of false or misleading SOX certifications provides evidence of scienter.  (Pls.' Opp., pp. 30-31.)  This argument is without merit.  As an initial matter, Plaintiffs do not make a single reference to SOX or an alleged SOX violation in their Complaint.  Accordingly, the Court should not consider Plaintiffs' baseless reliance upon Defendants' SOX certifications.  Even if the Court should permit Plaintiffs to expand their Complaint, false SOX certifications are only indicative of fraudulent intent if the person signing the certification was severely reckless in certifying the accuracy of the associated

---

[18]  Not surprisingly, even though Plaintiffs blatantly attempt to broaden the scope of their allegations to include both acute and chronic A/R, their arguments continue to rely on evidence specific to the acute segment of the SPS Division.  (Pls.' Opp., pp. 11-12, 26-27; Smith Dec., pp. 15-17, 20-21, 23-24, Docket No. 396-3.)

financial statements. *Grillo v. Tempur-Pedic Int'l, Inc.*, No. 5:05-410-JMH, 2008 WL 852131, at *9 (E.D. Ky. Mar. 28, 2008) (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)). Plaintiffs fail to (nor can they) establish that Defendants issued false or misleading SOX certifications. Plaintiffs argue that Defendants signed the certifications knowing that the A/R was overvalued and that, prior to January 2003, Defendants signed the certifications notwithstanding that the methodology for calculating the A/R Reserve had never been documented. (Pls.' Opp., pp. 30-31.) The evidence demonstrates that both of these arguments are false.

First, arguing that the Court should find that Defendants knew Accredo's financial statements were false because the SOX certifications were false or misleading, which Plaintiffs claim were false or misleading because Defendants allegedly knew their financial statements were false, is wholly circular and cannot support a finding of scienter. Second, the evidence clearly establishes that the A/R Reserve methodology was documented and understood prior to January 2003. (DSUF at ¶ 9.) In fact, a memorandum drafted by Sam Daniel (Accredo's former Controller) establishes that Defendants documented, evaluated, and understood the methodology as early as December 10, 2001. (*See* Exhibit "E"; Daniel Dep. 253:6-254:5, attached hereto as Exhibit "K.")

Even if the SOX certifications were false or misleading, such fact is only probative of scienter if they were issued in a severely reckless manner. *See Grillo*, 2008 WL 852131, at *9 (citing *Garfield*, 466 F.3d at 1266.) As established above, Defendants were not severely reckless manner in calculating the A/R Reserve estimate or in valuing the SPS Division's A/R. Any contention that false or misleading SOX certifications preclude summary judgment is, therefore, baseless.

4.      Motive and Opportunity to Commit Fraud Does Not Preclude Summary Judgment.

The mere fact that Plaintiffs argue that Defendants had the motive and opportunity to commit fraud is not evidence that they, in fact, did so and, thus, does not preclude summary judgment. *See*

*Robert N. Clemens Trust*, 485 F.3d at 848; *Comshare*, 183 F.3d at 549; *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 689 (6th Cir. 2004).  Defendants have already addressed each of the alleged motives and opportunities for committing fraud raised by Plaintiffs (s*ee* Defs.' Brief, pp. 22-26):  (1) Defendants' stock sales were not unusual or suspicious[19] and, thus, not indicative of scienter; (2) the shelf registration was never taken down or otherwise used and, therefore, fails to support accusations of fraudulent intent; and (3) Defendants' executive positions and compensation structure do not give rise to a finding of scienter.

The only new argument made by Plaintiffs is that stock sales made by Sam Daniel establish scienter as to the named Defendants.  (Pls.' Opp., pp. 32-33.)  Contrary to Plaintiffs' attempts to distract the Court, stock sales of insiders not named as defendants are irrelevant to establishing scienter as to actual named defendants.  *See Campbell v. Lexmark Int'l Inc.*, 234 F. Supp. 2d 680, 586 n.6 (E.D. Ky. 2002) (citing *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 834 (C.D. Cal. 1998) (finding that the stock sales of insiders who are not named as defendants are irrelevant to establishing scienter against named defendants).  Even if the Court were to consider Mr. Daniel's stock sales as potentially relevant to Mr. Stevens' and Mr. Kimbrough's states of mind, they are not indicative of any fraudulent intent because it is indisputable that Mr. Daniel's stock sales were not unusual or suspicious.  As a threshold matter, Mr. Daniel sold stock legitimately during open trading windows with approval from Tom Bell, Accredo's then general counsel.  (Daniel Dep. 420:20-421:13.)  *See In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1030 (C.D. Cal. 2003) (ruling that the plaintiffs could not establish scienter based on insider sales that took place when a trading window opened), *vacated on other grounds*, *Simpson v. Homestore.com, Inc.*, 519 F. 3d 1041 (9th Cir. 2008); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 312 (D. N.J. 2001).  In addition, Mr. Daniel purchased Accredo stock during the

---

[19]  In fact, Mr. Stevens and Mr. Kimbrough loss resulting from the price decline is greater than the proceeds from their allegedly suspicious sales.  (DSUF at ¶ 67.)

same time period and, therefore, continued to invest in Accredo stock.  (*See* Plaintiffs' Supplemental Statement of Undisputed Facts, No. 64, Docket No. 400.)

Moreover, even assuming for sake of argument the timing of the sales as incorrectly described in Plaintiffs' Opposition, Mr. Daniel had no alleged inside information or knowledge upon which to trade until February 12, 2003 at the earliest.[20]  In fact, even as of February 12, 2003, there was no information upon which Mr. Daniel would trade because no one at Accredo believed that Mr. Johnson's preliminary calculation could possibly be accurate or result in a probable increase in the A/R Reserve estimate.  (DSUF at ¶ 79.)  Even if the Court finds that Plaintiffs' assertions regarding Mr. Daniel's stock sales are relevant at all, based on the timing established by Plaintiffs themselves, any alleged inference of scienter resulting from such activity can only be measured beginning on February 12, 2003, not June 16, 2002, the beginning of the Class Period.[21]  Therefore, at a minimum, the Class Period in this case should be significantly shortened.

Because Plaintiffs are unable to prove or even establish a reasonable question of fact as to the requisite element of scienter, Defendants are entitled to summary judgment.  *See Harris v. Bornhorst*, 513 F.3d 503, 509 (6th Cir. 2008).

C.     **The Truth-on-the-Market Defense is Applicable and Precludes a Finding of Materiality.**

Plaintiffs' claims of securities fraud also fail because Plaintiffs cannot prove the materiality of any alleged misstatement.[22]  (*See* Defs.' Brief, pp. 39-41.)  The truth-on-the-market defense states that

---

[20] Plaintiffs contend that it was not until after Brian Johnson reported his findings to Mr. Daniel that Mr. Daniel actually made the "illicit" trades.  (Pls.' Opp., p. 32-33.)  Mr. Johnson did not report any findings to Mr. Daniel until February 12, 2003.  (DSUF at ¶ 77.)

[21] Plaintiffs' attempt to further cloud the issue by arguing the entirely collateral issue of whether Mr. Daniel should have been categorized as a reporting person required to file a Form 4s with the SEC disclosing his stock sales is a red herring.  Whether Mr. Daniel should have been designated as a reporting person has no bearing on this case.

[22] Plaintiffs attempt to bolster their materiality argument by regurgitating the arguments from their Motion for Partial Summary Judgment, Docket No. 360 ("Pls.' Motion").  (*See* Pls.' Opp., pp. 39-42; Pls.' Motion, pp. 6-10.)  These arguments, however, do not address Defendants' Motion for Summary Judgment on materiality, nor do they rebut the application of the truth-on-the-market defense.  (*See* Pls.' Opp., pp. 40-42.)  Rather than reiterate the points that rebut Plaintiffs' arguments here, Defendants point the Court to their Opposition to Plaintiffs' Motion for Partial Summary Judgment, pp. 4-12, Docket No. 393.

an alleged misrepresentation is immaterial if the information is already publicly disclosed through

analyst reports, company disclosures, or other sources, because, if the information is already known,

the alleged misrepresentation cannot defraud the investing public or alter the total mix of information

to a reasonable investor. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000); *Wielgos v.*

*Commonwealth Edison Co.*, 892 F.2d 509, 516 (7th Cir. 1989); *see also Stavroff v. Meyo*, No. 95-4118,

1997 WL 720475, at *4 (6th Cir. 1997) ("[m]isrepresentations are not material . . . if the investing

public is privy to the truth.").

Plaintiffs attempt to argue that the truth-on-the-market defense is inapplicable because

knowledge of the SPS Division's high DSOs is not enough to counteract statements regarding the

adequacy of the SPS Division's A/R Reserve.  (Pls.' Opp., pp. 42-43.)  Yet, this is exactly the type of

knowledge Plaintiffs allege Defendants are severely reckless for ignoring.  Plaintiffs cannot have their

cake and eat it too.  They cannot argue that Defendants recklessly disregarded the high DSOs, which

supposedly should have alerted them to the fact that the A/R Reserve was materially understated –

despite assurances from Gentiva, PwC, and E&Y[23] – and simultaneously argue that the investing

public's knowledge of the same DSO information was insufficient to alert them to the fact that the A/R

Reserve was understated!  If knowledge can be imputed to Defendants based on high DSOs, which

were publicly disclosed, the same knowledge should also be imputed the investing public.  Because the

DSOs, which Plaintiffs identify as "red flags," were publicly disclosed, Accredo's announcement that

they were investigating the adequacy of the A/R Reserve on April 7, 2003 would not have significantly

altered the "total mix" of information available to the reasonable investor and, therefore, could not

---

[23]  In fact, PwC initially believed that Accredo's A/R Reserve estimate was too conservative.  During due diligence, PwC disagreed with E&Y's determination that the A/R Reserve estimate should be increased by $3 million.  PwC firmly believed that the A/R Reserve estimate in its then current state was sufficient and in accordance with GAAP.  (Jan. 2, 2002 Accredo Board of Directors Meeting Minutes, ADCO 041 0851-54 (filed under seal and provided to the Court as an exhibit to DSUF at ¶ 45).)  PwC and Gentiva ultimately agreed to increase the A/R Reserve estimate as recommended by E&Y. (DSUF at ¶¶ 32-33.)

have been material as a matter of law.  *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

Accordingly, Defendants are entitled to summary judgment.

**D.      Plaintiffs Cannot Prove Loss Causation or Control Person Liability.**

Each of Plaintiffs' arguments as to the element of loss causation and control person liability

have already been fully addressed in Defendants' Motion and in their Opposition to Plaintiffs' Motion

for Partial Summary Judgment.[24]  Defendants will only point out to the Court that, to the extent

Plaintiffs' claims regarding loss causation rely on allegations in the E&Y Complaint that certain losses

allegedly were caused by E&Y's negligent conduct, such allegations are legal conclusions and hold no

weight as admissions, either judicial or evidentiary, and are, therefore, insufficient to establish a

question of material fact.  *See Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 394-

95 (6th Cir. 2007) (reiterating that in the Sixth Circuit statements of opinion and legal conclusions,

including those regarding negligence and cause, are not binding judicial admissions); *W.V. Realty, Inc.*

*v. Northern Ins. Co. of New York*, 334 F.3d 306, 316 (3d Cir. 2003) (stating that "legal conclusions

may not be used as evidentiary admissions"); *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th

Cir. 1996) (finding that, although statements made in one lawsuit may be evidence in another lawsuit,

statements made in a prior lawsuit which constitute legal conclusions are neither competent evidence

nor dispositive admissions of fact in subsequent lawsuits).

### III.      CONCLUSION

As demonstrated above, there is no evidence to support a genuine issue of material fact as to

scienter, materiality, or loss causation.  The record evidence proves that Defendants acted reasonably

prior to and throughout the Class Period with respect to calculating the SPS Division's  A/R Reserve

estimate.  In addition, Plaintiffs cannot prove the essential element of materiality based on the truth-on-

---

[24]  Once again, Plaintiffs recite the same loss causation arguments as made in their motion for partial summary judgment.
(Pls. Opp., pp. 44-47; Pls.' Motion, pp. 11-13.)  Accordingly, Defendants point the Court to their Opposition to Plaintiffs'
Motion for Partial Summary Judgment, pp. 12-17.

the-market defense.  Moreover, Plaintiffs cannot prove loss causation.  Because Plaintiffs cannot

sustain their claims against Defendants for primary violations of the securities laws, their "controlling

person" claims against the Individual Defendants also necessarily fail.  Accordingly, Defendants are

entitled to judgment as a matter of law, and their Motion for Summary Judgment should be granted,

along with any other appropriate relief the Court deems appropriate.

Respectfully submitted this 25th day of July, 2008.

<div style="margin-left:40%">

s/ Douglas F. Halijan_____

Jef Feibelman  (BPR # 7677)
Douglas F. Halijan  (BPR # 16718)
BURCH, PORTER & JOHNSON, PLLC
130 North Court Avenue
Memphis, TN  38103
(901) 524-5000

Peter Q. Bassett
Kelly C. Wilcove
Scott N. Sherman
Mark D. Trainer
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA  30309-3424
(404) 881-7000

Attorneys for Defendants Accredo Health, Inc., David D.
Stevens, and Joel R. Kimbrough.

</div>

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was forwarded

*via* the Court's electronic filing system, this 25th day of July, 2008 to:

> Tor Gronborg
> Mark Solomon
> Trig R. Smith
> COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
> 401 B Street, Suite 1700
> San Diego, CA  92101
>
> Timothy A. DeLange
> Blair A. Nicholas
> BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP
> 12544 High Bluff Drive, Suite 150
> San Diego, CA  92130
>
> B.J. Wade
> GLASSMAN EDWARDS WADE & WYATT, P.C.
> 26 N. Second Street Building
> Memphis, TN  38103

s/ Douglas F. Halijan