**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

In re ACCREDO HEALTH, INC.       )
SECURITIES LITIGATION            )
                                          )
                                          )      Civil Action No. 03-CV-2216-BBD
                                          )
This Document Relates To:         )      <u>CLASS ACTION</u>
                                          )
ALL ACTIONS

---

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR *DAUBERT* MOTION TO
EXCLUDE THE EXPERT OPINIONS AND TESTIMONY OF DR. SCOTT D. HAKALA**

---

Defendants Accredo Health, Inc. ("Accredo"), David D. Stevens, and Joel R. Kimbrough (collectively, "Defendants"), respectfully file this Memorandum in Support of their *Daubert* Motion to Exclude the Expert Opinions and Testimony of Dr. Scott D. Hakala.

## I.     <u>INTRODUCTION</u>

Plaintiffs retained Dr. Hakala to provide expert testimony regarding the elements of loss causation and damages alleged by Plaintiffs in this matter. On December 21, 2007, Dr. Hakala submitted his initial report on loss causation and damages (the "Hakala Report").[1] Dr. Hakala also submitted a rebuttal report on February 22, 2008 ("Hakala Rebuttal"), and provided deposition testimony regarding his opinions on March 10, 2008. The analysis proffered by Dr. Hakala is inadmissible under the Federal Rules of Evidence, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Accordingly, the Court should exclude all expert analysis, opinions, and testimony provided by Dr. Hakala in this matter.

---

[1] The Hakala Report is attached hereto as Exhibit "1." The Hakala Rebuttal is attached hereto as Exhibit "2."

Dr. Hakala, a veritable career plaintiff's expert,[2] is no stranger to the exclusion or questioning of his opinions and testimony by various courts.  For example, recently in *In re Xcelera.com Sec. Litig.*, No. 00-11649-RWZ (D. Mass. Apr. 25, 2008) ("Xcelera Order"), the court found that Dr. Hakala used a methodology with no support in the academic literature, that "his theory [did] not match the facts," and that his "analysis fail[ed] to take into consideration other factors that affected Xcelera's stock price."[3]  Similarly, in *Fener v. Belo Corp.*, 560 F. Supp. 2d 502, 507 (N.D. Tex. Apr. 2, 2008), the court found that Dr. Hakala failed to substantiate his argument because his study did not "target the corrective disclosure at issue."  In *In re Omnicom Group, Inc. Securities Litigation*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008), the court likewise found that Dr. Hakala failed to disaggregate confounding information, that his event study "at best incorrectly identifie[d] several corrective disclosures and at worst fail[ed] to identify any at all," and that "to the extent that any corrective disclosures exist[ed], the event study [did] not isolate their effect on Omnicom's stock price from that of the negative reporting."  In *In re Metris Cos., Inc. Securities Litigation*, 428 F. Supp. 2d 1004, 1014 (D. Minn. 2006), the court noted that it "strain[ed] the imagination" to accept Dr. Hakala's loss causation theory.  In *Arenson v. Broadcom Corp. (In re Broadcom Corp. Sec. Litig.)*, No. SAVC01275GLTMLGX, 2005 WL 1403756, at *2 (C.D. Cal. June 3, 2005), the court excluded Dr. Hakala's aggregate damages testimony and found that his proposed model for estimating damages had "not been subjected to the sort of critical peer review and publication that one would expect as a prerequisite for jury acceptance" and was of "highly questionable reliability and accuracy."  In *Bell v. Fore Sytems, Inc.*, No. Civ.A. 97-1265, 2002 WL 32097540, at *2 (W.D. Pa. Aug. 2,

---

[2] Dr. Hakala has participated in approximately 100 securities cases over the past two years, each as a plaintiff's expert.  Hakala Dep. 20:5-10.  Dr. Hakala also testified that he is a believer in what all 100 of these plaintiffs were alleging in their complaints.  Hakala Dep. 20:11-14.  The Hakala deposition experts are included in Exhibit "3."
[3] Xcelera Order at pp. 1, 2 & 4.  A copy of the Xcelera Order is attached hereto as Exhibit "4."

2002), the court excluded Dr. Hakala's damages testimony because his methodologies would violate the Private Securities Litigation Reform Act ("PSLRA")( "Hakala calculated 'aggregate damages' by multiplying the estimated number of damaged shares by the estimated artificial inflation for each day of the class period.   We interpret the PSLRA as mandating an individualized damages limitation for each plaintiff."). Beyond the above decisions, Dr. Hakala testified that various courts have excluded or criticized his opinions or analyses on no less than thirteen occasions.[4]  Based on the above, and as discussed further below, the Court here should exclude all expert analysis, opinions, and testimony provided by Dr. Hakala in this matter for the very same reasons that numerous other federal district courts have so ordered.

## II.   LAW AND ANALYSIS

### A.   Standards for Admissibility of Expert Opinions and Testimony

Federal Rule of Evidences 702 governs the use of expert testimony.  In *Daubert*, the Supreme Court established the standard for admissibility of scientific expert testimony under Rule 702.   The Supreme Court held that Rule 702 requires a trial judge to exercise a "gatekeeping" role and assure both the reliability and the relevance of scientific testimony or evidence.  *Id.* at 589.  "The relevance requirement directs that there be a 'fit' between the testimony and the issue to be resolved by the trial.  The reliability requirement is designed to focus on the methodology and principles underlying the testimony." *United States v. Pollard*,

---

[4] *See* Hakala Dep. 92:17-94:17; 94:21-95:2; 95:8-14; 95:19-97:16; 97:19-24; 98:1-14; 98:19-99:7; 99:12-20; 100:5-20; 100:24-102:12; 102:16-19.  The Hakala deposition excerpts are attached collectively hereto as Exhibit "5."  In testifying regarding the specifics of his exclusions or criticisms, Dr. Hakala continually attributes the exclusions or criticism to some shortcoming on the part of the court, rather than on his own analysis. Dr. Hakala testified that the court failed to recognize that Hakala's analysis was correct in the "Kohler" matter – as referred to by Dr. Hakala – because the court refused to consider certain information that would have impeached the testimony of the other party's fact witnesses and experts. Hakala Dep. 92:17-94:17.  With respect to a matter he referred to as "Brewer Quality Homes," Dr. Hakala testified that "the judge had trouble following the math." Hakala Dep. 94:21-95:2.  As to the "Omnicom" matter, Dr. Hakala believes that the judge made an incorrect finding of fact. *See* Hakala Dep. 95:19-97:16.  In the matter Dr. Hakala identifies as "Roth versus Mimms," he testified that the court excluded his report because the judge did not like Dr. Hakala's client. Hakala Dep. 101:4-102:12.  Accordingly, Dr. Hakala expressed his confidence that the district court ruling would be overturned on appeal based on the errors in the court's opinion. *Id.*

128 F. Supp. 2d 1104, 1116 (E.D. Tenn. 2001) (citing *United States v. Bonds*, 12 F.3d 540, 555-56 (6th Cir. 1993)). As the Sixth Circuit has stated:

> a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by "knowledge, skill, experience, training, or education." Second, *the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue."* Third, *the testimony must be reliable*. Rule 702 guides the trial court by providing general standards to assess reliability: whether *the testimony is based upon "sufficient facts or data,"* whether *the testimony is the "product of reliable principles and methods,"* and whether *the expert "has applied the principles and methods reliably to the facts of the case."* In addition, *Daubert* provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony. These factors include: *"testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community."*

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008) (internal citations omitted) (emphasis added).

The Supreme Court extended *Daubert* to non-scientific expert testimony in *Kumho*. Under *Kumho*, the obligations imposed on a trial judge by *Daubert* apply to all expert testimony and "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). Moreover, *if any step of a purported expert's analysis is found unreliable, the entire testimony must be excluded. See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (emphasis added).

Dr. Hakala's analysis is not based upon sufficient facts or data, his conclusions are not the product of reliable principles and methods, and his testimony does not apply his principles and methods reliably to the facts of this case. The purported expert opinions and testimony

provided by Dr. Hakala are neither reliable nor relevant and the Court should exclude all expert

analysis, opinions, and testimony provided by Dr. Hakala.

**B.**     **Dr. Hakala's Purported Expert Opinions and Testimony are Not Reliable.**

Dr. Hakala's analysis begins with an event study to estimate the per-share inflation

attributable to the alleged fraud.[5]   The per-share inflation represents the amount by which Dr.

Hakala estimates that Accredo stock is artificially inflated, as a result of Accredo's alleged

misrepresentations.[6]  Dr. Hakala selected a set of eight (8) relevant event days – days on which

announcements are made by or regarding Accredo that Dr. Hakala claims contain information

related to the disclosure of the alleged fraud – to purportedly estimate the per-share inflation.[7]

After adjusting for market and industry effects, Dr. Hakala purports to derive the per-share

inflation from the net change in Accredo's stock price on those relevant days.[8]  According to Dr.

Hakala's analysis, the per-share inflation during the Class Period is $8.48.[9]  Dr. Hakala attempts

to justify his damages-per-share and inflation-per-share determinations with two separate

analyses.  First, he contends that an alleged $9.30 build up in Accredo's stock price, prior to the

start of the Class Period, justifies his calculation of the alleged per-share inflation resulting from

the stock price reactions to the alleged curative disclosures on April 8 and April 9, 2003, and

May 5, 2003.[10]  Dr. Hakala then contends that the net effect of the April 8 and April 9, 2003, and

May 5, 2003 announcements revealed per-share damages of $8.48.[11]  Dr. Hakala's event study,

however, is flawed and unreliable because, as explained below, it employs a methodology that is

---

[5] *See* Hakala Report at ¶¶ 6-7.
[6] *See id.* at ¶¶ 7-8.
[7] *See id.* Exhibits B & C.
[8] *See id.* at ¶¶ 6-11.
[9] *See id.* at ¶ 12.
[10] *See id.* at Exhibit C and ¶12(b).
[11] *See id.* at Exhibit C.

not generally accepted, over-utilizes "dummy" variables[12] and selects relevant days arbitrarily and inconsistently.   Moreover, Dr. Hakala's event study fails to establish the necessary link between the actual allegations in Plaintiffs' Complaint, the supposed stock price inflation, and Dr. Hakala's estimated damages.

To then determine aggregate damages, Dr. Hakala takes his estimated per-share inflation and applies a trading model.[13]   Dr. Hakala utilizes a trading model – which attempts to estimate the buying and selling of Accredo stock during the Class Period – to estimate the number of allegedly damaged shares of Accredo stock.[14]   This estimate, combined with the per-share inflation estimate, purportedly establishes aggregate damages.[15]   Accordingly, based on his rogue theory, aggregate damages amount to inflation-at-purchase less inflation-at-sale for each share purchased during the Class Period.[16]   Regardless of Dr. Hakala's application of the trading models, trading models themselves are simply unreliable.[17]   As explained below, because Dr. Hakala's analysis regarding loss causation and damages is seriously flawed and unreliable, the Court should exclude all expert analysis, opinions, and testimony provided by Dr. Hakala in this matter.

**1.   Dr. Hakala's Event Study is Unreliable.**

An event study is an "empirical analysis of an intervention in a times series," and most

---

[12] A dummy variable generally "takes only the values 0 or 1, and distinguishes one group of interest from another." David H. Kaye & David A. Freedman, *Reference Guide on Statistics, in* Reference Manual on Scientific Evidence 83, 163 (Federal Judicial Center, 2d ed. 2000), a copy of which is attached hereto as Exhibit "6."

> For example, in a regression study of salary differences between men and women in a firm, the analyst may include a "dummy variable" for gender, as well as "statistical controls" like education and experience to adjust for productivity differences between men and women. The dummy variable would be defined as 1 for the men, 0 for the women.

*Id.* at 171.
[13] *See* Hakala Report at ¶¶ 71-6.
[14] *See id.*
[15] *See id.*
[16] *See id.*
[17] *See* Expert Rebuttal Report of Christopher M. James ("James Rebuttal") at ¶¶ 45-47; Kenneth R. Cone & James E. Laurence, *How Accurate are Estimates of Aggregate Damages in Securities Fraud Cases?*, 49 Bus. Law. 505, 508 (1994), a copy of which is attached hereto as Exhibit "7."   The James Rebuttal is attached hereto as Exhibit "8."

often "involves a statistical regression analysis of a time series of security returns, with the objective of identifying and measuring firm-specific effects of identifiable information releases (events)."[18]   A properly conducted event study can provide a scientific basis for determining whether a particular disclosure/announcement – or event – was material and can be causally connected to a change in a company's stock price.[19]   An event study uses the statistical method of linear regression over a period of time to isolate the price movements due to market and industry effects from movements caused by company-specific information.[20]   Once market and industry effects are controlled for, standard statistical tests can be conducted on the remaining – or residual – price movement to test for significant price changes that may indicate the presence of new, material company-specific information in the market.[21]   The difference between a stock's actual price change and its predicted price change on a given day is tested to see if that day's price change is typical for that particular stock.[22]   If it falls outside the typical range of values for that stock, it is said to be statistically significant.[23]

A proper event study should include a clear articulation of how events are selected. Before conducting a search for events, it is essential that the researcher establish a systematic, verifiable, reproducible methodology for identifying all unexpected company-specific events that

---

[18] M. Laurentius Marais & Katherine Schipper, *Event Study Methods: Detecting and Measuring the Security Price Effects of Disclosures and Interventions*, *in* Litigation Services Handbook: The Role of the Financial Expert, Supp. 17A, 17A.1(a) (Roman L. Weil et al., 3d ed. Supp. 2004), attached hereto as Exhibit "9."

[19] *See id.* at 17A.2; James Rebuttal at ¶26.

[20] *See id.* at 17A.1(b).

[21] *Id.* at 17A.1(c).

[22] *Id.*

[23] Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in* Reference Manual on Scientific Evidence 179, 194 (Federal Judicial Center, 2d ed. 2000), a copy of which is attached hereto as Exhibit "10."  Statistical significance is tested using a t-statistic, which measures the difference between a stocks' actual price movement relative to its normal variation. *See* Kaye & Freedman, *supra* note 12, at 175.  Academic studies consider a t-statistic over 1.96 to be accurate with over 95% confidence. *Id.* at 118 n.117.  Accordingly, any t-statistic over 1.96, absolute value, will identify a material – statistically significant – disclosure/announcement 95% of the time.

affect the company's stock price.  Such steps are necessary to ensure scientific reliability and enable a qualified peer to independently reproduce the results.[24]

Additionally, once disclosures/announcements of company-specific information are identified through an event study, the analysis should distinguish between those that are fraud-related and those that are non-fraud-related.  If confounding information exists, the portion of the stock price decline that is unrelated to the alleged fraud must be isolated.[25]  A proper event study must parse out the effects of the individual announcements to determine how each contributed to the stock price reaction, if at all.[26]

Dr. Hakala has not thoroughly documented his approach to identifying or evaluating events.[27]  Accordingly, a reader of the Hakala Report cannot deduce how the particular events were selected, precluding others from testing his event study and preventing his methodologies from being generally accepted in the economic community.[28]  Moreover, as discussed below, Dr. Hakala has included an excessive number of dummy variables (or event days), arbitrarily selected relevant event days, and failed to sufficiently parse out the separate effects of the alleged fraud-related and non-fraud-related information contained in the disclosure/announcement at the center of the alleged fraud, Accredo's April 8, 2003 announcement.

      a.      *Dummy Variables.*

Dr. Hakala's event study analyzed Accredo's stock price between January 3, 2002, and October 28, 2003, resulting in a regression period of 459 trading days.[29]  Dr. Hakala begins his event study by isolating market and industry factors, at which point, Dr. Hakala runs his first

---

[24] *See* James Rebuttal at ¶ 29.
[25] *See id.* at ¶ 28.
[26] *See id.* at ¶ 28.
[27] *See* Hakala Report at ¶ 31.
[28] *See id.*
[29] *Id.* at ¶ 6.

regression, seemingly for no reason at all.  Rather than use that regression to estimate damages, Dr. Hakala runs a second regression that considers certain event days "when potentially material information came into the market."[30]  According to Dr. Hakala, "information likely to be new and material was selected for inclusion in the study without access to or reference to the actual stock price reaction on the corresponding dates" – Dr. Hakala's "'blind' data selection process."[31]  Dr. Hakala employed this "'blind' data selection process" to identify 108 such event days.[32]

The 108 event days were then "dummied" out of his regression analysis, isolating the effects of these days.[33]   Accordingly, Dr. Hakala unilaterally excluded from the second regression in his event study 23.5% of all trading days in his regression period.[34]  Dr. Hakala relies on the results of this second regression and its determination of Accredo's stock price volatility to complete his event study.[35]  Dr. Hakala's over-identification of events, however, renders his event study unreliable because "it artificially lowers the hurdle for finding statistical significance of specific events"[36] by reducing the standard errors of the regression.[37]  By utilizing 108 "dummy" event days in his second regression, Dr. Halaka reduces the estimated volatility in Accredo's stock price from 3.80% in his first regression to 1.78% in his second regression.[38]  This considerable reduction in his estimate of Accredo's stock price volatility causes Dr. Hakala to conclude that many of the purported event days were statistically significant when they were

---

[30] *Id.* at ¶ 31.
[31] *Id.*
[32] *Id.*
[33] *See id.* at Exhibit B.  *See also id.* at ¶ 33 n.18.  Dr. Hakala readily admits that a "dummy" variable problem with his model exists because there were "too many company-specific events to be appropriate for an index applicable to Accredo."  *Id.* at ¶ 35.
[34] 108/459 = .235
[35] *See id.* at Exhibit B.
[36] James Rebuttal at p. 1.
[37] *See* Hakala Report at Exhibit B.
[38] *See id.*

not.[39]   In fact, had Dr. Hakala used the first regression in Exhibit B of the Hakala Report, he

would not have found three of his purported relevant dates – March 11, 2002, June 17, 2002, and

April 9, 2003 – statistically significant.   Regardless, under the second regression in Exhibit B of

the Hakala Report, Dr. Hakala still did not find two of his purported relevant dates – January 4,

2002, and June 18, 2002 – to be statically significant.[40]

Dr. Hakala excluded nearly one of every four days in his regression period using no

objective standards to select the days excluded.[41]   Dr. Hakala asserts that:

> the addition of more events (over-identification of events) will ensure a set
> of "clean" observations in the control sample of "non-event days" and
> avoid contaminating the market model estimates.   Thus, adding "too
> many" events ensures the relative absence of bias and ensures consistency
> of the estimates but at some slight loss of efficiency.[42]

However, Dr. Hakala's so-called "'blind' data selection process" is not reproducible by another

researcher and requires subjectivity to pick the days to omit.[43]   Because this selection process

cannot be replicated by another researcher – who might exclude entirely different days, if any at

all – it invalidates Dr. Hakala's conclusions in his event study results.[44]   Moreover, Dr. Hakala's

event study defies accepted notions of statistical significance and its methodology has **never**

been published in a peer-reviewed journal.[45]   Notably, in the *Xcelera* Order, the United States

District Court for the District of Massachusetts excluded the same type of analysis found in Dr.

---

[39] Dr. Hakala's analysis suggests that 10.68% of all days during the Class Period were statistically significant at the 5% level. *See* James Rebuttal at ¶ 31.
[40] Hakala Report at Exhibit B.
[41] *See* James Rebuttal at ¶ 30.
[42] Hakala Report, footnote 14.
[43] *See* James Rebuttal at ¶ 29.
[44] *See* Hakala Report at ¶ 31, indicating that Dr. Hakala offers no guidance as to how his selection process was derived or could be replicated.
[45] *See* James Rebuttal at ¶ 30; *Xcelera* Order at p. 1.

Hakala's event study because "no peer-reviewed journal supports the view that dummy variables may be used on all dates on which any company news appears."[46]

Indeed, even the event studies Dr. Hakala cites to bolster his event study regression "do not offer support for an approach that attempts to control for all firm-specific news that may affect a security price."[47]   According to the academic articles cited by Dr. Hakala, dummy variables are placed only on the events the studies seek to analyze.[48]  Accordingly, the only events for which Dr. Hakala's use of dummy variables are justified should be those days that actually address the Gentiva Health Services, Inc. ("Gentiva") Specialty Pharmaceutical Services ("SPS") Division allowance for doubtful accounts receivable ("A/R Reserve"), not every day having any type of firm-specific news.[49]  Moreover, the same articles cited by Dr. Hakala caution that overuse of dummy variables can result in an imprecise event-study regression and, therefore, dummy variables should be used prudently.[50]

Although Dr. Hakala states that, "I only included dummy variables in my event study for news events specifically related to Accredo (that were identified *a priori* without reference to the actual price movements of Accredo's shares) that were, in the context of this study, deemed important (material)," his determination of "important (material)" is not supported by the literature that he cites.[51]  The authorities cited by Dr. Hakala hold that events are those "well-defined, exogenous events or announcements whose impact is being tested."[52]  Further academic materials cited by Dr. Hakala state that, "the number of such dummies should be restricted to be relatively small[;] [a] liberal use of dummy variables can certainly achieve wonders in terms of

---

[46] *Xcelera* Order at p. 1 (Emphasis in original).
[47] James Rebuttal at ¶ 31.
[48] *See* James Rebuttal at ¶ 31.
[49] *See id.*
[50] *See id.*
[51] *Id.* at ¶ 32.
[52] *Id.*

goodness of fit, but very little else.  Indeed a dummy variable for each observation yields a perfect fit, but no 'explanation' of any kind. . . ."[53]  Although Dr. Hakala ignores this caution, it still identifies a serious problem with Dr. Hakala's event-study regression.[54]  Dr. Hakala achieved an artificial "goodness of fit," suggesting that non-material company news issued by Accredo would be considered material to the stock price.[55]  Because the excessive use of dummy variables actually increases the R-squared[56] – which indicates goodness of fit – in Dr. Hakala's event-study regression, he can falsely claim to explain more variability in the Accredo stock price.[57]  Accordingly, Dr. Hakala's non-standard approach is constructed in a manner that allows him to manufacture desired results.[58]

Dr. Hakala cites two additional academic articles that also fail to support his methodology.[59]  Although Dr. Hakala asserts that both papers advocate his methodology of including dummy variables for any day with company-specific news, neither paper supports his event study methodology.[60]  The first article advocates the use of dummy variables to represent the days conveying information actually under study.[61]  The relevant dummy variables in this matter should, therefore, represent only the days on which announcements related to information relevant to the A/R Reserve.  Moreover, the first article also states that the dummy variable approach is actually more convenient for assessing securities that are traded infrequently and non-synchronously, such as bonds and preferred stock, not highly traded securities like Accredo

---

[53] *Id.* at ¶ 33; Aris Spanos, *Statistical Foundations of Econometric Modeling* 539 (Cambridge University Press 1986), a copy of which is attached hereto as Exhibit "11."
[54] *See* James Rebuttal at ¶ 33.
[55] *See id.*
[56] In a regression, the R-squared is a measurement of how well the regression line approximates the real data points. *See* Kaye & Freedman, *supra* note 12, at 170.
[57] *See* James Rebuttal at ¶ 33.
[58] *See id.*
[59] *See id.* at ¶ 34.
[60] *See id.*
[61] *See id.*

stock.[62]  The second article compares different test statistics under the assumption that the control period used for estimating the market model has contaminating events, such as mergers and acquisitions, share buy-backs and earning announcements.[63]  Although Dr. Hakala claims that *any* news announcement constitutes a contaminating event, this is clearly not what the cited authors intended, as selecting events such as mergers and acquisitions, share buy-backs and earning announcements as material is far more specific than simply including all announcements. Dr. Hakala fails to offer legitimate academic support and the support he offers, in fact, contradicts his event study methodology, and the Court should, therefore, exclude all expert analysis, opinions, and testimony provided by Dr. Hakala in this matter.

   *b.*   *Selection of Relevant Event Days*

   Beyond Dr. Hakala's overuse of dummy variables and failure to use any identifiable standard to select event days, he also fails to employ a reliable methodology for selecting his eight (8) relevant event days actually resulting from his event study regression.  Dr. Hakala offers no analysis or reasoning to support the selection of certain event days as relevant, and his exclusion of others as irrelevant to his calculation of potential damages.[64]  Indeed, Dr. Hakala's event day selection cannot be replicated.  Moreover, Dr. Hakala's arbitrary relevant event day selection has not survived peer review or been generally accepted as a method of event day selection and is, therefore, completely unreliable.[65]

   As support for his per-share inflation of $8.48, Dr. Hakala claims that "the inflation in Accredo's share price builds up over time prior to the Class Period as the Defendants and analysts commenting on the statements of the Defendants led investors to believe that the

---

[62] *See id.* at ¶ 35.
[63] *See id.* at ¶ 36.
[64] *See* Hakala Report at ¶ 31.
[65] *Xcelera* Order at p. 1.

acquisition of SPS was extremely accretive in both accounting and valuation terms to Accredo."[66] Dr. Hakala's calculation of alleged inflation assumes that "the relevant events at the end of the Class Period and during the 90 day period after the Class Period should have occurred earlier in time and would have been reflected in the stock price of Accredo prior to and during the Class Period had the information as alleged by the Plaintiffs been disclosed."[67]   These statements make a fundamentally incorrect assumption that only the amount of the A/R Reserve was responsible for the movement in Accredo's stock price.[68]   This assumption is inconsistent based on a review of the public press, analyst reports, and the evidence in this matter.[69]

The first purported relevant event in Dr. Hakala's event study is January 3, 2002, the first trading day after Accredo's announcement of the acquisition of Gentiva's SPS Division.[70] Accredo's stock price increased by approximately 22% on that date;[71] however, this increase was not exclusively related to the expected collection of the SPS Division's outstanding accounts receivable.[72]   "Dr. Hakala completely ignores the commentary by analysts who discuss reasons for the SPS Division acquisition, which included expanding manufacturer relationships, economies of scale, and gaining access to payor contracts."[73]   Analysts clearly considered these reasons to be important.   In fact, analysts noted that "the acquisition reduces ACDO's manufacturer relationship concentration by increasing the number of companies with which it has relationships from six to 11."[74]   Moreover, analysts also thoroughly discussed the synergies

---

[66] Hakala Report at ¶ 67.
[67] *Id.* at ¶ 68.
[68] *See* James Rebuttal at ¶ 38.
[69] *See id.*; Defendants Statement of Undisputed Facts at ¶ 95.  The paragraph cited, and supporting evidence, is attached hereto as Exhibit "12."
[70] *See* Hakala Report at Exhibits B & C.
[71] *See id.* at Exhibits B & C.
[72] *See* James Rebuttal at ¶ 39.
[73] *Id.* at ¶ 39.
[74] Jan. 3, 2002 Raymond James Analyst Report at p.1, attached hereto as Exhibit "13."

and expanded product line-up created by Accredo's acquisition of the SPS Division.[75] Regardless, Dr. Hakala fails to parse out the non-fraud-related information in his selection of January 3, 2002, as a relevant event day making such a selection wholly unreliable.

Dr. Hakala then selects January 4, 2002, as a relevant event day.[76] Beyond the fact that Dr. Hakala's own event study regression shows that January 4, 2002 was not statistically significant,[77] the information he relies upon in arbitrarily selecting January 4, 2002 as relevant was already in the market. Exhibit B of the Hakala Report shows that the "events on January 4, 2002, consisted of changes in analyst estimates and price targets based on the information released on January 3, 2002."[78] Accredo announced its agreement with Gentiva to acquire the SPS Division after market hours on January 2, 2002.[79] Accordingly, the market reacted to that announcement on the subsequent trading day, January 3, 2002. Moreover, Dr. Hakala fails to recognize that other analysts had revised their expectations for Accredo on January 3, 2002.[80] Notably, Dr. Hakala contends that Accredo stock was traded in an efficient market. Because the same information Dr. Hakala contends is relevant on January 4, 2002, was already in the market on January 3, 2002,[81] Accredo stock was trading based on that information prior to January 4, 2002. Accordingly, January 4, 2002 was not a relevant event day and Dr. Hakala's selection of January 4, 2002 is purely arbitrary, unreliable, and contradictory to his own efficient-market theory.

---

[75] *See* James Rebuttal at ¶ 39; *see also* Jan. 3, 2002 A.G. Edwards Analyst Report at p.2 and Jan. 3, 2002 Thomas Wiesel Analyst Report at p. 1, attached collectively hereto as Exhibit "14."
[76] *See* Hakala Report at Exhibits B & C.
[77] *See id.* at Exhibit B.
[78] James Rebuttal at ¶ 40; *see* Hakala Report at Exhibit B.
[79] *See* Expert Report of Christopher M. James ("James Report") at ¶ 9. The James Report is attached hereto as Exhibit "15."
[80] *See* James Rebuttal at ¶ 40.
[81] *See* Hakala Report at ¶ 12.

Dr. Hakala also selects March 11, 2002, as a relevant event day.[82]  According to Exhibit B of the Hakala Report, on March 11, 2002, a Raymond James analyst raised Accredo's rating from "buy" to "strong buy" and raised Accredo's price target to $64 from $59.  The market, however, was already trading on the information that led to this change in rating.[83]  Dr. Hakala fails to recognize that several analysts had already raised Accredo's price target on March 8, 2002.[84]  Moreover, despite Dr. Hakala erroneous contentions, the change in rating was a response to Accredo's presentation at the Raymond James Institutional conference prior to March 11, 2002.[85]  These facts show that Dr. Halaka's selection of March 11, 2002, runs contrary to his own contention that Accredo stock traded in an efficient market.[86]  Because, in an efficient market, the information in this March 11, 2002 Raymond James analyst report would have previously been reflected in Accredo's stock price, Dr. Halaka's selection of March 11, 2002 is arbitrary and unreliable.

"After the market closed on June 16, 2002, Accredo updated its financial guidance for fiscal year 2003 to incorporate the SPS Division acquisition into its financial results."[87]  Dr. Hakala, therefore, decided that June 17, 2002 and June 18, 2002 were also relevant events based on analyst discussions of the completion of the SPS Division acquisition on June 16, 2002.[88]

---

[82] See id. at Exhibits B & C.
[83] See James Rebuttal at ¶ 40.  See also March 11, 2002 Raymond James Analyst Report at p.1, attached hereto as Exhibit "16."  "The change in rating was due to 1) the expansion and diversification of the company's revenue stream following the SPS acquisition, 2) improved valuation, as Accredo shares traded at a lower 2003 multiple than prior to the announcement of the SPS acquisition, 3) visible near-term catalysts, including the closing of the SPS acquisition in April, 3-4 product introductions expected in 2002, and new earnings guidance expected upon the release of 3Q-2 earnings at the end of April."  James Rebuttal at ¶ 40.
[84] See James Rebuttal at ¶ 40.  See also Leerink Swann & Company Raises Rating on Accredo Health, Inc. to Buy from Attractive, PR Newswire, March 8, 2002, 16:07 GMT; Accredo Health Reiterated 'Buy' at Thomas Weisel, Bloomberg News, March 8, 2002, 15:00 EST; Accredo Health Reiterated "Strong Buy" at SWS Securities, Bloomberg News, March 8, 2002, 15:33 EST.  The aforementioned wires are attached collectively hereto as Exhibit "17."
[85] See James Rebuttal at ¶ 41; Exhibit "16."
[86] See id. at ¶ 40.
[87] Id. at ¶ 42.
[88] See Hakala Report at Exhibit B.

The market, however, did not acquire any new information following the completion of the acquisition, as the information cited was actually disseminated prior to June 17 and 18, 2002.[89] Moreover, although Dr. Hakala was able to find June 17, 2002 statistically significant under his event study,[90] June 18, 2002 is not statistically significant under his flawed analysis.[91] Accordingly, because Dr. Hakala should not have selected June 17 and 18, 2002 as relevant event days, his selection of those days is unreliable.

Dr. Hakala opines that "the relative stock price increases on January 3 and 4, March 11 and June 17 and 18, 2002, combined, led to approximately a 35.6% relative increase in Accredo's share price (cumulative dollar increases of $9.16 per share based on the five event dates, or increase of $9.40 per share if considered based Accredo's share price on June 18, 2002)."[92] As discussed above, Dr. Hakala's selection of these dates as relevant event days is inconsistent with his opinion of market efficiency and, therefore, fails to support his per-share inflation calculation.   Accordingly, Dr. Hakala's event study is arbitrary, unreliable, and

---

[89] *See* James Rebuttal at ¶ 42.  According to footnotes 82 and 83 of the James Rebuttal:

> "On June 17, 2002, Dr. Hakala's relevant events include a cite from June 16, 2002: 'With inclusion of estimated results from operations of the newly acquired SPS division, Accredo revenues for FY03 are projected to be in the range of $1.45B to $1.5B, up sharply from the previous estimates of $760M to $780M, Accredo said. EPS estimates are being increased to a range of $1.87 to $1.97 from the previous estimated range of $1.40 to $1.50 (Reuters News 06.16.2002)...Credit Suisse First Boston increase FY03 EPS to $1.95 to bring it in line with company guidance (Analyst Report).' See Exhibit B of the Hakala Report." James Rebuttal at ¶ 42 n.82.

> "On June 18, 2002, Dr. Hakala's relevant events include: 'UBS Warburg increased FY03 EPS estimate to $1.91 from $1.47...by virtue of the recent acquisition (Analyst Report); Raymond James raised FY03 estimate to $1.97 from $1.47 and raised FY03 EPS estimate to $2.15 from $1.62. Price target was increased back to $70. Revisions were based on company guidance that outlined stronger Avonex sales, smaller negative impact from sale of home infusion business, and less leakage from managed care customers after the merger (Analyst Report); Banc of America Securities announced that it has completed a successful syndication of a new $325M senior credit facility for Accredo Health. The transaction was completed on June 13, 2002.' See Exhibit B of the Hakala Report." James Rebuttal at ¶ 42 n.83.

[90] As stated previously, by including 108 dummy variables in his second regression, Dr. Halaka reduces the estimated volatility in Accredo's stock price from 3.80% in his first regression to 1.78% in his second regression. Had Dr. Hakala used his first regression, which did not include the 108 dummy variables, he would *not* have found June 17, 2002, statistically significant.

[91] *See* Hakala Report at Exhibit B.

[92] *Id.* at ¶ 45 & Exhibit C.

- 17 -

seriously flawed, and the Court should exclude all expert analysis, opinions, and testimony provided by Dr. Hakala in this matter.

c.   *Failure to Parse Out the Separate Effects of the Fraud-Related and Non-Fraud-Related Information*

Once announcements of company-specific information are identified through an event study, the analysis must then distinguish between those that are fraud-related and those that are non-fraud-related. [93]   Such a distinguishing analysis is critical in this matter because the alleged curative disclosure on April 8, 2003 contained contemporaneous announcements.   On April 8, 2003, Accredo made two distinct announcements:   (1) it lowered fiscal year 2003 revenue and earnings per share guidance based on preliminary third quarter results; and (2) it was examining the adequacy of the A/R Reserve.

Dr. Hakala assumes that nearly all information on the relevant days he selected was fraud-related, and, therefore, quickly discounts the other factors that affected Accredo's stock price on April 8, 2003, and ignores any such factors from any other purported relevant events days. [94]   Instead of analyzing the contemporaneous announcements of the non-fraud-related negative news, Dr. Hakala merely states that his "event study found that . . . the corrective information that was disclosed could not have been discerned by investors or analysts prior to April 8, 2003 and represents a full materialization of the undisclosed issues with the SPS transaction."[95]   Dr. Hakala does not reliably separate the non-fraud-related effects from the fraud-related effects of the April 8, 2003 announcement, and the Court should exclude all expert analysis, opinions, and testimony provided by Dr. Hakala in this matter.

---

[93] *See* Hakala Report at ¶¶ 38-59.
[94] *See id.* at ¶ 11.  To correct for the non-fraud-related facts on April 8, 2003, Dr. Hakala merely calculates the net stock price effect resulting from the disclosures on April 8 and 9 and May 5, 2003, by subtracting the positive impact of the information released on May 5th from the negative cumulative impact of the information released on April 8th and 9th. *See id.*
[95] *Id.* at ¶ 59.

Although Dr. Hakala's failure to correctly recognize the disparate impacts resulting from the April 8, 2003 announcement, research analysts clearly distinguished the portion of the announcement that was related to the alleged fraud.  Analysts following Accredo found revenue pressures going forward to be of more concern than any price impact resulting from the portion of the announcement related to the A/R Reserve, clearly diminishing Dr. Hakala's flawed $8.48 per-share inflation conclusion.  Analysts specifically discussed the potential impact of the news announced on April 8, 2003.  According to an A.G. Edwards analyst:

> [g]iven the amount of attention (i.e., predominant line of questioning on the call), the accounting issue with regard to A/R reserves is the most troublesome issue for investors, but we feel the most benign from a forward looking fundamental standpoint. . . .  ACDO will either adjust the purchase price paid for SPS or take a charge against fiscal 2003 earnings (most likely in the $30-$40 million range).[96]

Moreover, according to a Raymond James analyst:

> [t]he unexpected sales slowdown is clearly the more important issue of the two- the balance sheet adjustment should be treated as a one-time event with a less than $1.00 per share impact . . . .  We do not envision that charge exceeding $60 million (or the amount of unreserved SPS receivables still outstanding) and suspect that the figure will be lower than that (maybe in the $35 to $50 million range as some of those receivables must still be collectable? [sic]).[97]

Despite Dr. Hakala's failure to address such announcements, he acknowledges the existence of additional factors affecting the stock price reaction on April 8, 2003, other than the A/R Reserve.[98]  Dr. Hakala states that, "a portion of the stock price decline was attributable to the reduction in revenues and earnings per share forecast by Accredo for fiscal 2003 and fiscal

---

[96] Apr. 8, 2003 A.G. Edwards Analyst Report, attached hereto as Exhibit "18."
[97] Apr. 9, 2003 Raymond James Analyst Report, attached hereto as Exhibit "19."
[98] Dr. Hakala initially contended that the alleged problems with Accredo's collectability of accounts receivable related to its SPS Division acquisition as the only reason for the stock price decline; however, he later conceded to additional contributing factors.  *See* Hakala Report at ¶ 25; *supra* note 94.

2004;"[99] however, he goes on to state that, "a **substantial portion** of those reduced forecasts were the foreseeable consequence of the bad debt reserve issues and lower revenue and earnings potential and greater risks of SPS relative to expectations."[100]   Although Dr. Hakala clearly notes that the stock price decline was due to a set of confounding effects,[101] he offers no suggestion as to how to either separate or link the stock price reaction to each effect.[102]   Moreover, using the phrase "a substantial portion" implies that Dr. Hakala cannot say with any certainty that all or even what portion – if any – of the forecast revisions were actually tied to the increase in A/R Reserve as opposed to other factors.[103]   Indeed, Dr. Hakala glosses over the presence of confounding factors, without any significant analytical support.[104]

In *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 270 (5th Cir. 2007), where Dr. Hakala was yet again the plaintiffs' economic expert, the Fifth Circuit held that "[w]hen unrelated negative statements are announced contemporaneous of a corrective disclosure, the plaintiff must prove 'that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline.'"   Dr. Hakala did not undertake a study of the impact of the negative revenue and earnings guidance statement that was announced concurrently with the investigation of the A/R Reserve on April 8, 2003.[105]   Dr. Hakala did not attempt to parse out the portion of the April 8, 2003 stock price movement related to the announcement for the adequacy of the A/R Reserve and the portion related to the lowered revenue and earnings guidance to determine the true cause of the price decline, as required under *Oscar*.   Accordingly, Dr. Hakala's event study is

---

[99] Hakala Report at ¶ 25.
[100] *Id.* (emphasis added).
[101] *See id.*
[102] *See* James Rebuttal at ¶ 18.
[103] *See id.*  In fact, the impact could be zero.  *See* James Report at ¶¶ 6, 30.
[104] *See supra* note 94.
[105] *See id.*

unreliable and the Court should exclude all expert analysis, opinions, and testimony provided by Dr. Hakala in this matter.

        *d.*     *Failure to Reliably Establish Loss Causation*

    *Dura Pharmaceuticals, Inc. v. Braudo*, 544 U.S. 336, 345-46 (2005), sets forth the controlling standard for proving loss causation under Section 10(b). 544 U.S. at 345-46; *see also D.E. & J. Ltd. P'ship v. Conaway*, 133 F. App'x 994 (6th Cir. 2005). Under *Dura*, to establish loss causation, Plaintiffs must prove that there was a causal connection between each of the alleged misrepresentations and the subsequent decline in Accredo's stock price. *Dura*, 544 U.S. at 345-46. When a plaintiff ultimately sells shares at a lower price, "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id.* at 343. Accordingly, *Dura* mandates that a plaintiff prove that the alleged fraud actually caused, and is directly linked to, the plaintiff's alleged damages. Dr. Hakala fails to establish that causal link and the Court should exclude all expert analysis, opinions, and testimony provided by Dr. Hakala in this matter.

    Dr. Hakala fails to establish causation regarding Plaintiffs' alleged losses. Instead of providing the careful, detailed analysis required under the law, Dr. Hakala offers mere contentions and juxtapositions of news excerpts with repeated references to Accredo's eventual stock price decline.[106] Dr. Hakala has failed to adequately demonstrate that Accredo's stock price was artificially inflated by any statement that Defendants made.[107] Moreover, Dr. Hakala has not even attempted to link the purported curative disclosure on April 8, 2003, to any of the

---

[106] James Rebuttal at ¶38.
[107] *Id.*

alleged misstatements set forth in Plaintiffs' Complaint. In fact, Dr. Hakala deems relevant only

one of the approximately eleven days on which Plaintiffs allege Defendants disseminated false

and misleading information.[108] Accordingly, Dr. Hakala's event study fails to link the erroneous

per-share inflation to the allegations in Plaintiffs' Complaint, and any decline in stock price that

cannot be causally linked to the alleged fraud should not be included in the damages estimate.[109]

Dr. Hakala's testimony, therefore, cannot support a finding of loss causation and should be

excluded.

On April 8, 2003, Accredo made two distinct announcements: (1) it lowered fiscal year

2003 revenue and earnings per share guidance based on preliminary third quarter results and

second; and (2) it was examining the adequacy of the A/R Reserve. Instead of analyzing the

contemporaneous announcements to determine their disparate impact on Accredo's stock price,

Dr. Hakala simply states that his "event study found that . . . the corrective information that was

disclosed could not have been discerned by investors or analysts prior to April 8, 2003 and

represents a full materialization of the undisclosed issues with the SPS transaction."[110] An event

study, however, is not a substitute for undertaking rigorous economic analysis in order to

properly establish loss causation. *See In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d

546, 554 (S.D.N.Y. 2008).

Dr. Hakala fails to properly analyze the "curative disclosure" on April 8, 2003, and parse

out the non-fraud and fraud-related announcements in order to determine their individual effect

on Accredo's stock price.[111] "When multiple negative items are announced contemporaneously,

mere proximity between the announcement and the stock loss is insufficient to establish loss

---

[108] *See* Compl. at ¶¶ 35-59 and Hakala Report at Exhibits B & C.
[109] *See* James Rebuttal at ¶ 28.
[110] Hakala Report at ¶59.
[111] *Id.* at ¶11.

causation." *See Oscar*, 487 F.3d at 271.  In *In re Williams Securities Litigation*, 496 F. Supp. 2d 1195, 1266 (N. D. Okla. 2007), the court excluded a loss causation expert for the same type of "analysis" provided by Dr. Hakala.  According to the *Williams* court, "Dr. Nye's proposed opinion testimony does not square with the law of loss causation, principally because his approaches to causation fail to differentiate, by means sufficient to pass muster under *Daubert*, between losses attributable to fraud and losses attributable to other forces."  496 F. Supp. 2d at 1275.  Dr. Hakala's methods and opinions suffer from the same deficiencies and should be excluded.

In *Omnicom*, 541 F. Supp. 2d at 554, the court stated that, although Dr. Hakala "undertook an event study to isolate the effect of Plaintiffs' identified disclosures on Omnicom's stock price from that of other market forces[,]" he "nevertheless fail[ed] to demonstrate loss causation."  Just as in *Omnicom*, here Dr. Hakala conducted an event study regarding Accredo's stock price that isolates the impact of certain market and industry forces, but which fails to demonstrate loss causation because it does not isolate other confounding negative factors.  As discussed above, Dr. Hakala did not attempt to parse out the portion of the April 8, 2003 stock price movement related to the announcement for the adequacy of the A/R Reserve and the portion related to the lowered revenue and earnings per share guidance.  "Because the law requires the disaggregation of confounding factors, disaggregating only some of them cannot suffice to establish that the alleged misrepresentations actually caused Plaintiffs' loss."  *Omnicom*, 541 F. Supp. 2d at 554.  Dr. Hakala's determinations regarding loss causation are, therefore, unreliable and the Court should exclude all expert analysis, opinions, and testimony provided by him, in this matter.

2.   **Dr. Hakala's Use of a Trading Model to Estimate Aggregate Damages is Unreliable.**

As part of his damages analysis, Dr. Hakala presents an aggregate damage calculation for the entire class.[112] To obtain an estimate of the number of allegedly damaged shares of Accredo stock, Dr. Hakala employs the use of a trading model to estimate the timing and quantity of purchases and sales of Accredo stock during the Class Period.[113] Dr. Hakala then applies his per-share inflation calculation – which is itself seriously flawed and unreliable – to the results of his trading model to produce his aggregate damages figure, purportedly representing the damages suffered by the class as a whole.[114]

Trading models attempt to simulate trading activity of individual and institutional shareholders over time. Trading models inherently rely on untestable assumptions regarding when particular shares might be sold and are by nature purely speculative because stock trading activity fluctuates from company to company and from time period to time period. Rarely do trading models accurately estimate the actual trading activity of a particular stock during a particular period of time.[115] An aggregate damages estimate should essentially be an estimate of the results of the claims process that would ensue if Plaintiffs were to prevail in this matter; when compared to proof-of-claim filings, however, trading models have been shown to grossly overstate damages.[116] In fact, Dr. Hakala's trading model is not calibrated to account for actual observed Accredo stock trading behavior.[117] To properly calibrate Dr. Hakala's trading model, he would need detailed Accredo stock trading records; this information, however, would make

---

[112] *See id.* at ¶¶ 71-76.
[113] *See id.* at ¶ 75.
[114] *See id.* at ¶¶ 71-76.
[115] *See* Cone & Laurence, *supra* note 17, at 507.
[116] *See, e.g., id.* at 508; James Rebuttal at ¶ 46.
[117] *See* James Rebuttal at ¶ 47.

the trading model obsolete.[118]   Moreover, simple reliance on the proof-of-claims method – if

Plaintiffs were to prevail – would make any speculative aggregate damage estimate completely

unnecessary.[119]

Courts have also scrutinized trading models under *Daubert*.  In *Kaufman v. Motorola,
Inc.*, No. 95 C 1069, 2000 WL 1506892, at *2 (N.D. Ill. Sept. 21, 2000), because the trading

model at issue had not been tested against reality or accepted by professional economists, the

court determined that "in absence of such testing and in absence of any acceptance by the

professional economists of the theory, it simply does not pass *Daubert* muster."  In excluding Dr.

Hakala's testimony regarding aggregate damages, the *Broadcom* Court held the following

regarding Dr. Hakala's trading model:

> The technique has not been tested against "real world" conditions, and
> probably cannot be so tested unless a different set of test protocols is
> established. It has not been subjected to the sort of critical peer review and
> publication that one would expect as a prerequisite for jury acceptance.
> The potential error rate is highly questionable, and is based on a set of
> criteria that undermines the claimed error rate as being truly representative
> of the facts sought to be proved. Although held out by litigation
> professionals as useful in securities litigation, most notably as a settlement
> aid, the technique is not generally accepted in what is the relevant
> scientific community-professional economists. The *Daubert* criteria are
> not exclusive, and the Court has considered others suggested by Plaintiffs,
> but the Court is unable to find other indicators of reliability or
> acceptability that would satisfy *Daubert's* requirement.[120]

2005 WL 1403756, at *2.  Moreover, during an evidentiary hearing in *Meisel v. Raytheon Co.*,

No. 99-12142-PBS (D. Mass. May 3, 2004), the court determined that Dr. Hakala's Wiebull

Curve aggregate damage methodology – the same accelerated trading model employed by Dr.

Hakala in this matter – was a methodology no one had accepted and would only serve to confuse

---

[118] *See id.*
[119] *See id.*
[120] Although the *Broadcom* Court did not make a final determination as to whether *Daubert* was satisfied, the cited
*Daubert* shortcomings of Dr. Hakala's trading model were enough to convince the court that defendants' damage
calculation was proper. *Id.* at *3.

the jury.[121]   Accordingly, Judge Saris refused to risk the case on the unreliable theory and

declined to adopt it for the first time in this country.  Instead, the court suggested that Dr. Hakala

publish his methodology in a peer reviewed journal first.[122]

Dr. Hakala proffers no empirical support for the accuracy of his trading model and there

exists no peer-reviewed "published paper that relies on this type of approach for estimating

trading patterns."[123]   Moreover, there is no "empirical evidence published in a peer-reviewed

journal or anywhere else that analyzes the accuracy of a trading model against a complete set of

actual trading data."[124]   In fact, damages studies have shown that trading models that are not

based on individual investors' trading records and proofs of claim cannot accurately predict

aggregate damages in a securities class action.[125]   Because the methodology employed in Dr.

Hakala's trading model has a high rate of error, has not been sufficiently tested, and is not

generally accepted in the economic community, the Court should exclude all expert analysis,

opinions, and testimony provided by Dr. Hakala in this matter.

## C.      Dr. Hakala's Purported Expert Opinions and Testimony Are Not Relevant.

Pursuant to Rule 702, to be relevant, expert testimony must assist the trier of fact to

understand the evidence or to determine a fact in issue.  Dr. Hakala's testimony will offer no

such assistance to the jury.  As discussed above, Dr. Hakala fails to establish loss causation, as

required under *Dura*.  Dr. Hakala's event study does not even consider the allegedly fraudulent

---

[121] *Raytheon* Hearing Transcript at p. 10.  The relevant excerpts from the hearing transcript are attached hereto as Exhibit "20."
[122] *Raytheon* Hearing Transcript at pp. 12-13.
[123] James Rebuttal at ¶ 45.
[124] *Id.*
[125] *See, e.g.,* Janet Cooper Alexander, *The Value of Bad News in Securities Class Actions,* 41 UCLA L. Rev. 1421 (1994); Michael Barclay & Frank C. Torchio, *A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation,* 64 Law & Comtemp. Probs. 105 (2001); Cone & Laurence, *supra,* note 17; Daniel R. Fischel et al., *The Use of Trading Models to Estimate Aggregate Damages in Securities Fraud Litigation: An Update, in* 10 Briefly . . . Perspectives on Legislation, Regulation, and Litigation (National Legal Center for the Public Interest Mar. 2006); Jon Koslow, *Estimating Aggregate Damages in Class-Action Litigation Under Rule 10b-5 for Purposes for Settlement,* 59 Fordham L. Rev. 811 (1991).  The aforementioned academic literature, except Cone & Laurence, which is attached as Exhibit "7," is attached collectively hereto as Exhibit "21."

and misleading statements contained in Plaintiffs' Complaint when manufacturing his per-share inflation estimate.   Accordingly, Dr. Hakala's purported expert opinion does not establish a causal link between Plaintiffs' alleged misrepresentations and the damages claimed by the class. The Court should, therefore, exclude all expert analysis, opinions, and testimony provided by Dr. Hakala as irrelevant to this matter because it offers no assistance to the jury in determining whether the statements attributed to Defendants were actually the cause of Plaintiffs' alleged damages.

Dr. Hakala not only ignores the alleged misrepresentations contained in Plaintiffs' Complaint, but also fails to recognize Plaintiffs' allegations that the purportedly known uncollectible A/R were solely attributable to the acute portion of the SPS Division.[126]   Dr. Hakala actually analyzes a contrived allegation that the uncollectible receivables came from both acute and chronic segments.   Dr. Hakala's calculation of potential damages does not, however, differentiate between acute and chronic A/R.   Moreover, his estimate of potential damages is further flawed because the ultimate one-time charge was largely related to the SPS Division chronic A/R, not the acute portion as alleged by Plaintiffs.[127]   Indeed, Dr. Hakala stated that, "[t]here is no dispute that the acute care receivables accounted for only a fraction of the total charges first disclosed by Accredo on April 8, 2003 and then further addressed on May 5, 2003."[128]   Again, because Dr. Hakala's analysis does not line up with Plaintiffs' own allegations, the Court should exclude all expert analysis, opinions, and testimony provided by him as irrelevant to this matter.

---

[126] Based on the allegations in Plaintiffs' Complaint, it is clear that this case has always centered on the alleged uncollectibility of the SPS Division's acute A/R.   *See* Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment, Docket No. 410, at sect. II.A., pp. 4-8, attached hereto as Exhibit "22."

[127] *See* James Report at ¶

[128] Hakala Rebuttal at ¶ 2.

Moreover, Plaintiffs' counsel has represented that it will not introduce evidence or testimony regarding aggregate damages and that the jury should be instructed to determine damages on a per-share basis, rather than to decide aggregate damages. Based on this alone, Dr. Hakala should not be permitted to provide evidence or testimony regarding his trading model methodology, which was employed for the purpose of estimating the number of damaged shares and calculating aggregate damages. Plaintiffs clearly do not expect the jury to make any determinations regarding aggregate damages. Because the jury will not be asked to make a determination as to aggregate damages, any evidence or testimony provided by Dr. Hakala regarding the use of – or purported $196 million aggregate damages calculation obtained from – his trading model methodology is not relevant. Accordingly, the Court should exclude any evidence or testimony provided by Dr. Hakala regarding his trading model methodology and its results as irrelevant to this matter.

**D.**   **Dr. Hakala's Purported Expert Opinions and Testimony are Substantially More Prejudicial than Probative.**

Even if the Court finds Dr. Hakala's analysis reliable and relevant under *Daubert*, the Court should still exclude his purported expert opinion and testimony pursuant to Federal Rule of Evidence 403, because it will only serve to confuse the issues and mislead the jury, thereby unfairly prejudicing Defendants. As discussed above, Dr. Hakala's estimates allow for potential damages that are not attributable to the misrepresentations and fraud actually alleged by Plaintiffs. Because Dr. Hakala does not adequately parse out fraud-related and non-fraud-related losses and does not link his estimated damages to Plaintiffs' Complaint allegations, admission of his opinions and testimony will confuse and mislead the jury. Moreover, because Dr. Hakala's estimates are based on pure speculation, they are not likely to match any actual damages – if Plaintiffs were to prevail – that would result from a proof-of-claim procedure. In fact, his

estimates are likely to grossly over-estimate damages, unduly and unfairly prejudicing Defendants. As discussed above, because the jury will not be asked to make a determination as to aggregate damages, any evidence or testimony provided by Dr. Hakala regarding the use of – or purported $196 million aggregate damages calculation obtained from – his trading model methodology will also unduly and unfairly prejudicing Defendants. Accordingly, the Court should exclude all expert analysis, opinions, and testimony provided by Dr. Hakala as unduly prejudicial in this matter pursuant to Rule 403.

## III.    CONCLUSION

For the reasons stated above, the Court should grant Defendants Motion to Exclude the Expert Opinions and Testimony of Dr. Scott D. Hakala.

Respectfully submitted this 8th day of September, 2008.

s/ Douglas F. Halijan
Jef Feibelman   (BPR # 7677)
Douglas F. Halijan (BPR 16718)
BURCH, PORTER & JOHNSON, PLLC
130 North Court Avenue
Memphis, TN  38103
(901) 524-5000

Peter Q. Bassett
Kelly C. Wilcove
Scott N. Sherman
Mark D. Trainer
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA  30309-3424
(404) 881-7000

Attorneys for Defendants Accredo Health, Inc.,
David D. Stevens, and Joel R. Kimbrough

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was forwarded *via* the Court's electronic filing system, this 8th day of September, 2008 to:

Tor Gronborg
Mark Solomon
Trig R. Smith
COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
401 B Street, Suite 1700
San Diego, CA  92101

Timothy A. DeLange
Blair A. Nicholas
BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP
12544 High Bluff Drive, Suite 150
San Diego, CA  92130

B.J. Wade
GLASSMAN EDWARDS WADE & WYATT, P.C.
26 N. Second Street Building
Memphis, TN  38103

s/ Douglas F. Halijan